Stuart A. Shanus (SBN 188046)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: +1 213 457 8000
Facsimile: +1 213 457 8080

Attorneys for Defendants Kyphon Sàrl
and Medtronic, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PABBAN DEVELOPMENT, INC., | No.: SACV 10-533 CJC (RNBx) |
| Plaintiff, | [Removal from Superior Court of California, County of Orange, Case No. 00352665] |
| vs. | |
| KYPHON SÀRL, MEDTRONIC, INC., AND DOES 1-100, | **DEFENDANTS MEDTRONIC, INC. AND KYPHON SARL'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1332(A) AND § 1441(B)** |
| Defendants. | |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COPY

FILED
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
2010 MAY -4 PM 4: 25

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

2   CENTRAL DISTRICT OF CALIFORNIA:

3

4       PLEASE TAKE NOTICE that Defendants Medtronic Inc. and Kyphon Sàrl hereby

5   remove this action from the Superior Court of California, County of Orange, to the

6   United States District Court for the Central District of California, pursuant to 28

7   U.S.C. § 1332(a) and § 1441(b). The removal of this action is based on the following:

8

9       1.     On March 11, 2010 Plaintiff Pabban Development, Inc. filed a complaint

10  against Medtronic, Inc., Kyphon Sàrl, and Does 1 through 100 in the Orange County

11  Superior Court, which was docketed at Civil Action No. 00352665.   A copy of the

12  Complaint is attached hereto as Exhibit "A."

13      2.     On April 20, 2010 Medtronic, Inc. was served with a copy of the

14  Summons and Complaint.  Plaintiff has not effectuated service of process on Kyphon

15  Sàrl.

16      3.     As set out more fully below, this action is a civil action of which this

17  Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be

18  removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. § 1441

19  in that it is a civil action in which the amount in controversy exceeds the sum of

20  $75,000, exclusive of costs and interest, and is between citizens of different states.

21

22  I.   REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT

23       MATTER JURISDICTION PURSUANT TO 28 U.S.C. § 1332 AND § 1441

24       A.   Diversity of Citizenship

25      4.     There is complete diversity between Plaintiff and Defendants Medtronic

26  Inc. and Kyphon Sàrl.

27      5.     Plaintiff Pabban Development, Inc.: At the time of the commencement of

28  this action, Plaintiff is a California corporation with its principal place of business in

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  California, and is therefore a citizen of the State of California for diversity purposes.

2  Plaintiff's Complaint was filed in the County of Orange, Superior Court of California,

3  and it alleges that Plaintiff's alleged damages occurred in the County of Orange,

4  California.

5       6.   <u>Defendant Medtronic, Inc.</u>: At the time of the commencement of this

6  action, Medtronic Inc. was, and still is, a Minnesota corporation, with its principal

7  place of business in Minnesota.  Medtronic, Inc. is not now, and was not at the time of

8  the filing of the Complaint, either incorporated in the State of California or had its

9  principal place of business in the State of California. Hence, Medtronic, Inc. is not

10  now, and was not at the time of the filing of the Complaint, a citizen of the State of

11  California.

12       7.   <u>Defendant Kyphon Sàrl</u>: At the time of the commencement of this action,

13  Kyphon Sàrl was, and still is, a corporation organized under the laws of Switzerland

14  with its principal place of business in Switzerland.  Kyphon Sàrl is not now, and was

15  not at the time of the filing of the Complaint, a citizen of the State of California.

16       8.   For diversity purposes, a corporation created under the laws of a foreign

17  state is deemed a citizen or subject of the foreign state. *JPMorgan Chase Bank v.*

18  *Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 92 (2002).  Federal district

19  courts have jurisdiction, under 28 U.S.C. § 1332 (a)(2)-(3) between citizens of one

20  state and citizens of a foreign state, and between citizens of different States in which

21  citizens or subjects of a foreign state are additional parties.

22       9.   <u>Does 1-100</u>: Upon information and belief, none of the Doe defendants

23  have been substituted with any named defendants or been served with process in the

24  state court action.  For purposes of removal, "the citizenship of defendants sued under

25  fictitious names shall be disregarded." 28 U.S.C. § 1441; accord *Soliman v. Phillip*

26  *Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002); *McCabe v. General Foods Corp.*, 811

27  F.2d 1336, 1339 (9th Cir. 1987). Therefore, the citizenship of Does 1 to 100 should be

28  disregarded for purposes of diversity.

**B.     Amount in Controversy**

10.     It is apparent from the face of the Complaint that Plaintiff seeks recovery of an amount in excess of $75,000, exclusive of costs and interests.   *See, e.g.,* Complaint at ¶ 11:27-28 (alleging that more than $31 million are owed and have not been paid under the Asset Purchase Agreement).

## II.     THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

11.     The filing of this Notice of Removal is timely under 28 U.S.C. § 1446 because it was filed less than one year from commencement of this action, and within thirty days after Medtronic, Inc. was served with a copy of the Complaint and corresponding summons.

12.     The Superior Court of California for the County of Orange is located within the Central District of California, Southern Division. *See* 28 U.S.C. § 84(c)(3). Thus, venue is proper in this Court because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

13.     No previous application has been made for the relief requested herein.

14.     In accordance with 28 U.S.C. § 1446(d), Medtronic, Inc. is filing a copy of this Notice of Removal with the Superior Court of California, Orange County, and is serving a copy upon Plaintiff's counsel.

///
///
///
///

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

— 3 —

1    15.    WHEREFORE, Medtronic Inc. and Kyphon Sàrl respectfully remove this

2  action from the Superior Court of California for the County of Orange.

3          DATED: May 4, 2010

4

5                                    Reed Smith LLP

6

7                                    By

8                                         Stuart A. Shanus
                                          Attorneys for Defendants Medtronic, Inc.
9                                         and Kyphon Sàrl

10

11  US_ACTIVE-103462570.1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Defendants Medtronic, Inc. and Kyphon Sàrl's Notice of Removal of Action
Under 28 U.S.C. § 1332(a) and § 1441(b)

EXHIBIT A

**EXHIBIT A**
**PAGE 5**

4/20/10 @ 2:55

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

KYPHON SARL; MEDTRONIC, INC.; and DOES 1-100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

PABBAN DEVELOPMENT, INC.

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 11 2010

ALAN CARLSON, Clerk of the Court

BY   N. LAU   DEPUTY

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Orange County Superior Court<br><br>700 Civic Center Drive West<br>Santa Ana, CA 92701 | CASE NUMBER:<br>*(Número del Caso):*<br>**30-2010<br>00352665** |

JUDGE SHEILA FELL
DEPT C22

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James M. Whitelaw, Thomas Whitelaw & Tyler, 18101 Von Karman Ave., Suite 230, Irvine, CA 92612

(949) 679-6400

| | | | |
|---|---|---|---|
| DATE: March   , 2010<br>*(Fecha)* MAR 11 2010 | ALAN CARLSON Clerk, by<br>*(Secretario)* NORRI M. LR | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Medtronic, Inc.

   under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*

4. ☒ by personal delivery on *(date):* 3/20/10

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Page 1 of 1

American LegalNet, Inc.
www.FormsWorkflow.com



COPY

1  C. TUCKER CHEADLE (State Bar No. 81669)
   *tcheadle@cheadlelaw.net*
2  1000 Quail Street, Suite 100
   Newport Beach, California 92660
3  Telephone:  (949) 553-1066
   Facsimile:  (949) 553-2477
4
5  JAMES M. WHITELAW (State Bar No. 171974)
   *jwhitelaw@twtlaw.com*
   THOMAS WHITELAW & TYLER LLP
6  18101 Von Karman Avenue, Suite 230
   Irvine, California 92612-7132
7  Telephone:  (949) 679-6400
   Facsimile:  (949) 679-6405
8
   Attorneys for PLAINTIFF PABBAN
9  DEVELOPMENT, INC

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 11 2010

ALAN CARLSON, Clerk of the Court

BY _____ N. LAU _____ DEPUTY

10       SUPERIOR COURT OF THE STATE OF CALIFORNIA

11       COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

12                                                    30-2010

13  PABBAN DEVELOPMENT, INC.          CASE NO.

14                                      0 0 3 5 2 6 6 5
                                      **COMPLAINT FOR DAMAGES:**
15       Plaintiffs,                  1.   **BREACH OF WRITTEN**
                                            **CONTRACT;**
16       vs.                          2.   **BREACH OF EXPRESS**
                                            **GUARANTY;**
17  KYPHON SARL; MEDTRONIC, INC.; and  3.   **BREACH OF IMPLIED**
    DOES 1-100, inclusive,                  **COVENANT OF GOOD FAITH**
18                                          **AND FAIR DEALING;**
         Defendants.                  4.   **COMMON COUNT FOR GOODS**
19                                          **SOLD AND DELIVERED;**
                                      5.   **COMMON COUNT FOR**
20                                          **ACCOUNT STATED**

21                                    Trial Date:        None Set

22                                       JUDGE SHEILA FELL
                                          DEPT. C22
23

24

25

26

27

28

81434

COMPLAINT FOR DAMAGES

**EXHIBIT A**
**PAGE 7**

## PARTIES

1.     At all times mentioned herein, plaintiff Pabban Development, Inc. ("PDI") was and is a California corporation doing business in Orange County, California.

2.     PDI is informed and believes and thereon alleges that at all times mentioned in this Complaint, defendant Kyphon Sarl ("Kyphon") was and is a Swiss limited liability company doing business in Orange County, California.

3.     PDI is informed and believes and thereon alleges that at all times mentioned in this Complaint, defendant Medtronic, Inc. ("Medtronic, Inc.") was and is a Minnesota corporation doing business in Orange County, California.

4.     PDI is ignorant of the true names and capacities of defendants sued as DOES 1-100, inclusive, and therefore sues these defendants by such fictitious names. PDI will amend this Complaint to allege their true names and capacities when ascertained.

## FACTUAL BACKGROUND

5.     On or about August 7, 2008, PDI, as seller, and Kyphon, as buyer, executed a written Asset Purchase Agreement for the purchase of certain intellectual property. Medtronic, Inc. executed the Asset Purchase Agreement as a guarantor of Kyphon's obligations under the Asset Purchase Agreement. A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit A** and is incorporated by reference.

6.     An integral part of the negotiations that led to the execution of the Asset Purchase Agreement were certain agreed upon income tax benefits and allocations for the payments made by Kyphon to PDI.

7.     The Closing Date of the Asset Purchase Agreement was on or about August 7, 2008.

8.     PDI has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Asset Purchase Agreement, including

9.     PDI transferred and delivered to Kyphon the Purchased Assets as identified in the Asset Purchase Agreement. Kyphon accepted and received the Purchased Assets.

81434

1

COMPLAINT FOR DAMAGES

**EXHIBIT A**
**PAGE 8**

10.   Paragraph 2.4 of the Asset Purchase Agreement provides that Kyphon will pay PDI an aggregate of $50 million dollars, as follows:

    (a)    At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars ($18,750,000);

    (b)    Eighteen months after the Closing Date, One Million Two Hundred and Fifty Thousand Dollars ($1,250,000);

    (c)    Eight months after the Closing Date, Four Million Dollars ($4,000,000);

    (d)    Upon the earlier to occur of (1) within ten Business Days after the Commercial Launch of a Kyphopak Natrix Kit, and (2) twelve months after the Closing Date, Four Million Dollars ($4,000,000);

    (e)    Within the prescribed number of days in section 2.5 of the Asset Purchase Agreement after the date of the $15,000^{th}$ aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit), Four Million Dollars ($4,000,000);

    (f)    The following additional payments: (1) commencing with the 500th aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of two years following such date, $75 per Commercial Sale of the Medtronic Natrix System, and (2) commencing on the date that is two years following Medtronic's 500th Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of four years following such date, $50 per Commercial Sales of the Medtronic Natrix System.

81434

EXHIBIT A
PAGE 9

1    11.    Kyphon made a payment to PDI at Closing in the amount of $18,750,000.

2    12.    Kyphon failed and refused to make payments in the amount of $9,250,000 at the

3 time they became due and owing under the Asset Purchase Agreement, as identified in ¶ 10(b)-(d)

4 of this complaint.

5    13.    Kyphon further repudiated its obligations under the Asset Purchase Agreement and

6 has failed to make additional payments under the Asset Purchase Agreement of $22,000,000, as

7 identified in ¶ 10(e)-(f) of this complaint.

8    14.    Paragraph 8.13 of the Asset Purchase Agreement provides that Medtronic, Inc. will

9 cause Kyphon to comply with and to satisfy its obligations under the Asset Purchase Agreement

10 and related agreements.

11    15.    Paragraph 8.13 of the Asset Purchase Agreement provides that Medtronic, Inc. will

12 guaranty the payment and performance of all of Kyphon's obligations under the Asset Purchase

13 Agreement and related agreements.

14    16.    Medtronic, Inc. has failed and refused to cause Kyphon to make payments to PDI

15 totaling $31,250,000, which are due and owing under the Asset Purchase Agreement.

16    17.    Medtronic, Inc. has failed and refused to make Kyphon's payment obligations under

17 the Asset Purchase Agreement in the amount of $31,250,000.

18 **FIRST CAUSE OF ACTION**

19 **(BREACH OF WRITTEN CONTRACT AGAINST DEFENDANTS KYPHON**

20 **AND DOES 1-100)**

21    18.    PDI realleges and incorporates herein paragraphs 1 through 17 of this complaint.

22    19.    On or about August 7, 2008, PDI, as seller, and Kyphon, as buyer, executed a

23 written Asset Purchase Agreement for the purchase of certain intellectual property.

24    20.    The Closing Date of the Asset Purchase Agreement was on or about August 7,

25 2008.

26    21.    PDI has performed all conditions, covenants, and promises required on its part to

27 be performed in accordance with the terms and conditions of the Asset Purchase Agreement.

28 ///

81434

3
COMPLAINT FOR DAMAGES

**EXHIBIT A
PAGE 10**

22.     PDI transferred and delivered to Kyphon the Purchased Assets as identified in the Asset Purchase Agreement. Kyphon accepted and received the Purchased Assets.

23.     Paragraph 2.4 of the Asset Purchase Agreement provides that Kyphon will pay PDI an aggregate of $50 million dollars, as follows:

(a)     At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars ($18,750,000);

(b)     Eighteen months after the Closing Date, One Million Two Hundred and Fifty Thousand Dollars ($1,250,000);

(c)     Eight months after the Closing Date, Four Million Dollars ($4,000,000);

(d)     Upon the earlier to occur of (1) within ten Business Days after the Commercial Launch of a Kyphopak Natrix Kit, and (2) twelve months after the Closing Date, Four Million Dollars ($4,000,000);

(e)     Within the prescribed number of days in section 2.5 of the Asset Purchase Agreement after the date of the 15,000th aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit), Four Million Dollars ($4,000,000);

(f)     The following additional payments: (1) commencing with the 500th aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of two years following such date, $75 per Commercial Sale of the Medtronic Natrix System, and (2) commencing on the date that is two years following Medtronic's 500th Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit)

4

COMPLAINT FOR DAMAGES

**EXHIBIT A**
**PAGE 11**

1        and continuing for a period of four years following such date, $50 per

2        Commercial Sales of the Medtronic Natrix System.

3      24.    Kyphon made a payment at Closing to PDI in the amount of $18,750,000.

4      25.    Kyphon failed and refused to make payments in the amount of $9,250,000 at the

5  time they became due and owing under the Asset Purchase Agreement, as identified in ¶ 23(b)-(d)

6  of this complaint.

7      26.    Kyphon further repudiated its obligations under the Asset Purchase Agreement and

8  has failed and refused to make additional payments under the Asset Purchase Agreement of

9  $22,000,000, as identified in ¶ 23(e)-(f) of this complaint.

10     27.    Kyphon has breached the Asset Purchase Agreement by failing and refusing to

11  make payments to PDI in the amount of $31,250,000, due and owing under the Asset Purchase

12  Agreement.

13     28.    As a result of Kyphon's breach of the Asset Purchase Agreement, PDI is entitled to

14  recover damages in an amount of $31,250,000, as well as costs, interest and other foreseeable

15  damages in an amount according to proof at trial.

16              **SECOND CAUSE OF ACTION**

17      **(BREACH OF GUARANTY AGAINST DEFENDANTS MEDTRONIC, INC.**

18                      **AND DOES 1-100)**

19     29.    PDI realleges and incorporates herein paragraphs 1 through 28 of this complaint.

20     30.    On or about August 7, 2008, PDI, as seller, and Kyphon, as buyer, executed a

21  written Asset Purchase Agreement for the purchase of certain intellectual property.  Medtronic,

22  Inc. executed the Asset Purchase Agreement as guarantor of the Kyphon's obligations under the

23  Asset Purchase Agreement.

24     31.    The Closing Date of the Asset Purchase Agreement was on or about August 7,

25  2008.

26     32.    PDI has performed all conditions, covenants, and promises required on its part to

27  be performed in accordance with the terms and conditions of the Asset Purchase Agreement.

28  ///

**EXHIBIT A
PAGE 12**

1      33.    PDI transferred and delivered to Kyphon the Purchased Assets as identified in the

2  Asset Purchase Agreement.  Kyphon accepted and received the Purchased Assets.

3      34.    Paragraph 2.4 of the Asset Purchase Agreement provides that Kyphon will pay PDI

4  an aggregate of $50 million dollars, as follows:

5            (a)    At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars

6                   ($18,750,000);

7            (b)    Eighteen months after the Closing Date, One Million Two Hundred and

8                   Fifty Thousand Dollars ($1,250,000);

9            (c)    Eight months after the Closing Date, Four Million Dollars ($4,000,000);

10          (d)    Upon the earlier to occur of (1) within ten Business Days after the

11                  Commercial Launch of a Kyphopak Natrix Kit, and (2) twelve months after

12                  the Closing Date, Four Million Dollars ($4,000,000);

13          (e)    Within the prescribed number of days in section 2.5 of the Asset Purchase

14                  Agreement after the date of the 15,000[th] aggregate Commercial Sale of a

15                  Medtronic Natrix System (which shall include any Medtronic Natrix

16                  System that may be sold as part of a kit or otherwise bundled with other

17                  products, including as part of the Kyphopak Natrix Kit), Four Million

18                  Dollars ($4,000,000);

19          (f)    The following additional payments:  (1) commencing with the 500th

20                  aggregate Commercial Sale of a Medtronic Natrix System (which shall

21                  include any Medtronic Natrix System that may be sold as part of a kit or

22                  otherwise bundled with other products, including as part of the Kyphopak

23                  Natrix Kit) and continuing for a period of two years following such date,

24                  $75 per Commercial Sale of the Medtronic Natrix System, and (2)

25                  commencing on the date that is two years following Medtronic's 500th

26                  Commercial Sale of a Medtronic Natrix System (which shall include any

27                  Medtronic Natrix System that may be sold as part of a kit or otherwise

28                  bundled with other products, including as part of the Kyphopak Natrix Kit)

81434

COMPLAINT FOR DAMAGES

EXHIBIT A
PAGE 13

1            and continuing for a period of four years following such date, $50 per

2            Commercial Sales of the Medtronic Natrix System.

3      35.      Kyphon made a payment at Closing to PDI in the amount of $18,750,000.

4      36.      Kyphon failed and refused to make payments in the amount of $9,250,000 at the

5 time they became due and owing under the Asset Purchase Agreement, as identified in ¶ 33(b)-(d)

6 of this complaint.

7      37.      Kyphon further repudiated its obligations under the Asset Purchase Agreement and

8 has failed and refused to make additional payments under the Asset Purchase Agreement of

9 $22,000,000, as identified in ¶ 33(e)-(f) of this complaint.

10      38.      Paragraph 8.13 of the Asset Purchase Agreement provides that Medtronic, Inc.

11 agrees to cause Kyphon to comply with and to satisfy its obligations under the Asset Purchase

12 Agreement.

13      39.      Paragraph 8.13 of the Asset Purchase Agreement provides that Medtronic, Inc.

14 guarantees the payment and performance of all Kyphon's obligations under the Asset Purchase

15 Agreement.

16      40.      Medtronic, Inc. breached the Asset Purchase Agreement by failing and refusing to

17 cause Kyphon to comply with and satisfy its obligations to pay $31,250,000 to PDI under the

18 Asset Purchase Agreement.

19      41.      Medtronic, Inc. breached the Asset Purchase Agreement by failing and refusing to

20 make the guaranty payments in the amount of $31,250,000 under the Asset Purchase Agreement.

21      42.      As a result of Medtronic, Inc.'s breach of the Asset Purchase Agreement, PDI is

22 entitled to recover damages in the amount of $31,250,000, as well as costs, interest and other

23 foreseeable damages in an amount according to proof at trial.

24 **THIRD CAUSE OF ACTION**

25 **(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

26 **AGAINST DEFENDANTS KYPHON, MEDTRONIC, INC. AND DOES 1-100)**

27      43.      PDI realleges and incorporates herein paragraphs 1 through 42 of this complaint.

28 ///

44. On or about August 7, 2008, PDI, as seller, and Kyphon, as buyer, executed a written Asset Purchase Agreement for the purchase of certain intellectual property. Medtronic, Inc. executed the Asset Purchase Agreement as a guarantor of Kyphon's obligations under the Asset Purchase Agreement.

45. Implied in the Asset Purchase Agreement is a covenant of good faith and fair dealing that requires each party to exercise its best efforts to perform thereunder, and to not hinder the other party's performance, frustrate the purposes of the Agreement, or deny the other party the benefits of the Agreement.

46. Defendant Kyphon failed to exercise its best efforts with respect to its obligations under the Asset Purchase Agreement when it failed and refused to pay the $31,250,000 that was and is due and owing to PDI.

47. Defendant Medtronic, Inc. failed to exercise its best efforts with respect to its obligations under the Asset Purchase Agreement when it failed and refused to cause Kyphon to comply with and to satisfy its obligations under the Asset Purchase Agreement.

48. Defendant Medtronic, Inc. failed to exercise its best efforts with respect to its obligations under the Asset Purchase Agreement when it failed and refused to pay the guaranteed payments and performance of Kyphon under the Asset Purchase Agreement.

49. As a proximate result of Kyphon's breach of the implied covenant of good faith and fair dealing, PDI has been damaged in the amount of $31,250,000.

50. As a proximate result of Medtronic, Inc.'s breach of the implied covenant of good faith and fair dealing, PDI has been damaged in the amount of $31,250,000, as well as costs, interest and other foreseeable damages in an amount according to proof at trial.

### FOURTH CAUSE OF ACTION

### (COMMON COUNT FOR GOODS SOLD AND DELIVERED AGAINST DEFENDANTS KYPHON AND DOES 1-100)

51. PDI realleges and incorporates herein paragraphs 1 through 50 of this complaint.

52. On or about August 7, 2008, Kyphon became indebted to PDI in the aggregate sum of $50 million for goods sold and delivered to Kyphon under the Asset Purchase Agreement.

81434

8

COMPLAINT FOR DAMAGES

EXHIBIT A
PAGE 15

53.     PDI transferred and delivered to Kyphon the Purchased Assets as identified in the Asset Purchase Agreement.  Kyphon accepted and received the Purchased Assets.

54.     Paragraph 2.4 of the Asset Purchase Agreement provides that Kyphon will pay PDI an aggregate of $50 million dollars, as follows:

    (a)    At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars ($18,750,000);

    (b)    Eighteen months after the Closing Date, One Million Two Hundred and Fifty Thousand Dollars ($1,250,000);

    (c)    Eight months after the Closing Date, Four Million Dollars ($4,000,000);

    (d)    Upon the earlier to occur of (1) within ten Business Days after the Commercial Launch of a Kyphopak Natrix Kit, and (2) twelve months after the Closing Date, Four Million Dollars ($4,000,000);

    (e)    Within the prescribed number of days in section 2.5 of the Asset Purchase Agreement after the date of the 15,000[th] aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit), Four Million Dollars ($4,000,000);

    (f)    The following additional payments:  (1) commencing with the 500th aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of two years following such date, $75 per Commercial Sale of the Medtronic Natrix System, and (2) commencing on the date that is two years following Medtronic's 500th Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit)

9

COMPLAINT FOR DAMAGES

EXHIBIT A
PAGE 16

1   and continuing for a period of four years following such date, $50 per

2   Commercial Sales of the Medtronic Natrix System.

3   55.   Kyphon made a payment at the closing to PDI in the amount of $18,750,000.

4   56.   Kyphon failed and refused to make payments in the amount of $9,250,000 at the

5   time they became due and owing under the Asset Purchase Agreement, as identified in ¶ 53(b)-(d)

6   of this complaint.

7   57.   Kyphon further repudiated its obligations under the Asset Purchase Agreement and

8   has failed and refused to make additional payments under the Asset Purchase Agreement of

9   $22,000,000, as identified in ¶ 53(e)-(f) of this complaint.

10   58.   Kyphon presently owes PDI $31,250,000 for the Purchased Assets sold and

11   delivered, as well as costs, interest and other foreseeable damages in an amount according to proof

12   at trial.

### FIFTH CAUSE OF ACTION

### (COMMON COUNT FOR ACCOUNT STATED AGAINST DEFENDANTS KYPHON AND DOES 1-100)

16   59.   PDI realleges and incorporates herein paragraphs 1 through 58 of this complaint.

17   60.   On or about August 7, 2008, PDI and Kyphon agreed in writing that Kyphon was

18   indebted to PDI in the aggregate amount of $50 million, payable as follows:

19   (a)   At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars

20   ($18,750,000);

21   (b)   Eighteen months after the Closing Date, One Million Two Hundred and

22   Fifty Thousand Dollars ($1,250,000);

23   (c)   Eight months after the Closing Date, Four Million Dollars ($4,000,000);

24   (d)   Upon the earlier to occur of (1) within ten Business Days after the

25   Commercial Launch of a Kyphopak Natrix Kit, and (2) twelve months after

26   the Closing Date, Four Million Dollars ($4,000,000);

27   (e)   Within the prescribed number of days in section 2.5 of the Asset Purchase

28   Agreement after the date of the 15,000[th] aggregate Commercial Sale of a

81434

10

COMPLAINT FOR DAMAGES

**EXHIBIT A
PAGE 17**

1          Medtronic Natrix System (which shall include any Medtronic Natrix

2          System that may be sold as part of a kit or otherwise bundled with other

3          products, including as part of the Kyphopak Natrix Kit), Four Million

4          Dollars ($4,000,000);

5      (f)    The following additional payments: (1) commencing with the 500th

6          aggregate Commercial Sale of a Medtronic Natrix System (which shall

7          include any Medtronic Natrix System that may be sold as part of a kit or

8          otherwise bundled with other products, including as part of the Kyphopak

9          Natrix Kit) and continuing for a period of two years following such date,

10         $75 per Commercial Sale of the Medtronic Natrix System, and (2)

11         commencing on the date that is two years following Medtronic's 500th

12         Commercial Sale of a Medtronic Natrix System (which shall include any

13         Medtronic Natrix System that may be sold as part of a kit or otherwise

14         bundled with other products, including as part of the Kyphopak Natrix Kit

15         and continuing for a period of four years following such date, $50 per

16         Commercial Sales of the Medtronic Natrix System.

17    61.    Kyphon made a payment at Closing to PDI in the amount of $18,750,000.

18    62.    Kyphon has failed and refused to make payment to PDI in the amount of

19 $9,250,000 under the Asset Purchase Agreement, which is presently due and owing, as identified

20 in ¶ 59(b)-(d) of this complaint.

21    63.    Kyphon has further failed and refused to pay additional sums owing to PDI under

22 the Asset Purchase Agreement of $22,000,000, as identified in ¶ 59(e)-(f) of this complaint.

23    64.    Kyphon presently owes PDI $31,250,000, as well as costs, interest and other

24 foreseeable damages in an amount according to proof at trial.

25                    **PRAYER**

26    WHEREFORE, PDI prays for judgment against defendants and each of them as follows:

27    1.    For damages against Kyphon, in an amount of $31,250,000;

28    2.    For damages against Medtronic, Inc. in an amount of $31,250,000;

81434

11

COMPLAINT FOR DAMAGES

**EXHIBIT A<br>PAGE 18**

3.   For interest as provided by law and/or in an amount according to proof at trial;

4.   For other foreseeable damages in an amount according to proof at trial;

5.   For costs of suit incurred herein; and

6.   For such other and further relief as the Court may deem just and proper.

## REQUEST FOR JURY TRIAL

Plaintiff PDI hereby demands a jury trial.

DATED: March 11, 2010                    THOMAS WHITELAW & TYLER LLP

By: _____
JAMES M. WHITELAW
Attorneys for PLAINTIFF PABBAN
DEVELOPMENT, INC.

81434                                    12
COMPLAINT FOR DAMAGES

**EXHIBIT A**
**PAGE 19**

EXHIBIT A

Final

# ASSET PURCHASE AGREEMENT

By And Between

KYPHON SARL,

a Swiss limited liability company,

and

PABBAN DEVELOPMENT, INC.,

a California corporation.

August 7, 2008

EXHIBIT A
PAGE 21

Final

# ASSET PURCHASE AGREEMENT

THIS AGREEMENT is entered into as of August 7, 2008, by and between Kyphon Sarl ("Medtronic"), a Swiss limited liability company, and Pabban Development, Inc. ("PDI"), a California corporation (PDI referred to herein as the "Seller"), and, for the limited purposes of Section 8.13, Medtronic, Inc.

## RECITALS

WHEREAS, Seller desires to sell, transfer and assign to Medtronic, and Medtronic desires to purchase from Seller, certain assets of Seller, on the terms and for the consideration set forth in this Agreement; and

WHEREAS, in connection with the transfer and assignment of such assets to Medtronic, the parties hereto desire to enter into the Supply Agreement.

## AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements contained herein, and subject to the terms and conditions set forth herein, the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1     Specific Definitions.  As used in this Agreement, the following terms shall have the meanings set forth or referenced below:

"Affiliate" of a specified person (natural or juridical) means a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with (through one or more common shareholders), the person specified. "Control" shall mean ownership of more than 50% of the shares of stock entitled to vote for the election of directors in the case of a corporation, and more than 50% of the voting power in the case of a business entity other than a corporation.

"Assumed Liabilities" means the liabilities described in Section 2.3.1.

"Authorizations" has the meaning set forth in Section 3.7.

"Business" means the business of researching, developing, commercializing and selling the Natrix System as and to the extent conducted prior to the Closing by Seller and/or its Affiliates.

"Business Day" means each day other than a Saturday, Sunday or other day on which commercial banks in Minneapolis, Minnesota are authorized or required by law to close.

"Business Intellectual Property" means as defined in Section 3.12.

**EXHIBIT A
PAGE 22**

Final

"Clinical/Regulatory and Product Information" means all records, reports (internal and external), regulatory submissions, data and files, associated with any (i) clinical studies initiated and/or conducted by or on behalf of Seller or an Affiliate of Seller with respect to the Business, (ii) communications documented between Seller or an Affiliate of Seller and outside regulatory bodies worldwide with respect to the Business, if any, and (iii) products or product concepts, or development thereof, that have been created, initiated and/or conducted by Seller or its Affiliates with respect to the Business together with all sales records, tracking records, and marketing and sales information therefor.

"Closing" and "Closing Date" have the meanings set forth in Section 6.1.

"Commercial Launch" means the occurrence of the first Commercial Sale of a relevant product.

"Commercial Sale" means the commercial sale of a relevant product by or on behalf of Medtronic, an Affiliate of Medtronic, any third party licensee of the Natrix System Technology, or any of such parties' designees, pursuant to which such party receives consideration in exchange for such product. For greater certainty, "Commercial Sales" shall not include any non-commercial sales (including for use in clinical trials, marketing purposes, samples, or other testing purposes), but shall include sales to distributors or other third party resellers.

"Competing Product" means any product, product line, process formulation or service (including any component thereof) that is designed, developed, manufactured, marketed or sold by anyone other than Medtronic, its Affiliates, or their designees and is competitive with, performs substantially similar functions (whether delivery is manual or automatic), or is used for the same purposes as, the Natrix System Technology in the Field.

"Consents" has the meaning set forth in Section 3.9.

"Contract" means any contract, purchase or sale order, lease, license, commitment or other agreement to which Seller is a party or an assignee or other beneficiary thereof or which otherwise relates to the Business.

"Employee Plans" means any health care plan or arrangement; life insurance or other death benefit plan or arrangement; deferred compensation or other pension or retirement plan or arrangement; stock option, phantom stock, bonus or other incentive plan or arrangement; or other fringe or employee benefit plan or arrangement; or any employment or consulting contract or executive compensation agreement; whether the same are written or otherwise, formal or informal, voluntary or required by law or by Seller's policies or practices, for the benefit of or relating to any present or former employees, leased employees, consultants, agents, directors, and/or their dependents, of Seller; including, without limitation, any Pension Plan and any Welfare Plan (whether or not any of the foregoing is funded) (i) to which Seller is a party or by which Seller is bound, (ii) that Seller has at any time established or maintained for the benefit of or relating to any present or former employees, leased employees, consultants, agents, directors, and/or their dependents, of Seller, or (iii) with respect to which Seller has made any payments or contributions in any of the last five years, or otherwise has any liability (including any such plan or other arrangement formerly maintained by Seller).

2

**EXHIBIT A
PAGE 23**

Final

"Environmental Laws" means all laws, statutes, directives, ordinances, rules and regulations relating to pollution, protection of the environment or exposure of any individual to Hazardous Substances, including those relating to emissions, discharges, releases or threatened releases of Hazardous Substances, or otherwise relating to the manufacture, processing, registration, distribution, labeling, recycling, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"FDA" means the United States Food and Drug Administration.

"FDA Quality Systems Regulations" means Quality Systems Regulations as defined in the Code of Federal Regulations at 21 CFR §820.

"Field" means the field of (a) diagnosis and treatment of diseases of the spine or (b) cement injection systems.

"Fiscal Quarter" means a fiscal year quarter of Medtronic, Inc.

"Hazardous Substance" means any substance, material, chemical, emission or waste designated by any governmental entity to be "hazardous", "toxic", a "pollutant" or "contaminant".

"Intellectual Property" means (a) patents, patent applications, continuations, continuations-in-part, divisional applications, revisions, reissue patents, re-examinations and reexamination certificates relative thereto, and other associated filings and applications; (b) copyrights and all works of authorship including all translations, adaptations, combinations, compilations and derivations of each of the foregoing; (c) trademarks, trade names, brand names, service marks, service names, trade dress, logos and corporate names including all translations, adaptations, combinations and derivations thereof, together with all common law rights and all goodwill associated with each of the foregoing; (d) technology, know-how, methods, processes, systems, trade secrets, inventions (whether or not patentable, copyrightable or susceptible to any other form of legal protection and whether or not reduced to practice), proprietary data, formulae, research and development data, and confidential information (including conceptions, ideas, innovations, manufacturing, development and production techniques, drawings, specifications, designs, proposals, financial and accounting data, business and marketing plans, customer and supplier lists and related information and documentation), in each case irrespective of whether in human or machine readable form; (e) computer software (including both source and object code) and all related program listings and data, systems, user and other documentation; (f) mask works; (g) all other forms of right by which one may effectively exclude another from using or otherwise enjoying any and each of the foregoing; and (h) all applications for any and each of the foregoing including applications for patent or registration, together with all registrations, renewals and extensions for any and each of the foregoing.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

3

EXHIBIT A
PAGE 24

Final

"Inventories" means finished goods, raw materials and ingredients, work-in-process, consignment goods, wares and merchandise.

"Key Personnel" means the individuals set forth on Schedule 1.1(a).

"Knowledge" of Seller means actual knowledge of the Key Personnel.

"Kyphopak Natrix Kit" means a group of medical devices or other products manufactured by or on behalf of Medtronic or an Affiliate of Medtronic and packaged together as a kit, intended to be used by physicians who are performing the kyphoplasty procedure incorporating the Natrix System or Medtronic Natrix System, or otherwise utilizing the Natrix System Technology or the Medtronic Natrix System; provided, however, that either bone cement or a bone cement mixer packaged with a Natrix System or Medtronic Natrix System shall not be considered a Kyphopak Natrix Kit unless at least one additional medical device or other product manufactured by or on behalf of Medtronic or an Affiliate of Medtronic is included in such package. For avoidance of doubt, products packaged separately and sold together, but not otherwise packaged together, do not qualify as a Kyphopak Natrix Kit.

"Liens" means liens, mortgages, charges, security interests, pledges, encumbrances, assessments, restrictions or other third party claims of any nature (other than liens for Taxes not yet due and payable).

"Material Adverse Effect" means any effect, change, event, circumstance or development (each a "Change," and collectively, "Changes") that, individually or in the aggregate with other related effects, is or could reasonably expected to be, materially adverse to the business, results of operation or financial condition of the Purchased Assets or the Business, considered as a whole; provided, however, that no Change (by itself or when aggregated or taken together with any and all other Changes) resulting from, arising out of, attributable to, or related to any of the following shall be deemed to be or constitute a "Material Adverse Effect," and no Change (by itself or when aggregated or taken together with any and all other such Changes) resulting from, arising out of, attributable to, or related to any of the following shall be taken into account when determining whether a "Material Adverse Effect" has occurred or may, would or could occur: (i) changes to the economic conditions (or changes in such conditions) in the United States or any other country or region in the world, or conditions in the global economy generally, or to the Business's industry in general which do not disproportionately affect the Business, results of operations or financial condition of the Purchased Assets or the Business; or (ii) acts of war (declared or undeclared), terrorism, disaster, strikes, civil disorder, earthquake, or similar occurrence or other force majeure events beyond Seller's control).

"Materiality Qualifier" means any qualification or reference to "material" or similar variations thereof, including "Material Adverse Effect."

"Medtronic Natrix System" means the Natrix System as may be modified, improved or otherwise changed by or on behalf of Medtronic or an Affiliate of Medtronic or their designees after the Closing or any system that otherwise utilizes some or all of the Natrix System Technology, including without limitation, the Kyphopak Natrix Kit. For the avoidance of doubt, to the extent any Kyphopak Natrix Kit or other bundled products include one or more Medtronic

4

EXHIBIT A
PAGE 25

Final

Natrix Systems, each such Medtronic Natrix System shall be counted as a separate and distinct product for the purpose of calculating the Milestone Payments and the Additional Consideration.

"Milestone Payments" means the payments as defined in Sections 2.4.5.

"Natrix System" means the pump and delivery system used to hydraulically deliver bone cement that is in development by Seller and/or its Affiliates.

"Natrix System Technology" means the Intellectual Property owned or licensed by Seller or an Affiliate of Seller that, as of the Closing Date, is required, necessary, and/or actually used to make, have made, use, modify, sell or offer to sell the Natrix System including, but not limited to, the Business Intellectual Property listed on Schedule 3.1.2.

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"Prime Rate" means, for any calendar quarter, the prime commercial lending rate quoted by US Bank National Association as in effect on the first day of such quarter.

"Product Liability" means any liability, claim or expense, including but not limited to attorneys' fees and medical expenses, arising in whole or in part out of a breach of any express or implied product warranty, strict liability in tort, negligent manufacture of product, negligent provision of services, product recall, or any other allegation of liability arising from the design, testing, manufacture, packaging, labeling (including instructions for use), marketing, distribution or sale of the Natrix System (whether for clinical trial purposes, commercial use or otherwise).

"Product Liability Claim" means any claim made by a third party against a Seller Indemnified Party with respect to any Natrix System or Medtronic Natrix System sold by or under authority of Medtronic or its Affiliates after the Closing Date resulting from a defect in design, research, or any failure to warn, or any noncompliance with any applicable laws or regulations by Medtronic or an Affiliate of Medtronic. A Product Liability Claim will be deemed to be made on the first date a written notice asserting a Product Liability Claim is received by Seller or Medtronic, as the case may be. For the avoidance of doubt, in no event shall a Product Liability Claim include any above described claim to the extent it results from a material breach by Seller of a representation or warranty in the Supply Agreement.

"Purchase Price" has the meaning set forth in Section 2.4.1.

"Purchased Assets" means all the rights, title, interests and claims of Seller or an Affiliate of Seller, to the extent utilized by Seller or an Affiliate of Seller in connection with the Natrix System as of the Closing Date, in and to the following assets:

(i)     All books, records (computer or otherwise), files, and data (including supplier lists), customer service histories, warehouse and other inventories and the Clinical/Regulatory Product Information, but excluding all Tax Returns of Seller and all records related thereto;

(ii)     All manufacturing related assets and equipment specifically listed on Section 3.1.1 of the Schedules;

5

**EXHIBIT A**
**PAGE 26**

Final

(iii)    All other assets necessary for the operation of the Business or the commercialization of sale of the Natrix System (other than the Retained Assets);

(iv)    The Natrix System Technology;

(v)    Regulatory Filings and Documentation in the possession of Seller or any of its Affiliates; and

(vi)    All intangible assets, including goodwill therein, used or proposed to be used by Seller or an Affiliate of Seller as of the date hereof for the Business.

"Regulated Products" has the meaning set forth in Section 3.7.

"Regulatory Filings and Documentation" means (a) all regulatory approvals, registrations, applications, permits, Authorizations, licenses and filings of Seller and its Affiliates for the Natrix System or the Natrix System Technology as of the Closing Date, including, but not limited to those listed on Schedule 1.1(b); (b) Clinical/Regulatory and Product Information for the Natrix System as of the Closing Date; and (c) all books, records (computer or otherwise), files, device master records, device history records, designs, data and information related to the Business and/or the commercialization of Natrix Systems (including, without limitation, all formulas, drawings, specifications, bills of materials, supplier lists, correspondence, files, ledgers, studies and reports) as of the Closing Date, whether or not these items are necessary for regulatory filings.

"Related Agreements" means the Supply Agreement and the Confidentiality Agreement.

"Retained Assets" has the meaning set forth in Section 2.2.

"Retained Liabilities" has the meaning set forth in Section 2.3.2.

"Supply Agreement" means the Supply Agreement in the form set forth in Exhibit A.

"Taxes" (and "Tax") means all taxes, additions to tax, penalties, interest, fines, duties, withholdings, assessments, and charges (all in the nature of taxes) assessed or imposed by any governmental authority, including but not limited to all federal, state, county, local and foreign income, profits, gross receipts, import, ad valorem, real and personal property, franchise, license, sales, use, value added, stamp, transfer, withholding, payroll, employment, excise, custom, duty, and any other taxes, obligations and assessments of any kind whatsoever; the foregoing shall include, but not be limited to, any liability arising as a result of being (or ceasing to be) a member of any affiliated, consolidated, combined, or unitary group as well as any liability under any Tax allocation, Tax sharing, Tax indemnity or similar agreement.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"Transfer and Sales Taxes" means all use taxes, stamp taxes, conveyance taxes, transfer taxes, filing fees, recording fees, prepayment fees or penalties, reporting fees and other similar

**EXHIBIT A
PAGE 27**

Final

duties, taxes and fees, if any, imposed upon, or resulting from, the transfer of the Purchased Assets or the Assumed Liabilities hereunder and the filing of any instruments relating to such transfer, including any sales tax.

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

1.2    Other Terms.  Other terms may be defined elsewhere in the text of this Agreement and shall have the meaning indicated throughout this Agreement.

1.3    Other Definitional Provisions.

1.3.1  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provisions of this Agreement.

1.3.2  The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

1.3.3  Unless the context requires otherwise, references herein (i) to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement and (ii) to a statute, ordinance or regulation mean such statute, ordinance or regulation as amended from time to time and includes any successor thereto.

1.3.4  References to an "Exhibit" or to a "Schedule" are, unless otherwise specified, to one of the Exhibits or Schedules attached to or referenced in this Agreement, and references to an "Article" or a "Section" are, unless otherwise specified, to one of the Articles or Sections of this Agreement.

1.3.5  The term "person" includes any individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization or government or any department or agency thereof.

1.3.6  The term "Dollars" or "$" shall refer to the currency of the United States of America.

1.3.7  All references to time shall refer to Minneapolis, Minnesota time.

1.3.8  The word "including" or variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE 2.
## PURCHASE AND SALE OF ASSETS

7

Final

2.1     Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Seller hereby sells, transfers, assigns and conveys to Medtronic, and Medtronic hereby purchases, all of the Purchased Assets free and clear of all Liens.

2.2     Retained Assets.  Seller hereby retains all of its rights, title and interests in and to, and there shall be excluded from sale, assignment or transfer to Medtronic hereunder, any assets of Seller as of the Closing that are not included in the Purchased Assets (the "Retained Assets").

2.3     Assumed Liabilities; Retained Liabilities.

2.3.1     Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Seller hereby assigns, transfers, and conveys to Medtronic and Seller shall thereafter not remain liable for, and Medtronic hereby assumes and agrees to pay, perform and discharge when due (a) those obligations of Seller to be performed after the Closing under the Contracts set forth on Schedule 2.3.1, and (b) liabilities arising after the Closing out of the ownership and operation of the Purchased Assets by or on behalf of Medtronic or its Affiliates (the "Assumed Liabilities").

2.3.2     Retained Liabilities.  The parties agree that Medtronic is not, nor shall be considered, the successor to Seller, and that Medtronic does not hereby agree to assume or become liable to pay, perform or discharge any obligation or liability whatsoever of Seller or any Affiliate of Seller or any former or present employees of Seller or Affiliate of Seller, except as expressly provided for in Section 2.3.1.   Seller shall retain (the "Retained Liabilities") any liability or obligation of, or claim against, Seller or the Business, direct or indirect, known or unknown, absolute or contingent, not expressly included in the Assumed Liabilities, and, notwithstanding anything to the contrary in the Agreement, none of the following of Seller or the Business shall be Assumed Liabilities (and each shall be included in the definition of "Retained Liabilities"):

2.3.2.1     The obligations of Seller under this Agreement.

2.3.2.2     Any accounts payable of Seller and any obligation, liability or claim that arise under any Contract of any Seller or any Affiliate of Seller.

2.3.2.3     Any and all Products Liability relating to product designed, manufactured, sold or distributed by Seller, or services performed by Seller, in all cases prior to the Closing Date, whether or not related to the Business.

2.3.2.4     Any obligation, liability or claim that may arise from any lawsuits, actions or proceedings against any Seller to the extent arising from or related to any facts or circumstances occurring before the Closing Date.

2.3.2.5     Any obligation, commitment, liability or claim regarding relationships by and between Seller and a distributor, reseller, representative or agent, including those which may arise in connection with the termination of such relationships.

8

**EXHIBIT A**
**PAGE 29**

Final

2.3.2.6    Any obligation, commitment, liability or claim related to any leased real property, including those which may arise in connection with the termination of the lease of such property by Seller.

2.3.2.7    Any obligation, commitment, liability or claim regarding relationships by and between Seller and Seller's employees, including those which may arise in connection with the termination of such relationships and any retention bonuses payable to any such employees.

2.3.2.8    Any obligation, liability or claim under any applicable Environmental Law and/or any regulatory requirements related to or arising out of events or conditions occurring or existing at or prior to the Closing Date.

2.3.2.9    Any other liability or obligation of, or claim against, Seller of any kind or nature whatsoever, whether known or unknown, fixed or contingent, determined or determinable, due or not yet due, or otherwise, that arose before the Closing Date or is based on facts or occurrences arising prior to the Closing Date and which is not expressly assumed by Medtronic under this Agreement.

2.4    Purchase Price; Milestone Payments. Subject to the contingencies set forth in this Agreement, as applicable, the total consideration for the Purchased Assets (the "Purchase Price") shall be up to an aggregate maximum of Fifty Million Dollars ($50,000,000), payable by Medtronic as follows:

2.4.1    At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars ($18,750,000) (the "Closing Payment").

2.4.2    On the date that is eighteen (18) months after the Closing, One Million Two Hundred and Fifty Thousand ($1,250,000) subject to any reductions pursuant to Article 7 of this Agreement (the "Holdback Amount").

2.4.3    Upon the date that is eight (8) months after the Closing Date, Four Million Dollars ($4,000,000).

2.4.4    Upon the earlier to occur of (a) within ten (10) Business Days after the Commercial Launch of a Kyphopak Natrix Kit; and (b) the date that is twelve (12) months after the Closing Date, Four Million Dollars ($4,000,000).

2.4.5    Within the prescribed number of days as provided for in Section 2.5 after the date of the 15,000th aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) Four Million Dollars ($4,000,000) (the "Commercial Sale Milestone Payment" and, together with the payments described in Sections 2.4.3 and 2.4.4, the "Milestone Payments").

2.4.6    Medtronic shall pay as additional contingent consideration (the "Additional Consideration") the following amount: (a) commencing with the 500th aggregate Commercial Sale of the Medtronic Natrix System (which shall include any Medtronic Natrix

9

Final

System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of two years following such date, $75 per Commercial Sale of the Medtronic Natrix System, and (b) commencing on the date that is two years following Medtronic's 500th Commercial Sale of the Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of four years following such date, $50 per Commercial Sale of the Medtronic Natrix System.

2.4.7   Notwithstanding anything to the contrary herein, the total Purchase Price payable to Seller pursuant to this Section 2.4 shall not exceed Fifty Million Dollars and Medtronic shall have no further obligations under this Section 2.4 or Section 2.5 from and after the date that (A) (i) the total amount of Purchase Price that has become due and payable, and has actually been paid, to Seller pursuant to this Section 2.4 plus (ii) the amount of Resolved Indemnifiable Losses that have either been satisfied by claims on the Holdback Amount or set-off against Milestone Payments or Additional Consideration equals (B) Fifty Million Dollars ($50,000,000).

2.5   Milestone Payment/Additional Consideration and Reports.   No later than fifty (50) days following the last day of the first Fiscal Quarter in which there is a Commercial Sale of a Medtronic Natrix System, and within forty-five (45) days following the first day of each Fiscal Quarter thereafter, Medtronic shall deliver to Seller a written report that includes reasonable detail reflecting Medtronic's calculation of (i) the number of Commercial Sales of Medtronic Natrix Systems in the immediately preceding Fiscal Quarter; and (ii) the Commercial Sale Milestone Payment and/or Additional Consideration payable for such Fiscal Quarter (the "Payment Report"). The Payment Report shall be prepared in accordance with Medtronic's standard accounting practices and procedures, consistently and reasonably applied, and shall include all information reasonably necessary to allow Seller to confirm the number of Commercial Sales of Medtronic Natrix Systems. Subject to Section 2.4.7, the Payment Report shall be accompanied by the payment to Seller of the Commercial Sale Milestone Payment and/or Additional Consideration reflected in the Payment Report.

2.6   Audit Rights.

2.6.1   Audit.   Upon written request by Seller delivered not later than sixty (60) days after Medtronic's delivery of a Payment Report, Medtronic and/or its Affiliates shall make available to Seller and its representatives during regular business hours and without disruption of the conduct of business by Medtronic, all records and relevant personnel related to the Business or necessary to verify the accuracy of the Payment Report. Prior to its review of the records and with such personnel described above, Seller shall execute and deliver to Medtronic a binding commitment (i) prohibiting Seller's disclosure of information provided to it by Medtronic hereunder and (ii) prohibiting Seller's use of information provided to it hereunder, except as is deemed necessary to evaluate, in conjunction with outside advisors, whether any Milestone Payment described in Section 2.4 became due or any Additional Consideration is due pursuant to Section 2.4.6. Such meetings with Medtronic as described above in this Section 2.6.1 shall be scheduled and held within fifteen (15) days of the date that a request for a meeting is delivered by Seller to Medtronic. Medtronic shall keep and retain complete and accurate records in

10

**EXHIBIT A**
**PAGE 31**

sufficient detail to enable Seller to complete the review described above. The Payment Report shall be deemed final and binding on Seller in the event Seller: (a) fails to make a request to verify the accuracy of a Payment Report within sixty (60) days after Medtronic's delivery of the Payment Report; or (b) in the event Seller timely makes a request to verify the accuracy of a Payment Report, Seller fails to make a claim disputing the accuracy of the Payment Report within ninety (90) days after such a request is received by Medtronic.

2.6.2   Resolution of Disputes.  The parties agree that disputes arising under this Section 2 with respect to the calculation of the amount of any Milestone Payment or Additional Consideration (each such disputed amount referred to as a "Disputed Payment") shall be resolved in the following manner:

2.6.2.1   Seller may deliver to Medtronic a written dispute notice setting forth a brief description of the issue in accordance with the time periods set forth in Section 2.6.1, for which such notice initiates the dispute resolution mechanism contemplated by this Section 2.6.2;

2.6.2.2   during the 60 day period following the delivery of the notice described above, Seller and a vice president management level representative of the business unit of Medtronic or Affiliate of Medtronic to which this Agreement relates (who initially shall be Robert White or his designee) will meet and seek to resolve the disputed issue through negotiation; or

2.6.2.3   if representatives of the parties are unable to resolve the disagreement relating to a Disputed Payment pursuant to Section 2.6.2.2. above, they shall promptly (within seven (7) days thereafter) jointly appoint an independent, nationally recognized accounting firm (the "Independent CPA") to resolve the objections and make any resulting adjustments to the Disputed Payment. If within such seven (7) day period the parties cannot agree on an Independent CPA, they shall each appoint an Independent CPA who will be charged with selecting the Independent CPA for the purposes of the audit contemplated by this Section 2.6.2.3. The Independent CPA shall not be the principal accounting firm of Medtronic and shall be required to sign a confidentiality agreement on terms reasonably acceptable to Medtronic.  The scope of the work assignment for the Independent CPA shall be limited to the resolution of any objections so notified. The Independent CPA shall deliver its findings to the parties within sixty (60) days after its appointment. The parties shall provide their full cooperation with respect to any reasonable requests by the Independent CPA.  The resolution of the objections by the Independent CPA and its adjustments to a new replacement Payment Report shall be final, binding and conclusive upon and without further recourse by Medtronic or Seller, except as provided in Section 2.6.3. below.

2.6.3   Costs. If the final amount for any Commercial Sales for any Disputed Payment is more than five percent (5%) greater than the original amount determined by Medtronic for such Milestone Payment or Additional Consideration, as the case may be, as listed on the applicable Payment Report, then all costs and expenses of the Independent CPA shall be borne by Medtronic; otherwise, the costs associated with the Independent CPA shall be borne by Seller.

2.7   Post-Closing Obligations.  From and after the Closing Date, Medtronic shall have no obligation to achieve any of the events that would give rise to any the Milestone Payments in any period of time or any Additional Consideration, and any and all decisions regarding the level

Final

of efforts or the amount of resources which Medtronic or its Affiliates shall cause to be expended with respect to the design, development, production, marketing or sales of the Natrix System, Medtronic Natrix System or any other matters directly or indirectly affecting or relating to the Milestone Payments or Additional Consideration described in Section 2.4 shall be in the sole and absolute discretion of Medtronic and its Affiliates without any express or implied obligation or liability to any party, including Seller. Notwithstanding the forgoing, the parties acknowledge that as a result of solely the passage of time, the Milestone Payments contained in Sections 2.4.3 and 2.4.4 shall become due and payable, without regard to the achievement of any of the events that would give rise to the applicable Milestone Payment, at no later than the dates listed in each such section, respectively.

2.8     Certification of Milestone Payments or Additional Consideration. The rights and interests of Seller in potential Milestone Payments and Additional Consideration shall not be represented by any certificate or instrument, and no portion of such rights or interests in the Milestone Payments and/or Additional Consideration may be sold, assigned, pledged, distributed or otherwise transferred, without the prior written consent of Medtronic, which consent shall not be unreasonably withheld.

2.9     Purchase Price Allocation. Prior to Closing, the parties shall agree on and attach hereto as Schedule 2.9(i) an allocation of the Purchase Price among the Purchased Assets. The allocation will be agreed to by Seller and Medtronic after arm's-length negotiations and in accordance with Section 1060 of the IRC and other applicable laws. Seller and Medtronic will, to the extent permitted by applicable law, adopt and utilize the amounts allocated to each asset or class of assets, as such allocations may be adjusted pursuant to this Section 2.9, for purposes of all federal, state, local and other Tax Returns, in any claim for refund, or otherwise with respect to such Tax Returns. Each party agrees to timely file an IRS Form 8594 reflecting the allocation of the Purchase Price among the Purchased Assets for the taxable year that includes the Closing Date, and to timely file any comparable or similar forms required by applicable state, local, and foreign tax laws. In the event of any adjustments to the Purchase Price, the parties shall prepare and timely file a supplemental asset acquisition statement on IRS Form 8594 in accordance with the rules under Section 1060 of the IRC and the Treasury regulations issued thereunder and shall prepare and timely file any comparable or similar form required by applicable state, local, and foreign tax laws. Except with respect to imputed interest, the parties also agree that no Form 1099 shall be issued in connection with the entering into or consummation of this Agreement or payments contemplated hereunder.

2.10    Transfer and Sales Taxes. Seller shall promptly pay all Transfer and Sales Taxes, due as a result of the consummation of the transactions contemplated by this Agreement. The parties shall cooperate with each other and use commercially reasonable efforts to minimize Transfer and Sales Taxes.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules to this Agreement (the "Schedules"), which Schedules are arranged by schedule corresponding to the numbered and lettered sections of this Agreement (any disclosure contained in any Schedule hereto shall be deemed included in each

12

Final

other applicable Schedule hereto, but only to the extent the applicability of the disclosure in such first Schedule is reasonably clear upon a reading of such disclosure), Seller represents and warrants to Medtronic as of the date of this Agreement (other than representations and warranties made specifically as of a particular date) as follows:

3.1   Listing of Certain Assets and Data.  Attached hereto as Schedule 3.1.1 through Schedule 3.1.4 are true and complete lists of the matters set forth in the following subsections of Section 3.1, including in each case all written or oral agreements or understandings and all amendments and modifications, if any, of each such Contract, document or other instrument referenced or described.

3.1.1   Manufacturing Assets; Equipment.  Schedule 3.1.1 sets forth a list of all material items of machinery, equipment, molding, benches, tools and dies, furniture, fixtures, spare parts, vehicles and other similar property and assets owned or leased by Seller or an Affiliate of Seller and used in the operation of the Business, setting forth with respect to all such listed property a summary description of all Liens relating thereto, specifically identifying the lien holders thereto.  Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies of all currently effective leases, conditional and other sales agreements and any other similar documents concerning the items listed in Schedule 3.1.1.

3.1.2   Business Intellectual Property.  Schedule 3.1.2 sets forth a list of all material Intellectual Property held or used by or for the benefit of Seller in the operation of the Business or which relates to the commercialization and sale of products related to the Business, and applications or registrations for, and invention disclosure forms that may result in, any of the foregoing, and any licenses pursuant to which any of the foregoing is held or used,.  Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies. of all issuances, registrations, applications, disclosures, and certificates regarding such Business Intellectual Property, true and complete copies of all Contracts with employees or others who has provided services to Seller in relation to the Business relating in whole or in part to disclosure, ownership, assignment or patenting of inventions or discoveries, confidential or proprietary information, product formulas, know-how, trade secrets or other Intellectual Property included in the Business Intellectual Property, and true and complete copies of all patent, trademark, trade name, copyright, know-how, trade secret or other Intellectual Property licenses granted at any time by or to Seller or for the operation of the Business.

3.1.3   Certain Agreements, Etc.  Schedule 3.1.3 sets forth a list of each of the following Contracts to which Seller is a party or by which it is bound and which, in each case, relates to the operation of the Business or the commercialization and sale of products related to the Business (other than Contracts listed on another Schedule and furnished pursuant to other subsections of this Section 3.1):

3.1.3.1   any research and development agreement, joint development agreement, OEM or other material supply agreement whereby products or components are developed or made by or for Seller;

3.1.3.2   any joint venture or franchise agreement, and related material agreements involving the acquisition or disposition of any products or process, or business by Seller;

13

**EXHIBIT A
PAGE 34**

3.1.3.3    any Contract for the purchase of any services, raw materials, supplies or equipment or other goods, including outstanding purchase orders, involving remaining payments estimated at more than $20,000, excluding Contracts for the provision of accounting, financial, tax or legal services;

3.1.3.4    any Contract for the sale of assets, products or services that is in any way not yet performed and involving remaining payments estimated at more than $20,000;

3.1.3.5    any dealer, distributor, broker, agent, sales representative or similar Contract by Seller for the sale of any products; and

3.1.3.6    any Contract not made in the ordinary course of business of Seller, or any other Contract that has or could reasonably be expected to have a Material Adverse Effect.

Prior to the date of this Agreement, Seller has delivered or made available to Medtronic or its Affiliates true and complete copies of all Contracts identified in Schedule 3.1.3. Such copies contain all the terms of the agreements, understandings and arrangements between the parties thereto with respect to the subject matter thereof.

3.1.4    Permits, Licenses, Etc.    Schedule 3.1.4 sets forth a list of all material permits, Authorizations, licenses, notifications, registrations and approvals, including, but not limited to, those issued by the FDA or similar state or foreign agencies or governmental authorities, held by or for the benefit of Seller and required to operate the Business or which otherwise relates to the development, manufacture, commercialization and sale of products related to the Business. Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies of all permits, Authorizations, licenses, notifications, registrations, approvals or other documents identified in Schedule 3.1.4.

3.2    Organization: Directors and Officers.    PDI is a corporation duly organized and in good standing under the laws of the State of California. PDI has all necessary power and authority to own its properties and assets and operate its business as it is presently being conducted. PDI is duly qualified and in good standing to do business in the jurisdictions listed on Schedule 3.2. The jurisdictions listed on Schedule 3.2 are the only jurisdictions where the character of the property owned, leased or operated by PDI or the nature of activities of PDI makes such qualification necessary, except where the failure to so qualify to do business would not have a Material Adverse Affect. Schedule 3.2 sets forth a true and complete list of the directors and officers (with all titles and positions indicated) of PDI.

3.3    Subsidiaries and Affiliates.    All of the Business is conducted solely through Seller. No Affiliate of Seller owns any interest in or to any of the Purchased Assets.

3.4    Authority.    Seller has full power and authority to enter into this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by Seller of this Agreement and the Related Agreements, and the consummation by Seller of the transactions contemplated hereby and thereby, have been duly and validly authorized by Seller's Board of Directors and shareholders. No other action of Seller's Board of Directors or shareholders, or corporate proceedings on the part of Seller, is necessary to authorize this Agreement and the Related Agreements or to consummate the transactions

14

Final

contemplated hereby and thereby. This Agreement and the Related Agreements have been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Medtronic and other parties thereto, constitute legal, valid and binding agreements of Seller enforceable against it in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Neither the execution and delivery of this Agreement or the Related Agreements nor compliance by Seller with their respective terms and provisions will violate (i) any provision of the certificate or articles of incorporation, bylaws or other governing instruments of Seller, (ii) to Seller's Knowledge, any permit or license of Seller relating to the Business, or (iii) to Seller's Knowledge, any law, statute, regulation, injunction, order or decree of any government agency or authority or court to which Seller or any of the Purchased Assets is subject.

    3.5    Litigation.  As of the date hereof, no actions, suits, proceedings, audits and investigations have been instituted against or by Seller, or to which the Business or the Purchased Assets are subject, nor, to the Knowledge of Seller, otherwise have affected or are affecting Seller, the Business or the Purchased Assets.   There are no actions, suits, or proceedings pending or, to the Knowledge of Seller, threatened against or by Seller, at law, in equity or otherwise, in, before, or by any court, arbitrator, or governmental agency or authority. There are no unsatisfied judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against or to which Seller or the Business or any of the Purchased Assets are subject.

    3.6    Compliance with Law.  Seller has not violated in the past seven (7) years and is currently not in violation of any material applicable law, ordinance or regulation of any governmental entity in connection with its operation of the Business.  All governmental approvals, registrations, notifications, permits, licenses and other permissions or authorizations (collectively, "Authorizations") required in connection with the conduct of the Business have been obtained and are in full force and effect and are being materially complied with in all material respects; provided that nothing herein shall be interpreted as a guarantee by Seller that the FDA will not require a 510(k) clearance to market and sell the Medtronic Natrix System. Seller has not received any written notification of any asserted past or present violation in connection with the conduct of the Business of any applicable law, ordinance or regulation, or any written complaint, inquiry or request for information from any governmental entity relating thereto.  Neither Seller nor the Business nor any of the Purchased Assets is the subject of any enforcement action instituted by any federal, state or local authority or, to the Knowledge of Seller, other material investigation. Neither Seller nor any of its Affiliates has made any written regulatory filings with the FDA or other health care regulatory organization relating to the Natrix System.  To Seller's Knowledge, all design files related to the Natrix System that are included in the Purchased Assets materially comply with all applicable requirements of the FDA, if any. Seller has provided or made available to Medtronic or its Affiliates all relevant Regulatory Filings and Documentation that Seller or any of Seller's Affiliates has in its respective possession.

    3.7    Taxes.  To the extent that failure to do so could adversely affect Medtronic's use or ownership of the Purchased Assets, Seller has timely filed all Tax Returns required by any law or regulation of any jurisdiction to be filed by or on behalf of Seller, and all such Tax Returns

15

Final

were true, correct and complete in all material respects on the date of such Tax Returns. To the extent that failure to do so could adversely affect Medtronic's use or ownership of the Purchased Assets, Seller has duly paid, deposited or accrued on its books of account, all Taxes pursuant to such Tax Returns, or which Seller is obligated to withhold from amounts owing to any employee. No assessment of any additional Taxes that by law should have been reported or paid, nor any investigation or audit, is pending or, to the Knowledge of Seller, threatened or expected. No taxing or assessment authority has asserted in writing any unresolved deficiencies with respect to Tax liabilities of Seller for any period, and to the Knowledge of Seller there are no facts or circumstances that would give rise thereto. Seller has not waived any statute of limitations in respect of foreign, federal, state or local Taxes or agreed to any extension of time with respect to an assessment of deficiency with respect to such Taxes.

3.8    Consents.   Schedule 3.8 lists each consent, approval, waiver or authorization (collectively, the "Consents"), that is legally or contractually required on the part of Seller to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby.

3.9    Title to and Condition of the Purchased Assets.   Seller has full right, title and interest to the tangible Purchased Assets, free and clear of all Liens. The Purchased Assets (other than the Retained Assets or the Business Intellectual Property) include all assets, properties, rights, interests and claims necessary for the conduct of the Business and all assets, properties, rights, interests and claim owned or controlled by Seller or an Affiliate of Seller that relate to the development, manufacture, commercialization or sale of products related to the Business. The Purchased Assets (other than the Retained Assets or the Business Intellectual Property) are suitable for the uses for which they are presently used by Seller, in normal operating condition and free from any significant defects, ordinary wear and tear excepted. The Purchased Assets include at least those assets listed on Schedule 3.1.1 through 3.1.4 (other than the Retained Assets).  Except as specifically set forth on Schedule 3.9, all of the Purchased Assets are located at the facilities of Seller.

3.10   Contracts.   Except as specifically set forth in Schedule 3.10, each Contract is valid and enforceable and is and, following the consummation of the transactions contemplated by this Agreement, will remain, in full force and effect in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Except as specifically set forth in Schedule 3.10, there have been no amendments, modifications, or supplements to any such Contracts. There is no default or claim of default by Seller under any Contract and no event has occurred, or will occur as a result of the consummation of the transactions contemplated by this Agreement, that, with the passage of time or the giving of notice or both, could reasonably be expected to constitute a default by Seller or, to the Knowledge of Seller, any other party thereto under any such Contract, or could reasonably be expected to permit modification, acceleration, or termination of any such Contract, except for such defaults or permits that would not, individually or in the aggregate, have a Material Adverse Effect. No event has occurred, or will occur as a result of the consummation of the transactions contemplated by this Agreement, that, with the passage of time or the giving of notice or both, would constitute a default by Seller under any Contract and could reasonably be expected to

16

**EXHIBIT A**
**PAGE 37**

Final

permit the creation of any Lien on any of the Purchased Assets, except for such defaults or permits that would not, individually or in the aggregate, have a Material Adverse Effect.

    3.11    Intellectual Property.  Seller owns, free and clear of any Lien, or is licensed to use, the Intellectual Property included in the Purchased Assets (the "Business Intellectual Property").  The Business Intellectual Property includes all processes, methods, techniques, procedures, trade secrets and know how used or necessary to use to conduct the Business.  Seller has the exclusive right to use all Business Intellectual Property. No claim has been asserted, or, to the Knowledge of Seller, threatened, by any person with respect to Seller's use of the Business Intellectual Property or challenging or questioning the validity or effectiveness of any license or agreement with respect thereto, and, to Seller's Knowledge, no basis for any such claim exists. All Business Intellectual Property listed on Schedule 3.1.2 has the status indicated therein and is in good standing and has not been abandoned.  Seller has provided or made available to Medtronic or its Affiliates all material information Seller or any of Seller's Affiliates have in their respective possession, as the case may be, that relates to the Business.  To Seller's Knowledge after inquiry by Seller of its primary patent counsel (Peter Gluck of Greenberg Traurig), no facts or circumstances exist that could result in the invalidation or in a finding of unenforceability or unpatentability of any of the patents or trademarks listed in Schedule 3.1.2, or, to the Knowledge of Seller, any of the patents or trademarks issuing on any of the patent or trademark applications listed in Schedule 3.1.2.  To Seller's Knowledge, no person nor such person's business or products has infringed or misappropriated any Business Intellectual Property, or currently is infringing or misappropriating any Business Intellectual Property.  No Seller employee or consultant who performs services with respect to the Business is subject to or otherwise restricted by any employment, nondisclosure, assignment of inventions, nonsolicitation of employees, or noncompetition agreement between such employee or consultant and a third party that has been violated or will be violated as a result of the transactions contemplated by this Agreement.  All Seller employees and consultants who perform services with respect to the Business have signed a confidentiality and assignment of inventions agreement, a true and correct copy of the form of such confidentiality and assignment of inventions agreement has been delivered or made available to Medtronic or its Affiliates, and each such agreement shall remain, the legal, binding, and enforceable obligation of such employee or consultant, except as may be limited by laws affecting creditors' rights generally or by judicial limitations on the right to specific performance or other equitable remedies.  Seller has not granted any license rights or otherwise transferred any Business Intellectual Property to any third party.

    3.12    No Finders.  Except as set forth on Schedule 3.12, which matters shall be the sole responsibility of Seller, no act of Seller or its Affiliates has given or will give rise to any claim against any of the parties hereto for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated herein.

    3.13    Product Liability Claims.  To Seller's knowledge, all Natrix Systems that Seller has manufactured were manufactured in accordance with their specifications and were free from defects in design, manufacture, material or workmanship that have resulted in a claim for Product Liability.  Seller has never incurred any uninsured or insured Product Liability relating to the Natrix System, or received a claim based upon alleged Product Liability relating to the Natrix System, and to the Knowledge of Seller, no basis for any such claim exists.

EXHIBIT A
PAGE 38

Final

3.14   Relations with Suppliers.   No material current supplier of the Business has canceled any contract or order for provision of, and, to the knowledge of Seller, there has been no threat by any such supplier not to provide, raw materials, products, supplies, or services.

3.15   Environmental Matters.   To Seller's knowledge, Seller has obtained, and is in compliance in all material respects with, all permits, licenses or other approvals necessary under the Environmental Laws with respect to the Business and the Purchased Assets, and is in material compliance with all Environmental Laws.   No capital or other expenditures are necessary so that the Business and the Purchased Assets comply in all material respects with any Environmental Law.

3.16   Manufacturing Processes.   Seller has delivered or made available to Medtronic or its Affiliates complete and accurate written documentation of the processes and procedures used or necessary to manufacture the Natrix System as it is currently conducted (the "Manufacturing Documentation").   To Seller's Knowledge, the Natrix System, as presently designed and configured, and, when manufactured in accordance with the Manufacturing Documentation, will materially conform to the specifications established therefor and to Seller's Knowledge will be (a) of merchantable quality; (b) free from defects in design, material and workmanship; and (c) suitable for their intended and labeled purpose.   The Business Intellectual Property includes all the Manufacturing Documentation and all processes, methods, techniques, procedures, trade secrets and know how included therein.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF MEDTRONIC

Medtronic represents and warrants to Seller as follows:

4.1   Organization of Medtronic.   Medtronic is a limited liability company duly organized, validly existing and in good standing under the laws of Switzerland.   Medtronic has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as now being conducted and are duly qualified to do business and are in good standing in each jurisdiction in which the failure to be so qualified would have a material adverse effect on Medtronic.   Medtronic has sufficient funds and financial resources necessary to permit Medtronic to satisfy its obligations under this Agreement, including payment of the Purchase Price and consummation of the transactions contemplated by this Agreement and the Related Agreements subject to the terms and conditions hereof.

4.2   Authority.   Medtronic has full power and authority to enter into this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.   This Agreement and the Related Agreements have been duly authorized, executed, and delivered by Medtronic and, assuming the due authorization, execution and delivery by Seller and other parties thereto constitute legal, valid and binding agreements of Medtronic, enforceable against Medtronic in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.   No further proceeding on the part of Medtronic is necessary to authorize this Agreement and the Related Agreements and the transactions contemplated hereby and thereby.   Neither the execution and delivery of this Agreement or the

18

**EXHIBIT A**
**PAGE 39**

Final

Related Agreements nor compliance by Medtronic with their respective terms and provisions will violate (i) any provision of the articles of incorporation or bylaws of Medtronic, (ii) any contract, permit or license of Medtronic, or (iii) any law, statute, regulation, injunction, order or decree of any government agency or authority or court to which Medtronic or any of Medtronic's assets is subject.

    4.3    <u>No Finders</u>.  No act of Medtronic has given or will give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated herein.

    4.4    <u>Consents</u>.    No consent, approval, waiver or authorization is legally or contractually required on the part of Medtronic to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby.

**ARTICLE 5.**
**CERTAIN COVENANTS AND AGREEMENTS**

    5.1    <u>Noncompetition Covenant</u>.

    5.1.1    For a period of five (5) years from and after the Closing, Seller agrees that it will not, individually or otherwise, do any of the following:

    5.1.1.1    directly or indirectly, own any interest in or control any person or entity, or subsidiary, subdivision, division, or joint venture of such entity (except Medtronic or its Affiliates) that designs, develops, manufactures, licenses, distributes, markets, or sells a Competing Product in the Field; provided, however, that Seller may purchase or otherwise acquire up to (but not more than) two percent (2%) of any class of publicly traded securities of any enterprise (but without participating in the activities of any enterprise engaged in the development or commercialization of Competing Products in the Field);

    5.1.1.2    render services (including but not limited to services in research or as an employee) to any person or entity in the Field (except Medtronic or its Affiliates) in connection with a Competing Product (it being understood that the foregoing shall not prohibit Seller from rendering services (including but not limited to services in research or as an employee) to any person or entity in connection with a product that is not a Competing Product even if any such person or entity has business interests in or relating to a Competing Product);

    5.1.1.3    directly or indirectly, solicit, attempt to solicit, interfere, or attempt to interfere with Medtronic's relationship, in connection with a Competing Product in the Field, with its customers, on behalf of any person or entity engaged in the design, development, manufacture, marketing, or sale of a Competing Product in the Field; or

    5.1.1.4    directly or indirectly design, develop, manufacture, license, distribute, market, or sell any Competing Product in the Field.

    5.1.2    The parties acknowledge and agree that the market for the Natrix System is worldwide and that the provisions of this Section 5.1 shall apply throughout the world.

19

Final

5.1.3   In addition to any other relief or remedies afforded by law or in equity, if Seller breaches its obligations under this Section 5.1, Medtronic shall be entitled, as a matter of right and without posting any bond or other security, to injunctive relief in any court of competent jurisdiction. This shall not preclude the granting of any other appropriate relief including, without limitation, money damages against Seller for breach of this Section 5.1.

5.2   Confidentiality. The parties hereby agree that any information provided or received pursuant to this Agreement, prior to and in connection with the negotiation and execution of this Agreement and pursuant to the consummation of the transactions contemplated hereby, shall be governed by the terms of a Mutual Confidentiality Agreement among Seller and Medtronic in the form set forth in Exhibit B (the "Confidentiality Agreement").

5.3   Prompt Payment of Retained Liabilities. Seller agrees that it shall pay, discharge and perform promptly, when due, any and all Retained Liabilities that may affect Medtronic from and after Closing.

5.4   Further Assurances; Seller Access to Records. Subject to the other provisions of this Agreement, at such time and from time to time on and after the Closing Date upon request by Medtronic, Seller will, and will cause any of its Affiliates to, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances that may be reasonably required for the better conveying, transferring, assigning, delivering and confirming ownership to, or reducing to the possession of, Medtronic or its approved respective successors and assigns all of the Purchased Assets and to otherwise carry out the purposes of this Agreement. Subject to the other provisions of this Agreement, Seller shall permit Medtronic and its authorized representatives to have reasonable access to, on a confidential basis, and to copy, at Medtronic's expense, during regular business hours and upon reasonable advance notice to Seller, such books, records and documents related to the conduct of the Business prior to the Closing as Medtronic may reasonably request.

## ARTICLE 6.
## CLOSING

6.1   Closing Date. The consummation of the purchase and sale of the Purchased Assets provided for herein (the "Closing") shall take place at 10:00 a.m. (local time) on the date hereof, or on such other date and/or at such other time as the parties hereto may agree upon (the "Closing Date"). The Closing shall take place (i) at the offices of Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota, or (ii) on the mutual agreement of the parties, by delivery via facsimile transmission (with originals sent via overnight courier service) of the documents to be delivered at the Closing and wire transfer of the payment to be made in accordance with Section 2.4.1, or (iii) at such other place or in such other manner as the parties hereto may agree.

6.2   Proceedings. All proceedings taken and all documents executed and delivered by the parties hereto at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

20

**EXHIBIT A**
**PAGE 41**

Final

# ARTICLE 7.
## INDEMNIFICATION

7.1    <u>Indemnification of Medtronic</u>.  Subject to Section 8.2 of this Agreement, Seller shall indemnify, defend and hold harmless Medtronic and each of its Affiliates, subsidiaries, officers, directors, employees, and shareholders (each being a "<u>Medtronic Indemnified Party</u>") from and against and in respect of any and all paid or incurred losses, damages, liabilities, assessments, interest and penalties, costs and expenses (including, without limitation, reasonable legal fees and disbursements incurred in connection therewith and in seeking indemnification therefor, and any amounts or expenses paid or incurred in connection with any action, suit, proceeding, claim, appeal, demand, assessment or judgment), whether or not involving a third party claim, (collectively "<u>Indemnifiable Losses</u>") directly or indirectly resulting from, arising out of, or imposed upon or incurred by any person to be indemnified hereunder by reason of, any one or more of the following:

7.1.1   any breach of any representation or warranty of Seller or an Affiliate of Seller contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Seller or an Affiliate of Seller in connection with any of the transactions contemplated by this Agreement or the Related Agreements;

7.1.2   any breach of any covenant or obligation of Seller or an Affiliate of Seller contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Seller or an Affiliate of Seller in connection with any of the transactions contemplated by this Agreement or the Related Agreements; and

7.1.3   any Retained Liability.

7.2    <u>Indemnification of Seller</u>.  Subject to Section 8.2 of this Agreement, Medtronic shall indemnify, defend and hold harmless Seller, and its officers, directors, employees and shareholders (each being a "<u>Seller Indemnified Party</u>") from and against and in respect of any and all Indemnifiable Losses paid or incurred by them directly or indirectly resulting from, arising out of, or imposed upon or incurred by any person to be indemnified hereunder by reason of, any one or more of the following:

7.2.1   any breach of any representation or warranty of Medtronic contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Medtronic in connection with the transactions contemplated by this Agreement or the Related Agreements;

7.2.2   any breach of any covenant or obligation of Medtronic contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Medtronic in connection with the transactions contemplated by this Agreement or the Related Agreements; and

7.2.3   any Assumed Liability; and

7.2.4   any Product Liability Claim.

21

7.3     Right to Set-Off; Limitations.

7.3.1     Set-Off. Subject to the limitations set forth in this Agreement, Medtronic shall have the right to set-off any claims for Indemnifiable Losses of any Medtronic Indemnified Party as set forth in an Officer's Certificate delivered in accordance with Section 7.4 against any payments due and owing to Seller hereunder and not yet paid.  If (i) Medtronic has made claim(s) for indemnification pursuant to this Article 7 and (ii) the aggregate amount of any unpaid or unresolved Indemnifiable Losses as set forth in Officer's Certificates delivered in accordance with Section 7.4 exceeds the Holdback Amount or the Holdback Amount has already been paid to Seller, then Medtronic shall be entitled to retain that portion of the Milestone Payments and/or Additional Consideration, as applicable, otherwise due to Seller and not yet paid, which is equal to the amount by which the aggregate unpaid and Unresolved Indemnifiable Losses paid or incurred by Medtronic exceeds the Holdback Amount that is then available (the "Withheld Amount") and is necessary to satisfy unpaid claims for any such Unresolved Indemnifiable Losses.  Upon the final resolution of the underlying claim of any Indemnifiable Loss that was subject to Medtronic's retention of all or any portion of the Milestone Payments and/or Additional Consideration, as applicable, Medtronic shall release the Withheld Amount, or the appropriate portion thereof, within five (5) Business Days after such resolution, that is determined to be no longer necessary to satisfy any remaining unpaid claims for Unresolved Indemnifiable Losses.

7.3.2     Limitations.

7.3.2.1     Subject to 7.3.2.4. below, Seller shall not have liability for any indemnification with respect to any Indemnifiable Losses under Section 7.1.1 unless and until the aggregate amount of all Indemnifiable Losses under Section 7.1.1, taken together, exceeds One Hundred Thousand United States Dollars ($100,000) (the "Basket Amount"), in which case the Medtronic Indemnified Party shall be entitled to indemnification for the amount of Indemnifiable Losses that exceeds the Basket Amount.

7.3.2.2     No claim for Indemnifiable Losses under Section 7.1 may be brought hereunder unless such claim is first asserted prior to the relevant survival of such a claim as determined in accordance with Section 8.2.

7.3.2.3     The parties agree that the Holdback Amount and rights of Medtronic to set-off Indemnifiable Losses against the Milestone Payments and Additional Consideration as set forth in Section 7.3.1 shall be the sole and exclusive remedy and recourse of Medtronic and the Medtronic Indemnified Parties with respect to any and all Indemnifiable Losses actually suffered or incurred by any such person, except Indemnifiable Losses resulting from or arising out of: (i)  any fraud on the part of Seller; (ii) any Retained Liability; (iii) any breach by Seller of the representations and warranties set forth in Section 3.4 (Authority) or the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets); or (iv) the breach of any covenant of Seller to be performed after the Closing, including, but not limited to, Seller's obligations under Section 5.1 (Noncompetition Covenant).  Seller's maximum liability under this Agreement, other than liability relating to claims by Medtronic of fraud or breach of the covenants set forth in Section 5.1 (Noncompetition Covenant), Section 5.2 (Confidentiality) or Section 5.3 (Retained Liabilities), shall be limited to the amount of

22

the Purchase Price already paid to Seller plus the amount of any Purchase Price that becomes due and payable to Seller hereunder.

7.3.2.4    The Basket Amount requirement of Section 7.3.2.1. shall not apply to Indemnifiable Losses resulting from or arising out of (i) any fraud on the part of Seller or any Affiliate of Seller; (ii) any Retained Liability; (iii) failure with respect to the title or delivery of any of the Purchased Assets by Seller; (iv) a breach by Seller of Section 5.1 (Noncompetition Covenant); or (v) a breach by Seller of a representation or warranty set forth in Section 3.4 (Authority), the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets), Section 3.11 (Intellectual Property), Section 3.12 (No Finders), Section 3.13 (Product Liability Claims) or Section 3.15 (Environmental Matters).

7.4    Indemnification Claims.    Subject to Section 7.4.1. hereof, to the extent Medtronic asserts a claim for Indemnifiable Losses, at any time on or before the Survival Date, Medtronic shall deliver to Seller a certificate signed by any officer of Medtronic (an "Officer's Certificate"): (i) stating that a Medtronic Indemnified Party has paid or reasonably anticipates that it will have to pay Indemnifiable Losses and the amount thereof, and (ii) specifying in reasonable detail the individual items of Losses included in the amount so stated, the date each such item was paid, or the basis for such reasonably anticipated liability to be paid, and the nature of the misrepresentation, breach of warranty or covenant or otherwise to which such item is related.

7.4.1    Objections to Claims.    For a period of thirty (30) days after the delivery of any Officer's Certificate, Seller may object in a written statement to the claim made in the Officer's Certificate, and such statement shall have been delivered to Medtronic prior to the expiration of such thirty (30) day period.

7.4.2    Resolution of Conflicts.    In case Seller objects in writing to any claim or claims made in any Officer's Certificate as provided in Section 7.4.1 hereof, Seller and Medtronic shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claim.  If Seller and Medtronic should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties.  Subject to Section 7.4.1. hereof, Medtronic shall be entitled to rely on any such memorandum form satisfaction of its Indemnifiable Losses with respect to such claims in accordance with the terms thereof.

7.4.2.1    In connection with any Indemnifiable Losses, except resulting from or arising out of a breach by Seller of Section 3.11 (Intellectual Property) or any claim by a third party, if no agreement can be reached after good faith negotiation, either Medtronic or Seller may demand arbitration of the matter.  The parties shall negotiate in good faith regarding the identification of a single arbitrator with respect to the arbitration and regarding whether the results of the arbitrations shall be binding or non-binding on the parties.  In the event that the parties cannot agree on whether the arbitration shall be binding or non-binding, the results of the arbitration shall be non-binding on the parties.  In the event that the parties cannot agree on the identity of a single arbitrator, the matter shall be settled by arbitration conducted by three arbitrators with Medtronic and Seller each selecting one arbitrator, and the two arbitrators so selected selecting a third arbitrator.  The arbitrator(s) shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the

Final

arbitrators, to discover relevant information from the opposing parties about the subject matter of the dispute. If the parties agree that the arbitration is binding, the decision of the arbitrator (or, if applicable, a majority of the three arbitrators) as to the validity and amount of any claim in such Officer's Certificate shall be binding and conclusive upon the parties to this Agreement, and notwithstanding anything in Section 7.4.1. hereof, Medtronic shall be entitled to act in accordance with such decision for the satisfaction of any Indemnifiable Losses with respect to any claim in such Officer's Certificate in accordance therewith. Any decision of the arbitrator(s) shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).

7.4.2.2   Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any such arbitration shall be held in Orange County, California under the rules then in effect of the American Arbitration Association.

7.4.2.3   If Seller and Medtronic otherwise fail to reach agreement on an any claim or claims made in any Officer's Certificate after good faith negotiations or through binding arbitration pursuant to Sections 7.4.2.1 and 7.4.2.2, a party may pursue rights they have under law.

7.4.2.4   Following resolution of any disputes relating to Indemnifiable Losses pursuant to this Section 7.4, such final and resolved Indemnifiable Losses shall be referred to herein as "Resolved Indemnifiable Losses."

7.5   Third party Claims.

7.5.1   If a claim by a third party is made against any indemnified party, and if the indemnified party intends to seek indemnity with respect thereto under this Article 7, such indemnified party shall promptly notify the indemnifying party of such claim and deliver pursuant to Section 7.4 to the indemnifying party a written notice describing in reasonable detail the nature of such third party claim and referencing the section(s) of this Agreement which serve as the basis for the indemnified party's request for indemnification under this Agreement, together with a copy of all complaints, subpoenas and other documents with respect to such claim, if any; provided, however, that failure to give timely notice shall not affect the rights of the indemnified party so long as the failure to give timely notice does not materially adversely affect the indemnifying party's ability to defend such claim against a third party.

7.5.2   Except as otherwise provided in this Section 7.5, where any Medtronic Indemnified Party is the indemnified party, Medtronic shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any third party claim, action or suit against such Medtronic Indemnified Party as to which indemnification will be sought by any Medtronic Indemnified Party hereunder; provided, however, that Medtronic shall be required to use reasonable efforts to diligently defend, prosecute and settle such third party claim, action or suit. In any such case, Seller shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Medtronic Indemnified Party in connection therewith; provided, that Seller may participate, through counsel chosen by it and at its own expense, in the defense of any such claim, action or suit as to which the Medtronic Indemnified Party has so elected to conduct and control the

24

**EXHIBIT A**
**PAGE 45**

Final

defense thereof. No Medtronic Indemnified Party shall, without the written consent of Seller (which written consent shall not be unreasonably withheld), pay, compromise or consent to the entry of a judgment or enter into any settlement agreement with regard to any third party claim, action or suit.

7.5.3 Notwithstanding Section 7.5.2., (i) if any third party claim, action or suit against any Medtronic Indemnified Party: (A) is solely for money damages of an amount equal to or less than the remaining portion of the Holdback Amount; and (B) will have no continuing effect in any material respect on any Medtronic Indemnified Party or its business, assets or operations; or (ii) where a Seller Indemnified Party is the indemnified party, then Seller shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any such third party claim, action or suit against such indemnified party as to which indemnification will be sought by any indemnified party from any indemnifying party hereunder; provided, however, that Seller shall be required to use all commercially reasonable efforts to diligently defend, prosecute and settle such third party claim, action or suit. In any such case the indemnified party shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the indemnifying party in connection therewith; provided, that the indemnified party may participate, through counsel chosen by it and its own expense, in the defense of any such claim, action or suit as to which the indemnifying party has so elected to conduct and control the defense thereof. Notwithstanding the foregoing, the indemnified party shall have the right to pay, compromise or consent to the entry of a judgment or enter into any settlement agreement with regard to such third party claim, action or suit provided, however, that the indemnified party shall have waived in writing any right to indemnity hereunder for Indemnifiable Losses by Seller Indemnified Parties resulting from any such third party action or suit and such resolution involves only the payment of money or does not otherwise adversely effect the other party.

7.6    Cooperation as to Indemnified Liability. Each party hereto shall cooperate fully with the other parties with respect to access to books, records, or other documentation within such party's control, if deemed reasonably necessary or appropriate by any party in the defense of any claim that may give rise to indemnification hereunder. Regardless of which party is controlling the settlement or defense of any claim, both the indemnified party and indemnifying party shall act in good faith and the indemnifying party shall not thereby permit to exist any Lien upon any asset of any indemnified party or its Affiliates.

7.7    Determination of Indemnifiable Losses. For purposes of determining the amount of any Indemnifiable Losses, and not with regard to determining the occurrence of any breach of or inaccuracy in any representation or warranty, Indemnifiable Losses shall be determined without regard to any Materiality Qualifier set forth in such representation or warranty.

ARTICLE 8.
MISCELLANEOUS

8.1    Complete Agreement. The Schedules and Exhibits to this Agreement shall be construed as an integral part of this Agreement to the same extent as if they had been set forth verbatim herein. This Agreement and the Confidentiality Agreement constitute the entire

25

**EXHIBIT A
PAGE 46**

Final

agreement between the parties hereto with respect to the subject matter hereof and supersede all prior proposals, discussions, or agreements, whether written or oral, relating hereto.

8.2   Survival.   The representations, warranties and indemnification for breaches thereof, and the covenants, agreements and indemnification for breaches thereof that are to have been fully performed prior to the Closing, shall survive the Closing and remain in full force and effect for eighteen months hereafter (the "Survival Date"); provided that any claims made prior to such date shall survive until final resolution thereof; provided further that claims with respect to (i) title to the Purchased Assets; (ii) the representations and warranties set forth in Section 3.4 (Authority), the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets), Section 3.12 (No Finders), Section 3.13 (Product Liability Claims) or Section 3.15 (Environmental Matters) shall survive the Closing and remain in full force and effect for forty-eight months hereafter; (iii) the representations and warranties set forth in Section 3.11 (Intellectual Property) shall survive the Closing and remain in full force and effect for sixty months hereafter; and (iv) claims with respect to fraud shall survive indefinitely.   No independent investigation made by a party hereto, or by its counsel or any of its agents or employees, shall in any way limit or restrict the scope of the representations, warranties, covenants or agreements made by another party in this Agreement.   All covenants and obligations of the parties contained in this Agreement and any other documents, certificate, schedule or instrument delivered in connection herewith that are required to be performed or complied with after the Closing shall survive until fully performed or fulfilled.

8.3   Waiver, Discharge, Amendment, Etc.   The failure of any party hereto to enforce at any time any of the provisions of this Agreement, including the election of such party to proceed with the Closing despite a failure of any condition to such party's closing obligations to occur, shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part thereof or the right of the party thereafter to enforce each and every such provision.   No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.   Any amendment to this Agreement shall be in writing and signed by the parties hereto.

8.4   Notices.   All notices or other communications to a party required or permitted hereunder shall be in writing and shall be given by hand delivery, overnight courier service (with acknowledgment of receipt), facsimile transmission (with confirmation of transmission), or by certified mail, postage prepaid with return receipt requested.   Such notices or other communications shall be deemed to have been delivered (i) if given by hand delivery, when it is delivered, (ii) if delivered by overnight courier service, on the next Business Day following the date when deposited with such overnight courier serviced and marked for next Business Day delivery, (iii) if delivered by telecopier, telex or facsimile transmission, upon transmission to the party's fax number set forth below, with the party's name and address set forth below clearly shown on the page first transmitted together with confirmation of successful transmission and (iv) if delivered by certified mail, postage prepaid, return receipt requested and addressed to the party to receive it as set forth below, three (3) Business Days after being deposit in the U.S. mails.   All notice or other communications to party shall be addressed to such party at the following addresses:

26

Final

if to Medtronic, to:

> Medtronic, Inc.
> World Headquarters
> 710 Medtronic Parkway NE
> Minneapolis, MN 55432-5604
> Attention:   General Counsel
> Telecopier No.: (763) 572-5459

> with a separate copy thereof addressed to:

> Medtronic, Inc.
> World Headquarters
> 710 Medtronic Parkway NE
> Minneapolis, MN 55432-5604
> Attention:   Vice President, Corporate Development

and if to Seller:

> Pabban Development, Inc.
> 955 S. Virginia Street
> Suite 116
> Reno, Nevada 89502
> Attention: Harry N. Herbert

> with a separate copy thereof addressed to:

> C. Tucker Cheadle, A Law Corporation
> 4041 MacArthur Boulevard, Suite 375
> Newport Beach, California, 92660
> Attention: Tucker Cheadle
> Telecopy No.: 949-553-2477

> and

> Wilson Sonsini Goodrich & Rosati
> Professional Corporation
> 650 Page Mill Road
> Palo Alto, California 94304-1050
> Attention:  J. Casey McGlynn, Esq.
> Telecopy No.:  (650) 493-6811

Any party may change the above-specified recipient and/or mailing address by notice to all other parties given in the manner herein prescribed.

27

EXHIBIT A
PAGE 48

Final

8.5    Public Announcement.   Seller agrees that no press release or similar public announcement or communication will be made or caused to be made concerning the execution or performance of this Agreement unless specifically approved in advance by Medtronic.

8.6    Expenses.   Except as otherwise expressly provided herein, each party hereto shall pay its own expenses (including, but not limited to, all compensation and expenses of its own counsel, financial advisors, consultants, actuaries and independent accountants) incident to this Agreement and the preparation for, and consummation of, the transactions provided for herein.

8.7    Governing Law.   The legality, validity, enforceability and interpretation of this Agreement shall be governed by the laws of the State of Delaware, without giving effect to the principles of conflict of laws.

8.8    Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and the successors or assigns of the parties hereto; provided that the rights of Seller herein may not be assigned except as otherwise provided for herein, and all or any portion of the rights of Medtronic may be assigned only to a subsidiary of Medtronic, Inc. or to such business organization that shall succeed to the business of Medtronic or of such subsidiary to which this Agreement relates, provided that Medtronic remains liable for the fulfillment by such assignee(s), in accordance with and subject to the terms and conditions hereof, of Medtronic's obligations hereunder.

8.9    Titles and Headings; Construction.   The titles and headings to Sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction hereof against the party causing this Agreement to be drafted.

8.10   Severability.   If any provision of this Agreement is held invalid, unenforceable or void by a court of competent jurisdiction, the remaining provisions shall nonetheless be enforceable according to their terms. In such case, the parties agree to use their best efforts to achieve the purpose of the invalid provision. Further, if any provision is held to be overbroad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.

8.11   Benefit.   Nothing in this Agreement or the agreements referred to herein, expressed or implied, shall confer on any person other than the parties hereto or thereto, or their respective permitted successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, the agreements referred to herein, or the transactions contemplated herein or therein.

8.12   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

8.13   Performance by Medtronic.   Medtronic, Inc. hereby agrees to cause Medtronic to comply with and to satisfy its obligations under this Agreement or the Related Agreements,

28

**EXHIBIT A**
**PAGE 49**

Final

subject to the terms and conditions hereof and whenever this Agreement or the Related Agreements require Medtronic to take any action, such requirement hereby includes an undertaking of Medtronic, Inc. to cause Medtronic to take such action and Medtronic, Inc. hereby guarantees the payment and performance of all Medtronic's obligations under this Agreement or the Related Agreements.

*(Signature page follows)*

29

**EXHIBIT A**
**PAGE 50**

ACCORDINGLY, each of the parties has caused this Asset Purchase Agreement to be executed, in the manner appropriate for each, as of the date first above written.

KYPHON SARL

By:_____

Its:_____


PABBAN DEVELOPMENT, INC.

By:_____

Its:_____


For the limited purposes set forth in Section 8.13:


MEDTRONIC, INC.

By:_____

Its:_____


4398653_3.DOC

EXHIBIT A
PAGE 51



**EXHIBIT A**
**PAGE 52**

ACCORDINGLY, each of the parties has caused this Asset Purchase Agreement to be executed in the manner appropriate for each, as of the date first above written.

TYPHOON

By

Its

FABIAN DEVELOPMENT, INC.

By

Its

For the limited purposes set forth in Section 3.17

ADDITIONAL SELLER

EXHIBIT A
PAGE 53

PABBAN DEVELOPMENT, INC.

SCHEDULES TO ASSET PURCHASE AGREEMENT

Schedule 1.1(a)

Key Personnel

Harry N. Herbert
Bill Starks
Lawrence Green

Schedule 1.1(b)

Regulatory Filings and Documentation

- The Natrix System has been listed on a manufacturing schedule of a New Medical Device Manufacturing License Application filed with the California Department of Public Health- Food and Drug Branch by an Affiliate of Seller (as previously disclosed and identified to Medtronic).

- An Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 17171 Daimler Avenue, Irvine, California, 92614 has made a regulatory filing with the FDA pursuant to device listing requirements under 21 C.F.R. 807.

**EXHIBIT A**
**PAGE 56**

Schedule 2.3.1

Contracts

None.

EXHIBIT A
PAGE 57

Schedule 2.9(i)

Purchase Price Allocation

The amount of $103,423 shall be allocated to Class V and the balance of the Purchase Price, less imputed interest, shall be allocated to Class VI and VII.  Seller shall prepare Form 8594 and provide it to Buyer by August 15, 2009 and both parties shall use such Form 8594 for all income tax reporting purposes.

*FINAL*

**PABBAN DEVELOPMENT, INC.**

**DISCLOSURE SCHEDULE**

This Disclosure Schedule (the "Disclosure Schedule") has been prepared and is being delivered pursuant to the Asset Purchase Agreement, dated as of August 7, 2008 (the "Asset Purchase Agreement"), by and among Pabban Development, Inc., a California corporation ("Pabban") and Medtronic, Inc., a Minnesota corporation ("Medtronic"). All capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Asset Purchase Agreement.

No reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule, as some matters stated herein are given for informational purposes only.

This Disclosure Schedule is organized by sections as they appear in the Asset Purchase Agreement. The headings contained in this Disclosure Schedule are included for convenience only, and are not intended to limit the effect of the disclosures contained in this Disclosure Schedule or to expand the scope of the information required to be disclosed in this Disclosure Schedule.

The information and disclosures contained in each section of this Disclosure Schedule shall be deemed to be disclosed against the corresponding section of the Asset Purchase Agreement (any disclosure contained in any section of this Disclosure Schedule shall be deemed included in each other applicable section of this Disclosure Schedule, but only to the extent the applicability of the disclosure in such first section of this Disclosure Schedule is reasonably clear upon a reading of such disclosure.)

1

**EXHIBIT A**
**PAGE 59**

Section 3.1

Listing of Certain Assets and Data

Section 3.1.1 Manufacturing Assets; Equipment

*Assets*

- Natrix Gun Molds

*Mold List*

| Part Name | Part No. | Mold Class | Mold Type | Mold No. |
|---|---|---|---|---|
| Housing Left | 02821027 | 104 | SDM Inserts | 10212 |
| Housing Right | 02821026 | 104 | SDM Inserts | 10212 |
| Trigger Quick Release | 02821001 | 103 | SDM Inserts | 10214 |
| Handle, Liquid Reservoir | 02821025 | 104 | SDM Inserts | 10215 |
| Handle, Pumping | 02821029 | 104 | SDM Inserts | 10229 |
| 10CC Syringe | 02821034 | 103 | Complete | 10235 |
| Valve Input | 02821018 | | MUD Unit | 10240 |
| Body | 02821024 | 103 | Complete | 10242 |
| Syringe Connector | 02821019 | 104 | SDM Inserts | 10243 |
| CAP, 10CC Syringe | 02821017 | 103 | | 10244 |
| General CAP Assembly, 10CC | 02831132 | 103 | | 10244 |
| Plunger, 10CC Syringe | 02821022 | 104 | SDM Inserts | 10252 |
| Funnel Syringe | 02821059 | 103 | SDM Inserts | 10263 |
| Adapter Input Valve | 02821062 | 103 | SDM Inserts | 10291 |
| Ring | 02821030 | 103 | SDM Inserts | 10292 |
| Plunger, Gun | 02821020 | 103 | MUD Unit | 10352 |
| Valve, Pressure | 02821021 | 104 | Family | 10353 |
| Piston Pressure Relief | 02821023 | 104 | Family | 10354 |
| Valve Input | 02821018 | 104 | SDM Inserts | 10357 |
| Cover Liquid Reservoir | 02821028 | 104 | SDM Inserts | 10374 |
| CAP, 10CC Syringe Kyphon | 02821134 | 104 | SDM Inserts | 10414 |
| Kyphon Cap Assembly 10CC | 02831138 | 104 | SDM Inserts | 10414 |
| Manual Bleed Connector | 02821125 | 104 | SDM Inserts | 10417 |
| Kyphon Cap Assembly | 02821133 | 104 | SDM Inserts | 10418 |
| CAP 10CC Syringe Kyphon | 02821126 | 104 | | 10420 |
| Kyphon CAP Assembly | 02831133 | 104 | | 10420 |
| Auto Bleed Connector 10CC | 02821124 | 104 | SDM Inserts | 10423 |

*Existing Assembly Fixtures and Tooling currently being used by the Seller in the Natrix System*

Gun Assembly, P/N 02821033
- Fixture 364: Fixture used to press and bond input valve into body (used with Arbor Press)
- Fixture 339: Multiple Body Holding Fixture, used to hold bodies while set screw is being tightened
- Fixture 342: Custom wrench with stop used for tightening set screw
- Fixture 343: Torque wrench used to torque tubing brass fitting into body
- Fixture 340: Multiple Holding Fixture, used to hold several liquid reservoir handles
- Fixture 351: Fixture used to press ring with saline bag into liquid reservoir (used with arbor press)
- Fixture 348: Pressurization fixture

Tubing Assembly P/N 02831035
- Fixture 297-1: Bottom Crimping Tool, used to crimp ferrule & sleeve (used with arbor

2

EXHIBIT A
PAGE 60

press)
- Fixture 297-2: Top Crimping Tool, used to crimp ferrule & sleeve (used with arbor press)
- Fixture used to drill bodies on CNC milling machine (Qty: 2)
- Fixture: Tube cutting fixture used to cut 4' length
- Fixture: O-ring placement fixture used to install o-ring onto plunger

Syringe Assembly Tooling
- Fixture: Holding fixture for syringe and shrink tubing (front load syringe)
- Fixture: Holding fixture for syringe and shrink tubing (pour in syringe)
- Fixture: Rod fixture used to move plunger inside syringe (pour in syringe)

### Additional Fixtures and Tooling that are Currently in Development

Additional Fixtures and Tooling Currently in Development
- Fixture 364: Fixture used to press and bond input valve into body (used with Arbor Press) (Qty: 1)
- Fixture 342: Wrench with stop used for tightening screw (Qty: 3)
- Fixture 343: Torque wrench used to torque tubing brass fitting into body (Qty: 2)
- Fixture 340: Multiple Holding Fixture, used to hold several liquid reservoir handles (Qty: 1)
- Fixture 351: Arbor press used to press ring with saline bag into liquid reservoir (Qty: 2)
- Fixture 296: Arbor press used to crimp ferrule and sleeve onto tubing (Qty: 2)
- Fixture 297-1: Bottom Crimping Tool, used to crimp ferrule & sleeve (used with arbor press) (Qty: 2)
- Fixture 297-2: Top Crimping Tool, used to crimp ferrule & sleeve (used with arbor press) (Qty: 2)
- Fixture 348: Pressurization fixture (Qty: 2)
- Fixture 365: Fixture used to drill bodies on CNC milling machine (Qty: 2)

### Natrix Tooling, Validation & Production in Progress

Natrix Syringe Validations ETO
- ETO Sterilization Validation (not yet completed)
- Six-Month Packaging Validation (not yet completed)
- One-Year Packaging Validation (to be completed by early September 2008)
- Biocompatibility (not yet completed)

Natrix Delivery System Validations Gamma
- Microbial challenge (not yet completed)
- Packaging Validation (one year) (to be completed by September 2008)

Natrix Assembly Tooling & Production in Process
- Pressurization Fixtures (2 in process)
- FDA Grade Lubrication Qualification
- Housing Reservoir Strengthening
- Shrink Sleeve Consistency
- Reservoir Plunger Mold to eliminate secondary machining operation
- Syringe Cap Welding Improvements (to eliminate flash & increase tolerance on the .065 dimension)

### Natrix Delivery System Research and Development Matters in Progress

- Sellers are currently in the process of improving the engineering processes in connection with the following research and development matters- all of which are on hold after the Closing unless otherwise instructed by Kyphon Sarl

| Part # & Description | Description | Status | Comments |
|---|---|---|---|
| Saline Bag | Source alternative material to reduce saline loss (lower WMTR) | In process | Waiting for new samples requested on 06/24/2008. Evaluate new material |

3

**EXHIBIT A**
**PAGE 61**

| Relief Valve | Modify the pressure relief valve to optimize the consistency of delivery pressure. Change the spring and different material for the plunger valve. | In process | Awaiting sterile sample for evaluation |
|---|---|---|---|
| Handle Liquid Reservoir | Modify the mold to optimize the strength. Add ribs around the OD of the handle where the ring, saline bag, and handle are compressed together. | In process | Tooling modification in process |
| Tray and Lid 810-00 | To decide version to be made (w/ or w/o pressure gauge cavity and syringe retain cavity) | On hold | Finalize the design |
| Self Prime | Research and develop self prime for Natrix Gun | In process | Order parts, build test samples, and evaluation |
| Pressure Gauge | a) Research appropriate pressure gauge for kyphoplasty application<br>b) Sourcing and Sample<br>c) Finalize | On hold | Continue sourcing vendors and evaluate samples |
| Pressure Gauge Adapter (manifold which connect the pressure gauge to the body) | a) Concept design and Modeling<br>b) Prototype<br>c) Finalize design<br>c) RFQ<br>d) Place order | On hold | Need to create two CAD version. One for molding and one for Machine method. |
| CARTRIDE INPUT VALVE | Reduce production assembly cycle time. Assembly problematic. | On hold | Future project. |
| CARTRIDE PRESSURE VALVE | Reduce production assembly cycle time. Assembly problematic. | On hold | Future project. |
| 14CC Syringe | a) Preliminary design<br>b) RFQ<br>c) Place order | On hold | Future project. |
| 02831033 Delivery gun sealing study (real-time, 6 months, 12months aging) | a) Gun sealing experiment (Loctite & Double O-rings) Samples — Completed<br>b) Test Protocol — Completed<br>c) Test — In process<br>d) Test Report — In process | | Report for 6 months is completed. Waiting for 12 months due to evaluate samples. |
| Manual Bleed Connector P/N 02821125 | b) Design and finalize drawing — Completed<br>c) RFQ — Completed<br>d) First article samples — Completed<br>e) FA inspection — Completed<br>f) Test — Completed<br>g) Approval — On hold<br>h) Post Sterilization Validation | | Ready to build, sterilize and validate. Test is on hold. |
| 10cc Syringe | a) Post Gamma Sterilization Validation | Completed | Test Completed: Samples bursted at 3200-4600 psi |
| 10cc Syringe | a) Post ETO Sterilization Validation | Completed | Test Completed: Samples bursted at 3800-4300 psi |
| Solid Stop on Syringe Connector | | | |

*Natrix Delivery System Miscellaneous Matters in Progress*

- Sellers are currently in the process of improving the engineering processes in connection with the following miscellaneous matters- all of which are on hold following Closing unless otherwise instructed by Kyphon Sarl

4

EXHIBIT A
PAGE 62

| Part # & Description | Description | Status | Comments |
|---|---|---|---|
| Mixing Cap | Modify the thread for more engagement. Build some samples with carbon filter cartridge to eliminate the PMMA odor. | In process | |
| Pressure Gauge | a) Research appropriate pressure gauge for kyphoplasty application | In process | Continue sourcing vendors and evaluate samples |
| | b) Sourcing and Sample | In process | |
| Mixing Cap Large Opening | a) Quote | Completed | Awaiting for 1st article samples from Bob |
| | b) 1st article sample | In process | |
| | c) Testing | TBD | |
| Fluid Aspiration Kit | Waiting feed back from Dave | In process | |
| Thick Cement | Source for vendor or chemist to formulate our own cement | In process | Evaluate and test samples |
| Vacuum Venting Port for Mixing System | Waiting feed back from Dave | On hold | |
| Pig's vertebrate experiment for thick cement and extravasion | a) Test protocol | On hold | |
| | b) Test fixtures | On hold | |
| | c) Test | On hold | |
| | d) Test report | On hold | |

5

EXHIBIT A
PAGE 63

Section 3.1

Listing of Certain Assets and Data

Section 3.1.2 Business Intellectual Property

*Inchoate Intellectual Property List- Disclosures*

| No. | Matter | Name | Disclosure |
|---|---|---|---|
| 1 | Disclosure/IR | Void Filling Device | High pressure delivery, using a PMMA or biologic with larger elements to potentially elevate endplates large enough elements to avoid extravasation only can be accomplished with higher pressure delivery |
| 2 | Disclosure/IR | BFD with Slats | Extruded out of disposable BFD delivery cartridge via high pressure no syringe between pressure line and BFD, direct hook up CFD preloaded with cylinders/slats to be extruded end feature controlling directional extrusion and stacking/orientation |
| 3 | Disclosure/IR | Wire Stent Mesh | Same principal as marlex mesh with cement pressurized outside extravasation outside mesh dependent on the high pressurized source |
| 4 | Disclosure/IR | Balloon Fill Kit | Cost: simple add on kit to existing Natrix configuration, eliminate need for Merit fill |
| 5 | Disclosure/IR | Height Restoration with Flexible Liner | 2 step procedure without removal of balloon before injecting, again dependent on high pressure |
| 6 | Disclosure/IR | Pressure Gauge Gun | Tactile, audible and now visual reference to cement viscosity, safe confirmation of pressure release |
| 7 | Disclosure/IR | Tubing Length Greater Than 4' (current) | For greater protection in CT cases where greater right, greater distance desired |
| 8 | Disclosure/IR | Viscoplasty | Viscous cement balloon creating height elevation in one step, high pressure, directional delivery |
| 9 | Disclosure/IR | Proprietary Cement | To optimize viscous delivery system cement specs currently being characterized |
| 10 | Disclosure/IR | Manual Venting System | Part of wing nut assembly to manually vent air in the delivery syringe |
| 11 | Disclosure/IR | Wingnut Automatic Venting | Part of wing nut assembly that automatically vents air |
| 12 | Disclosure/IR | Fenestrated Cannula | High pressure delivery gun directional flow, balloon capsule |

*Intellectual Property Applications*

| Matter | Inventor | Assignee | Status |
|---|---|---|---|
| U.S. Patent Application Serial No. 10/776,209 Filed: 02/12/2004 Manual Pump Mechanism and Delivery System (79693.010700/US) | Lawrence Green & Arturo A. Gonzalez | Pabban Development, Inc. | Pending |
| Canadian Patent Application Serial No. 2,493,421 Filed: 01/20/2005 Manual Pump Mechanism and Delivery System (79693.010700/CA) | Lawrence Green & Arturo A. Gonzalez | Pabban Development, Inc. | Pending |
| Chinese Patent Application Serial No. 200510009418.X | Lawrence Green & Arturo A. Gonzalez | Pabban Development, Inc. | Pending |

6

**EXHIBIT A**
**PAGE 64**

| | | | |
|---|---|---|---|
| Filed: 02/08/2005<br>Manual Pump Mechanism and Delivery System<br>(79693.010700/CN) | | | |
| European Patent Application<br>Serial No. 05000725.1<br>Filed: 01/14/2005<br>Manual Pump Mechanism and Delivery System<br>(79693.010700/EP) | Lawrence Green &<br>Arturo A. Gonzalez | Pabban Development, Inc. | Pending |
| Japanese Patent Application<br>Serial No. 027859/2005<br>Filed: 02/03/2005<br>Manual Pump Mechanism and Delivery System<br>(79693.010700/JP) | Lawrence Green &<br>Arturo A. Gonzalez | Pabban Development, Inc. | Pending |
| U.S. Trademark Application<br>Serial No. 76/660,760<br>Reg No. 3,392,320<br>Filed: 05/30/2006<br>NATRIX<br>(79693.010200/US) | N/A | Bio-Medical Devices, Inc. | Registered<br>March 4,<br>2008. |

7

**EXHIBIT A**
**PAGE 65**

Section 3.1

Listing of Certain Assets and Data

Section 3.1.3 Certain Agreements, Etc.

None.

8

EXHIBIT A
PAGE 66

Section 3.1

Listing of Certain Assets and Data

Section 3.1.4 Permits, Licenses, Etc.

None.

9

EXHIBIT A
PAGE 67

**Section 3.2**

**Organization; Directors and Officers**

<u>Corporate Officers</u>

President: Harry N. Herbert

Secretary: Harry N. Herbert

Treasurer: Harry N. Herbert

<u>Corporate Directors</u>

Harry N. Herbert

Bradford H. Hack

Ben A. Trainer

10

Section 3.6

Compliance with Law

- The Natrix System has been listed on a manufacturing schedule of a New Medical Device Manufacturing License Application filed with the California Department of Public Health- Food and Drug Branch by an Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 17171 Daimler Avenue, Irvine, California, 92614.

- An Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 17171 Daimler Avenue, Irvine, California, 92614 has made a regulatory filing with the FDA pursuant to device listing requirements under 21 C.F.R. 807.

EXHIBIT A
PAGE 69

Section 3.8

Consents

None.

12

EXHIBIT A
PAGE 70

Section 3.9

Title to and Condition of the Purchased Assets

Those assets listed under "Mold List" under Schedule 3.1.1 above are located at the facilities of an Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 13948 Mountain Avenue, Chino, California, 91710.  All other tangible assets listed under Schedule 3.1.1 are located at the facilities of an Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 17171 Daimler Avenue, Irvine, California, 92614.

EXHIBIT A
PAGE 71

**Section 3.10**

**Contracts**

None.

14

EXHIBIT A
PAGE 72

Section 3.11

Intellectual Property

In June 2008, Nysa Membrane Technologies, Inc., a supplier of high performance, single use and multi-cycle disposable chromatography products founded in 2005 announced Natrix Separations, Inc. as the company's new name.

15

EXHIBIT A
PAGE 73

Section 3.12

No Finders

None.

16

EXHIBIT A
PAGE 74

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

James M. Whitelaw (Bar No. 171974), THOMAS WHITELAW & TYLER LLP
18101 Von Karman Ave., Suite 230, Irvine, CA 92612

TELEPHONE NO.: 949-679-6400    FAX NO.: 949-679-6405
ATTORNEY FOR (Name): Plaintiff PABBAN DEVELOPMENT, INC.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 11 2010

ALAN CARLSON, Clerk of the Court

BY 3Q-2010 DEPUTY

CASE NAME:
Pabban Development, Inc. v. Kyphon Sarl; Medtronic, Inc.; et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder | | 00 352665 |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: JUDGE SHEILA FELL |
| | | | | DEPT. C22 |

Items 1–6 below must be completed (see instructions on page 2).

1 Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☑ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2 This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a ☐ Large number of separately represented parties     d ☐ Large number of witnesses
b ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve     e ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
c ☐ Substantial amount of documentary evidence     f ☐ Substantial postjudgment judicial supervision

3 Remedies sought (check all that apply): a ☑ monetary   b ☐ nonmonetary; declaratory or injunctive relief   c ☐ punitive
4 Number of causes of action (specify): five
5 This case ☐ is ☑ is not a class action suit
6 If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 11, 2010
James M. Whitelaw
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

**EXHIBIT A**
**PAGE 75**

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
Non-PI/PD/WD (Other) Tort
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment (*non-domestic relations*)
Sister State Judgment
Administrative Agency Award (*not unpaid taxes*)
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
Declaratory Relief Only
Injunctive Relief Only (*non-harassment*)
Mechanics Lien
Other Commercial Complaint Case (*non-tort/non-complex*)
Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

## EXHIBIT A
## PAGE 76

# SUPERIOR COURT OF CALIFORNIA
### ORANGE COUNTY – CENTRAL JUSTICE CENTER
## CIVIL DEPARTMENT CALENDAR SCHEDULING CHART
**Ex Parte applications must comply with California Rules of Court, rules 3.1200 – 3.1207**
**Court Local Rules are located at www.occourts.org**

| LrDept. | Judicial Officer | Motion Days and Time | Ex Parte Days and Time | Telephonic Notice to Courtroom the day before the hearing but no later than: | Ex Parte Application and Proposed Order presented to the court the day before the hearing but no later than: | Rulings posted on Internet? | Other Call for available dates. |
|---|---|---|---|---|---|---|---|
| C11 | BANKS 657-622-5211 | Friday 1:30 p.m. | Daily 8:45 a.m. | Noon | 3:00 p.m. | Yes | Call (657) 622-5211 to reserve motion date. Moving party must submit on moving papers unless court invites oral argument. Counsel must reserve Ex Parte hearings with the courtroom by calling (657) 622-5211 and supply whatever information may be requested. |
| C20 | CHAFFEE 657-622-6220 | Friday 9:30 a.m. | Daily 1:30 p.m. | None | Noon | Yes - 3:00 p.m. the day before | Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310) 914-7884 or (888) 88-COURT |
| C15 | FIRMAT 657-622-5215 | Thursday 3:00 p.m. | Daily 8:30 a.m. | Not required | 11:00 a.m. | Yes | Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT. |
| C18 | DI CESARE 657-622-5218 | Thursday 1:30 p.m. | M,T,W,F 1:30 p.m. | Noon | 4:30 P.M. if day prior to the Ex Parte hearing is Monday-Thursday; 3:00 P.M. if day prior to the Ex Parte hearing is Friday. | Yes - 3:00 p.m. the day before | If there is no appearance for argument, the court will order the tentative ruling to become effective and final the date of the hearing. |
| C22 | FELL 657-622-5222 | Wednesday 10:00 a.m. | Daily 8:30 a.m. | Not required | 2:00 p.m | Yes - 4:30 p.m. the day before | Moving party must submit on moving papers unless the court invites oral argument. Oral argument will be heard on the hearing date. Oppositions must be in writing but may be hand written if presented at the time of appearance. |
| C33 | GLASS 657-622-5233 | Tuesday 9:00 a.m. | Monday 10:00 a.m. T, W, Th, F 9:00 a.m. | 9:00 a.m. | 3:00 p.m. Oppositions due by 9:00 a.m. day before hearing | Yes - Friday before hearing | Oral argument will be heard at the hearing. Counsel may submit on pleadings but must inform clerk prior to calendar call. Call clerk if all sides submit to tentative ruling. The court may allow oral argument but it will be limited to 5 minutes or less per side. |

**EXHIBIT A**
**PAGE 77**

# SUPERIOR COURT OF CALIFORNIA
## ORANGE COUNTY – CENTRAL JUSTICE CENTER
# CIVIL DEPARTMENT CALENDAR SCHEDULING CHART
Ex Parte applications must comply with California Rules of Court, rules 3.1200 – 3.1207
### Court Local Rules are located at www.occourts.org

| Dept. | Judicial Officer | Motion Days and Time | Ex Parte Days and Time | Telephonic Notice to Courtroom the day before the hearing but no later than: | Ex Parte Application and Proposed Order presented to the court the day before the hearing but no later than: | Rulings posted on Internet? | Other. Call for available dates. |
|---|---|---|---|---|---|---|---|
| C31 | HORN 657-622-5231 | Wednesday 1:30 p.m. | M, T, W, Th, Fri 9:00 a.m. | 12:00 p.m. before Ex Parte Hearing. Reservation must be made with courtroom prior to the hearing. | 3:00 p.m. | No | |
| C24 | HUNT 657-622-5224 | T, W, Th 8:30 a.m. | Daily 1:30 p.m. | Not required | Submit documents at time of hearing | No | Motions for Summary Judgment & Demurrers must be reserved with C-24 prior to filing by calling (657)522-5224. Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT |
| C26 | LEWIS 657-622-5226 | Monday 10:30 a.m. | T, W, Th,F 8:30 a.m. | 10:00 a.m. | 2:00 p.m | Yes - noon Friday before | Late ex parte applications shall not be accepted. Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT |
| C3 | MAKINO 657-622-5203 | Friday 9:00 a.m. | M,T,W,Th 8:45 a.m. | 10:00 a.m. Reservation must be made with courtroom prior to Ex Parte hearing. | 3:00 p.m. | Yes | Once tentative ruling is posted NO continuance will be granted or hearing cannot be taken off calendar |

EXHIBIT A
PAGE 78

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV10- 533 CJC  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
PABBAN DEVELOPMENT, INC.

**DEFENDANTS**
KYPHON SARL, MEDTRONIC, INC., AND DOES 1-100,

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
C. Tucker Cheadle (tcheadle@cheadlelaw.net),
1000 Quail Street, Suite 100, Newport Beach, CA 92660
Tel. 949-553-1066/Fax 949-553-2477

Attorneys (If Known)
Stuart A. Shanus (sshanus@reedsmith.com)
Reed Smith LLP, 1901 Avenue of the Stars, Suite 700,
Los Angeles, California 90067
Tel. 310-734-5200 / Fax 310-734-5299

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding   ☑ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No   ☑ **MONEY DEMANDED IN COMPLAINT:** $ 31,250,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Sections 1332 and 1441

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: SACV 10-533 CJC (RNB)

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　 ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　 ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　 ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Pabban Development, Inc. - Orange County, California | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Medtronic, Inc. - Minnesota<br>Kyphon Sarl - Switzerland |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　　**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _~~Smith~~_　　　　Date  May 3, 2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |