ORIGINAL

1  JOSEPH E. THOMAS (State Bar No. 101443)
   *jthomas@twtlaw.com*
2  JAMES M. WHITELAW (State Bar No. 171974)
   *jwhitelaw@twtlaw.com*
3  THOMAS B. KING (State Bar No. 241661)
   *tking@twtlaw.com*
4  THOMAS WHITELAW & TYLER LLP
   18101 Von Karman Avenue, Suite 230
5  Irvine, California 92612-7132
   Telephone: (949) 679-6400
6  Facsimile: (949) 679-6405

7  C. TUCKER CHEADLE (State Bar No. 81669)
   *tcheadle@cheadlelaw.net*
8  1000 Quail Street, Suite 100
   Newport Beach, California 92660
9  Telephone: (949) 553-1066
   Facsimile: (949) 553-2477
10
   Attorneys for PLAINTIFF PABBAN
11 DEVELOPMENT, INC.

12

13                    UNITED STATES DISTRICT COURT

14        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

15

16 PABBAN DEVELOPMENT, INC.          CASE NO. SACV 10-533 CJC (RNBx)

17                                   **FIRST AMENDED COMPLAINT
              Plaintiffs,            FOR DAMAGES AND
18                                   DECLARATORY RELIEF**
        vs.
19                                   **JURY TRIAL DEMANDED**
   KYPHON SARL AND MEDTRONIC,
20 INC.

21            Defendants.

22

23

24

25

26

27

28

109327v5

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1   Plaintiff Pabban Development, Inc., ("Pabban") for its Amended Complaint

2   against defendants Kyphon Sarl and Medtronic, Inc. ("Medtronic"), (collectively,

3   "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

5   1.      On March 11, 2010, Pabban initiated this action in the Superior Court

6   of the State of California, in Orange County, California.  On May 4, 2010,

7   Medtronic removed the case to the Central District of California, purportedly

8   pursuant to 28 U.S.C. § 1331 and § 1441.  The action was stayed on June 23, 2010

9   to permit the parties to conduct non-binding arbitration.  The parties completed this

10  arbitration on January 18, 2011.  On April 12, 2011, the Court lifted the stay and

11  entered an order permitting Pabban to amend its complaint.

## JURISDICTION AND VENUE

13  2.      Pabban is a California corporation having its principal place of business

14  in Orange County, California.  Defendant Medtronic is a Minnesota corporation

15  whose principal place of business is in Minnesota.  Defendant Kyphon Sarl is

16  organized under the corporate laws of Switzerland.  Defendant Kyphon Sarl

17  purports that its principal place of business is in Switzerland.  As set forth below,

18  the amount in controversy, without interest and costs, exceeds the sum or value

19  specified by 28 U.S.C. §1332.

20  3.      This is a civil action seeking damages arising out of Defendants' failure

21  to comply with their contractual obligations.  This Court has subject matter

22  jurisdiction pursuant to 28 U.S.C. §1332, provided that the representations made by

23  defendants Medtronic and Kyphon Sarl concerning their corporate status and their

24  respective principal places of business are accurate.

25  4.      Defendants Kyphon Sarl and Medtronic have purposefully engaged in

26  business in this judicial district and in the State of California by entering into an

27  Asset Purchase Agreement with Pabban, which is located in Orange County,

28  California, and by purchasing assets which were located in Orange County

109327v5

1

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

California.  Pabban is headquartered in this judicial district, and its performance under the Asset Purchase Agreement occurred in Orange County, California.  Defendants' breach of this contract also occurred in the State of California.

## FACTUAL BACKGROUND

5.      Pabban is a company located in Irvine California that is dedicated to developing biomedical devices.  Pabban has two affiliated  companies—Syntech International and Bio-Medical Devices, Inc.—that operate from a single facility in Irvine, California.  Each of these companies is managed by Nick Herbert, CEO of Pabban.

6.      In 2001, Pabban began development on a system that would assist physicians in performing spinal surgery to treat Vertebral Compression Fractures ("VCF").  Doctors treat the pain associated with these fractures by injecting bone cement into the patient's spine to stabilize, or set the fracture.  The two different procedures for treating VCFs are called Vertebroplasty and Kyphoplasty. Physicians face many challenges during VCF surgery due to the unpredictable thickening (setting time) of surgical bone cement following mixing.

7.      Pabban created the Natrix System to address these challenges— providing a new level of control and safety for doctors and patients alike. This was a significant leap from existing devices in the market that utilized mechanical advantage alone.  Experts in the field saw the Natrix as a significant break through, for its ability to consistently deliver any bone fillers on the market (regardless of viscosity, or hardening speed), for a wider window of time, with more precision and control.  The fact that users were now able to move further from dangerous beam scatter was a major added bonus. Pabban filed patent applications covering the Natrix System throughout the world.

8.      After several years of development, Pabban offered the Natrix System to key opinion leaders and local doctors for testing and evaluation, in anticipation of launching Natrix as a commercial product.  These doctors used the Natrix system in

live Vertebroplasty and Kyphoplasty procedures, and provided helpful and very favorable feedback on the Natrix product. Based on this feedback, in 2007-2008, Pabban moved forward with plans to finalize development and commercialize the Natrix System.

9. Meanwhile, by 2006-2007, Kyphon, Inc. the parent company of defendant Kyphon Sarl, was the dominant player in the treatment of VCFs. Kyphon, Inc. pursued an aggressive mergers and acquisitions program to protect its position in the marketplace. In 2007, Kyphon, Inc. purchased the "Confidence Device" cement delivery system for approximately $100,000,000. Kyphon Inc. was itself acquired by defendant Medtronic in a transaction announced in July 2007. Due to Kyphon Inc.'s dominant position in the market for VCF treatment, however, the United States Federal Trade Commission ordered it to stop using the Confidence Device. This order was issued on December 3, 2007, and required Kyphon Inc. to divest itself of the Confidence Device within 60 days of the order. Kyphon Inc. eventually sold the Confidence Device assets to De Puy, one of its main competitors, for approximately $100,000,000. De Puy, an affiliate of Johnson and Johnson, began selling the Confidence Device in June 2008.

10. After the FTC divestiture order, Kyphon, Inc. contacted Pabban CEO Nick Herbert and expressed interest in purchasing the Natrix System, and conducted site visits. From March 2008 to August 2008, Pabban, Medtronic, and Kyphon conducted due diligence and extensive contract negotiations concerning the Natrix System. Medtronic and Kyphon teams conducted on-site inspections at Pabban's facilities on May 22-23, 2008 and June 12, 2008. In addition, Medtronic's due diligence and contract negotiations teams were in close communication with Pabban during this time period. Medtronic had a full and fair opportunity to evaluate the Natrix System during the due diligence process. Medtronic employees were present during actual patient surgeries where the Natrix System was used. As a result, Medtronic knew that the Natrix System was ready for use with patients. Medtronic

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

was also aware that the Natrix System had not yet completed the packaging validation process.  Moreover, Defendants were aware that the existing Natrix System packaging (which was undergoing packaging validation) was different from their packaging and processing specifications they would require.  As major manufacturers of medical devices, Defendants were also aware that any changes to the existing packaging or processes would lead to delays in their plans to commercialize the Natrix system.  These issues were presumably reflected in the price Medtronic was willing to pay for the Natrix System.

11.     After the lengthy due diligence and contract negotiation period, Medtronic and Pabban signed an Asset Purchase Agreement August 7, 2008.  The named parties to the contract are Pabban, as seller, and Kyphon Sarl (a Kyphon Inc. subsidiary), as buyer.  Medtronic executed the Asset Purchase Agreement as a guarantor of Kyphon Sarl's obligations under the Asset Purchase Agreement.  A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit A** and is incorporated by reference.

12.     Pursuant to the Asset Purchase Agreement, Pabban transferred its intellectual property in the Natrix System to the Defendants, including the Natrix designs, plans, trade secrets, patent applications, etc.  Medtronic also entered into a supply agreement with Syntech International, one of Pabban's affiliated companies, to build the Natrix System for Medtronic according to Medtronic's specifications.

13.     As payment for the Natrix System, Kyphon Sarl and Medtronic promised to pay Pabban a fixed fee of $28,000,000 as follows:

(a)     At closing: $18,750,000;

(b)     Eighteen months after closing: $1,250,000);

(c)     Eight months after the closing: $4,000,000;

(d)     Upon the earlier of (1) ten business days after commercial launch or (2) twelve months after the closing: $4,000,000;

14.     Kyphon Sarl and Medtronic further promised to pay Pabban royalties

109327v5

4

1  of $75 for each sale of a Medtronic Natrix System, commencing with the 500th

2  commercial sale, for two years following such date, and $50 for each sale for the

3  following two years.  After the 15,000[th] aggregate Commercial Sale of a Medtronic

4  Natrix System, Medtronix and Kyphon Sarl agreed to pay Pabban $4,000,000.  The

5  Asset Purchase Agreement capped total compensation (including both the fixed fee

6  and royalty components) to Pabban at $50,000,000.  Thus, because the fixed

7  payment to Pabban was $28,000,000, the total potential royalty payments to Pabban

8  could not exceed $22,000,000.

9      15.     Pabban and Kyphon Sarl finalized and executed the Asset Purchase

10  Agreement on August 7, 2008 (the "Closing Date").  On or around the closing date,

11  Pabban transferred its assets in the Natrix System (including its intellectual

12  property) to Kyphon Sarl.  Kyphon Sarl made an initial payment to Pabban at

13  closing in the amount of $18,750,000.

14      16.     Immediately after closing the Asset Purchase Agreement with Pabban,

15  Medtronic began working with Syntech to modify and produce a Kyphon-branded

16  version of the Natrix System.  This work was performed pursuant to the Global

17  Supply Agreement, which required Medtronic to provide plans and instructions for

18  how to build and package the Natrix System.  After less than three months,

19  however, Medtronic elected to terminate the supply agreement.  Medtronic's stated

20  justification for terminating the supply agreement were alleged defects in the Natrix

21  product.  Yet the claimed "defects" were a result of Medtronic's changes in the

22  processing and packaging of the Natrix system.

23      17.     On April 7, 2009, Kyphon Sarl failed to make the $4,000,000 payment

24  described in ¶13(c) of this Complaint.  Instead, Kyphon Sarl sent an "officer's

25  certificate" – a document required under the Asset Purchase Agreement that

26  describes alleged losses under the agreement.  This officer's certificate claimed over

27  $15,000,000 in losses, but did not describe basis for those losses or how they were

28  incurred.  The officer's certificate stated Kyphon Sarl would invoke its right of

109327v5

5

1  setoff and that it would not make the payment required under the Asset Purchase

2  Agreement.

3      18.    On August 6, 2009, Kyphon Sarl failed to make the $4,000,000

4  payment described in ¶13(d) of this Complaint.  Instead, an attorney for Medtronic

5  sent a letter stating that "Medtronic will not be making the August 7 payment.

6  Medtronic's obligation to make the payment will be decided in the context of the

7  arbitration."

8      19.    On September 21, 2009, Medtronic announced the U.S. release of the

9  "Kyphon Cement Delivery System."  The Kyphon Cement Delivery System is a

10 modified Natrix System.  Pabban is entitled to royalties for Medtronic's sales of the

11 Kyphon Cement Delivery System as described in ¶14 above.  On information and

12 belief, since September 2009, Medtronic and Kyphon, Inc. have sold thousands of

13 units of the Kyphon Cement Delivery System since September 2009.  Yet Kyphon

14 Sarl has failed to make any of the payments described in ¶14 of the Complaint.

15 Defendants have also failed to comply with their contractual obligation to provide

16 written royalty reports.  *See* Exh. A ¶2.5.

17     20.    On February 7, 2010, Kyphon Sarl failed to make the $1.25 million

18 payment described in ¶13(b) of the complaint.

19     21.    In total, Kyphon Sarl has failed to pay up to $31,250,000 that is due

20 and owing to Pabban.

21     22.    Paragraph 8.13 of the Asset Purchase Agreement provides that

22 Medtronic will cause Kyphon Sarl to comply with and to satisfy its obligations

23 under the Asset Purchase Agreement and related agreements.  Paragraph 8.13 of the

24 Asset Purchase Agreement further provides that Medtronic will guaranty the

25 payment and performance of all of Kyphon Sarl's obligations under the Asset

26 Purchase Agreement and related agreements.

27     23.    Medtronic. has failed and refused to cause Kyphon Sarl to make

28 payments to Pabban totaling at least $9,250,000 and possibly as much as

$31,250,000, which are due and owing under the Asset Purchase Agreement. Medtronic has also failed and refused to honor its guaranty of Kyphon Sarl's payment obligations under the Asset Purchase Agreement.

## FIRST CAUSE OF ACTION

### (BREACH OF WRITTEN CONTRACT

### AGAINST DEFENDANT KYPHON SARL)

24.     Pabban realleges and incorporates herein paragraphs 1 through 23 of this complaint.

25.     On or about August 7, 2008, Pabban, as seller, and Kyphon Sarl, as buyer, executed a written Asset Purchase Agreement for the purchase of certain intellectual property.

26.     Pabban has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Asset Purchase Agreement.

27.     Pabban transferred and delivered to Kyphon Sarl the Purchased Assets as identified in the Asset Purchase Agreement.  Kyphon Sarl accepted and received the Purchased Assets.

28.     As set forth in paragraphs 13 and 14 above, Kyphon Sarl agreed to pay Pabban at least $28,000,000 and as much as $50,000,000 pursuant to the terms of the Asset Purchase Agreement.

29.     Kyphon Sarl made a payment at Closing to Pabban in the amount of $18,750,000.

30.     Kyphon Sarl has breached the Asset Purchase Agreement as follows:

      (i)     On April 7, 2009, Kyphon Sarl failed to honor its promise to pay $4,000,000 to Pabban as described in ¶13(c) above.

      (ii)     On August 7, 2009, Kyphon Sarl failed to honor its promise to pay $4,000,000 to Pabban as described in ¶13(d) above.

      (iii)     On February 7, 2010, Kyphon Sarl failed to honor its promise to

pay $1,250,000 to Pabban as described in ¶13(b) above.

(iv)   Since the September 2009 release of the Kyphon Cement Delivery System, which is based on the Natrix technology that Kyphon Sarl purchased from Pabban, Kyphon Sarl has failed to honor its promise to pay royalties to Pabban.  These royalty payments are worth as much as $22,000,000, as described in ¶14 above.

(v)    Since the September 2009 release of the Kyphon Cement Delivery System, Kyphon Sarl has failed to honor its promise to provide quarterly royalty reports detailing the royalty-bearing sales and accrued royalties.

31.    Further, Kyphon Sarl has been unjustly enriched by its breach of contract, because it has enjoyed the benefit of the intellectual property that it purchased from Pabban (e.g., by selling and profiting from the Cement Delivery System) without paying the amount that it agreed to pay.

32.    As a result of Kyphon Sarl's breach of the Asset Purchase Agreement, Pabban is entitled to recover damages in an amount no less than $9,250,000 and possibly as much as $31,250,000, as well as costs, interest and other foreseeable damages in an amount according to proof at trial.

## SECOND CAUSE OF ACTION

## (BREACH OF GUARANTY AGAINST DEFENDANT MEDTRONIC, INC.)

33.    Pabban realleges and incorporates herein paragraphs 1 through 32 of this complaint.

34.    On or about August 7, 2008, Pabban, as seller, and Kyphon Sarl, as buyer, executed a written Asset Purchase Agreement for the purchase of certain intellectual property.  Medtronic executed the Asset Purchase Agreement as guarantor of the Kyphon Sarl's obligations under the Asset Purchase Agreement.

35.    On or about August 7, 2008, Pabban, as seller, and Kyphon Sarl, as

1   buyer, executed a written Asset Purchase Agreement for the purchase of certain
2   intellectual property.

3       36.   Pabban has performed all conditions, covenants, and promises required
4   on its part to be performed in accordance with the terms and conditions of the Asset
5   Purchase Agreement.

6       37.   Pabban transferred and delivered to Kyphon Sarl the Purchased Assets
7   as identified in the Asset Purchase Agreement.  Kyphon Sarl accepted and received
8   the Purchased Assets.

9       38.   As set forth in paragraphs 13 and 14 above, Kyphon Sarl agreed to pay
10  Pabban up to $50,000,000.

11      39.   Kyphon Sarl made a payment at Closing to Pabban in the amount of
12  $18,750,000.

13      40.   As set forth above, Kyphon Sarl has breached the Asset Purchase
14  Agreement by failing to honor its promise to pay Pabban up to $31,250,000 for its
15  purchase and use of the Natrix System.

16      41.   Medtronic promised to cause Kyphon Sarl to comply with all of its
17  obligations under the Asset Purchase Agreement.  *See* Asset Purchase Agreement
18  ¶8.13.  Defendant Medtronic further guaranteed the payment and performance of all
19  of Kyphon Sarl's obligations under the Asset Purchase Agreement.  *Id.*

20      42.   Medtronic breached the Asset Purchase Agreement as follows:

21          (i)    Medtronic failed to honor its obligation to ensure Kyphon Sarl's
22                 performance under the Asset Purchase Agreement.

23          (ii)   Medtronic failed to honor its obligation to pay the moneys owed
24                 to Pabban in the event that Kyphon Sarl did not make such
25                 payments.

26      43.   Further, Medtronic has been unjustly enriched by its breach of contract,
27  because it has enjoyed the benefit of the intellectual property that it purchased from
28  Pabban (e.g., by selling and profiting from the Cement Delivery System) without

1   paying the amount that it and Kyphon Sarl agreed to pay.

2       44.    As a result of Medtronic's breach of the Asset Purchase Agreement,

3   Pabban is entitled to recover no less than $9,250,000 and up to $31,250,000, as well

4   as costs, interest and other foreseeable damages in an amount according to proof at

5   trial.

6   **THIRD CAUSE OF ACTION**

7   **(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR**

8   **DEALING AGAINST DEFENDANTS KYPHON SARL, AND MEDTRONIC)**

9       45.    Pabban realleges and incorporates herein paragraphs 1 through 44 of

10   this complaint.

11       46.    On or about August 7, 2008, Pabban, as seller, and Kyphon Sarl, as

12   buyer, executed a written Asset Purchase Agreement for the purchase of certain

13   intellectual property.  Medtronic executed the Asset Purchase Agreement as a

14   guarantor of Kyphon Sarl's obligations under the Asset Purchase Agreement.

15       47.    The Asset Purchase Agreement includes an implied covenant of good

16   faith and fair dealing that is subject to Delaware law.  This implied covenant

17   required Kyphon Sarl to exercise good faith in making its claims of loss under the

18   Asset Purchase Agreement.  Likewise, Kyphon Sarl had an obligation not to

19   exercise its right of setoff unfairly, or without proper justification.  Kyphon Sarl also

20   had an obligation to exercise fair dealing in identifying any losses under the Asset

21   Purchase Agreement, particularly since it enjoyed an advantageous position under

22   the contract, having received the full Natrix System at the outset of the agreement

23   while paying less than 40% of the full purchase price up front.

24       48.    Defendant Kyphon Sarl failed to exercise good faith or fair dealing in

25   its performance under the Asset Purchase Agreement.  Specifically, the alleged

26   "losses" claimed by Kyphon Sarl in its officer's certificate cannot in good faith be

27   attributed to Pabban.  For example, Kyphon Sarl's claim that it paid too much for

28   the Natrix System cannot be Pabban's responsibility under fundamental contract

10

law.  During the arbitration, Kyphon Sarl provided documents that purportedly enumerate its claimed alleged losses.  But the total amount of these alleged losses— even if they were Pabban's responsibility, which they are not—is actually *less* than the amount presently due and owing to Pabban.  Kyphon Sarl has not expressed a willingness to pay the excess amount (which should be undisputed under the setoff provision) to Pabban.  Kyphon Sarl justifies its non-payment by claiming that Pabban committed fraud, but has not and cannot provide any explanation or basis for this allegation.  Kyphon Sarl's attempt to take advantage of its position by identifying moving-target artificial "losses" and unsupported—and unsupportable— allegations of fraud constitute a breach of the implied covenant of good faith and fair dealing.

49.    As a proximate result of Kyphon Sarl's breach of the implied covenant of good faith and fair dealing, Pabban has been damaged in the amount of $31,250,000.

## FOURTH CAUSE OF ACTION

### (COMMON COUNT FOR REASONABLE VALUE OF GOODS SOLD AND DELIVERED AGAINST DEFENDANTS KYPHON SARL AND MEDTRONIC, INC.)

50.    Pabban realleges and incorporates herein paragraphs 1 through 49 of this complaint.

51.    On or about August 7, 2008, in Irvine, California, Pabban sold and delivered certain goods including the Natrix System at the special request of Kyphon Sarl and Medtronic  Kyphon Sarl agreed to pay the fair value of those goods.  Medtronic agreed to satisfy Kyphon Sarl's obligation in the event Kyphon Sarl failed to pay.

52.    At the time of the sale and delivery, the fair and reasonable value of the goods was at least $50,000,000.

53.    Kyphon Sarl made a payment at closing to Pabban in the amount of

109327v5

11

1 $18,750,000, leaving a balance due of $31,250,000.

2       54.    Kyphon Sarl and Medtronic presently owe Pabban up to $31,250,000.

3 **FIFTH CAUSE OF ACTION**

4 **(DECLARATORY RELIEF AGAINST KYPHON SARL)**

5       55.    Pabban realleges and incorporates herein paragraphs 1 through 54 of
6 this complaint.

7       56.    As set forth in paragraphs 13 and 14 above, Pabban and Kyphon Sarl
8 agreed in writing that Kyphon Sarl was indebted to Pabban in the aggregate amount
9 of $50 million.

10       57.    Kyphon Sarl made a payment at closing to Pabban in the amount of
11 $18,750,000.

12       58.    Kyphon Sarl failed and refused to make payments in the amount of
13 $9,250,000 at the time they became due and owing under the Asset Purchase
14 Agreement, as identified in ¶13 of this complaint.

15       59.    Kyphon Sarl further violated its obligations under the Asset Purchase
16 Agreement and has failed and refused to make additional payments under the Asset
17 Purchase Agreement of $22,000,000, as identified in ¶14 of this complaint.

18       60.    On April 7, 2009, Kyphon Sarl sent a letter to Pabban alleging that
19 Pabban had breached section 3.9 and 3.16 of the Asset Purchase Agreement.
20 Kyphon Sarl further alleged that it had incurred or expected to incur over $15
21 million in losses, and that Pabban was obligated to indemnify Kyphon Sarl for these
22 alleged losses.

23       61.    Contrary to Kyphon Sarl's allegations, Pabban complied fully with
24 sections 3.9 and 3.16 of the Asset Purchase Agreement.

25       62.    An actual controversy has arisen and now exists between Pabban and
26 Kyphon Sarl concerning their respective rights and duties in that Pabban contends
27 that it has complied with the  and is entitled to the payments identified in ¶73(b)-(f)
28 above.  Kyphon Sarl disputes these contentions and contends that Pabban has

12

1  breached the Asset Purchase Agreement, and that Kyphon Sarl has suffered

2  damages as a result of this breach.  Kyphon Sarl acknowledges that it has not made

3  the payments required by the Asset Purchase Agreement, but claims that it is

4  entitled to set off its payment obligation in the amount of its damages.

5       63.    Pabban desires a judicial determination of its rights and duties, and a

6  declaration that (1) Pabban has not breached the Asset Purchase Agreement; (2)

7  Kyphon Sarl has not suffered damages as a result of Pabban's alleged breach in the

8  amount of $15 million or otherwise; (3) that Kyphon Sarl has breached the Asset

9  Purchase Agreement by failing to pay the amounts owed to Pabban; (4) in the

10  alternative, that Kyphon Sarl's payment obligations to Pabban exceed any damages

11  that it has suffered and that Kyphon Sarl has breached the asset purchase agreement

12  by failing to pay the amount in excess at it became due.

13       64.    A judicial declaration is necessary and appropriate at this time under

14  the circumstances in order that Pabban may ascertain its rights and duties under the

15  Asset Purchase Agreement.  Declaratory relief would resolve Kyphon Sarl's

16  allegation that Pabban has breached the Asset Purchase agreement and show that

17  Pabban is entitled to the payments identified in ¶73(b)-(f), including the ongoing

18  payments identified in ¶73(f).  Declaratory relief would also settle the issue of

19  whether Kyphon Sarl has a right of setoff.

20  ### PRAYER

21       WHEREFORE, Pabban prays for judgment against defendants and each of

22  them as follows:

23      1.    For damages against Kyphon Sarl, in an amount of $31,250,000;

24      2.    For damages against Medtronic in an amount of $31,250,000;

25      3.    That defendant Kyphon Sarl be ordered to comply with its obligations

26          under the Asset Purchase Agreement by paying Pabban all amounts

27          currently owed and to provide a quarterly statement as set forth in ¶2.5

28          of the Asset Purchase Agreement.

109327v5

13

4.   That defendant Medtronic be ordered to comply with its obligations under the Asset Purchase Agreement by causing Kyphon Sarl to pay Pabban all amounts currently owed and to provide a quarterly statement as set forth in ¶2.5 of the Asset Purchase Agreement, or in the alternative, by providing the payments and quarterly reports to Pabban itself.

5.   For a declaration that (1) Pabban has not breached the Asset Purchase Agreement; (2) Kyphon Sarl has not suffered damages as a result of Pabban's alleged breach in the amount of $15 million or otherwise; (3) that Kyphon Sarl has breached the Asset Purchase Agreement by failing to pay the amounts owed to Pabban; (4) in the alternative, that Kyphon Sarl's payment obligations to Pabban exceed any damages that it has suffered and that Kyphon Sarl has breached the asset purchase agreement by failing to pay the amount in excess as it became due.

6.   For interest as provided by law and/or in an amount according to proof at trial;

7.   For other foreseeable damages in an amount according to proof at trial;

8.   For costs of suit incurred herein including without limitation Pabban's attorneys fees; and

9.   For such other and further relief as the Court may deem just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiff Pabban hereby demands a jury trial.

DATED: April 29, 2011                THOMAS WHITELAW & TYLER LLP


By: _James M. Whitelaw /+K_
JAMES M. WHITELAW
Attorneys for PLAINTIFF Pabban
DEVELOPMENT, INC.

109327v5

14

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Final

# ASSET PURCHASE AGREEMENT

By And Between

KYPHON SARL,

a Swiss limited liability company,

and

PABBAN DEVELOPMENT, INC.,

a California corporation.

August 7, 2008

Final

# ASSET PURCHASE AGREEMENT

THIS AGREEMENT is entered into as of August 7, 2008, by and between Kyphon Sarl ("Medtronic"), a Swiss limited liability company, and Pabban Development, Inc. ("PDI"), a California corporation (PDI referred to herein as the "Seller"), and, for the limited purposes of Section 8.13, Medtronic, Inc.

## RECITALS

WHEREAS, Seller desires to sell, transfer and assign to Medtronic, and Medtronic desires to purchase from Seller, certain assets of Seller, on the terms and for the consideration set forth in this Agreement; and

WHEREAS, in connection with the transfer and assignment of such assets to Medtronic, the parties hereto desire to enter into the Supply Agreement.

## AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements contained herein, and subject to the terms and conditions set forth herein, the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1     Specific Definitions.  As used in this Agreement, the following terms shall have the meanings set forth or referenced below:

"Affiliate" of a specified person (natural or juridical) means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with (through one or more common shareholders), the person specified.  "Control" shall mean ownership of more than 50% of the shares of stock entitled to vote for the election of directors in the case of a corporation, and more than 50% of the voting power in the case of a business entity other than a corporation.

"Assumed Liabilities" means the liabilities described in Section 2.3.1.

"Authorizations" has the meaning set forth in Section 3.7.

"Business" means the business of researching, developing, commercializing and selling the Natrix System as and to the extent conducted prior to the Closing by Seller and/or its Affiliates.

"Business Day" means each day other than a Saturday, Sunday or other day on which commercial banks in Minneapolis, Minnesota are authorized or required by law to close.

"Business Intellectual Property" means as defined in Section 3.12.

"Clinical/Regulatory and Product Information" means all records, reports (internal and external), regulatory submissions, data and files, associated with any (i) clinical studies initiated and/or conducted by or on behalf of Seller or an Affiliate of Seller with respect to the Business, (ii) communications documented between Seller or an Affiliate of Seller and outside regulatory bodies worldwide with respect to the Business, if any, and (iii) products or product concepts, or development thereof, that have been created, initiated and/or conducted by Seller or its Affiliates with respect to the Business together with all sales records, tracking records, and marketing and sales information therefor.

"Closing" and "Closing Date" have the meanings set forth in Section 6.1.

"Commercial Launch" means the occurrence of the first Commercial Sale of a relevant product.

"Commercial Sale" means the commercial sale of a relevant product by or on behalf of Medtronic, an Affiliate of Medtronic, any third party licensee of the Natrix System Technology, or any of such parties' designees, pursuant to which such party receives consideration in exchange for such product. For greater certainty, "Commercial Sales" shall not include any non-commercial sales (including for use in clinical trials, marketing purposes, samples, or other testing purposes), but shall include sales to distributors or other third party resellers.

"Competing Product" means any product, product line, process formulation or service (including any component thereof) that is designed, developed, manufactured, marketed or sold by anyone other than Medtronic, its Affiliates, or their designees and is competitive with, performs substantially similar functions (whether delivery is manual or automatic), or is used for the same purposes as, the Natrix System Technology in the Field.

"Consents" has the meaning set forth in Section 3.9.

"Contract" means any contract, purchase or sale order, lease, license, commitment or other agreement to which Seller is a party or an assignee or other beneficiary thereof or which otherwise relates to the Business.

"Employee Plans" means any health care plan or arrangement; life insurance or other death benefit plan or arrangement; deferred compensation or other pension or retirement plan or arrangement; stock option, phantom stock, bonus or other incentive plan or arrangement; or other fringe or employee benefit plan or arrangement; or any employment or consulting contract or executive compensation agreement; whether the same are written or otherwise, formal or informal, voluntary or required by law or by Seller's policies or practices, for the benefit of or relating to any present or former employees, leased employees, consultants, agents, directors, and/or their dependents, of Seller; including, without limitation, any Pension Plan and any Welfare Plan (whether or not any of the foregoing is funded) (i) to which Seller is a party or by which Seller is bound, (ii) that Seller has at any time established or maintained for the benefit of or relating to any present or former employees, leased employees, consultants, agents, directors, and/or their dependents, of Seller, or (iii) with respect to which Seller has made any payments or contributions in any of the last five years, or otherwise has any liability (including any such plan or other arrangement formerly maintained by Seller).

EX. A PG. 17

"Environmental Laws" means all laws, statutes, directives, ordinances, rules and regulations relating to pollution, protection of the environment or exposure of any individual to Hazardous Substances, including those relating to emissions, discharges, releases or threatened releases of Hazardous Substances, or otherwise relating to the manufacture, processing, registration, distribution, labeling, recycling, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"FDA" means the United States Food and Drug Administration.

"FDA Quality Systems Regulations" means Quality Systems Regulations as defined in the Code of Federal Regulations at 21 CFR §820.

"Field" means the field of (a) diagnosis and treatment of diseases of the spine or (b) cement injection systems.

"Fiscal Quarter" means a fiscal year quarter of Medtronic, Inc.

"Hazardous Substance" means any substance, material, chemical, emission or waste designated by any governmental entity to be "hazardous", "toxic", a "pollutant" or "contaminant".

"Intellectual Property" means (a) patents, patent applications, continuations, continuations-in-part, divisional applications, revisions, reissue patents, re-examinations and reexamination certificates relative thereto, and other associated filings and applications; (b) copyrights and all works of authorship including all translations, adaptations, combinations, compilations and derivations of each of the foregoing; (c) trademarks, trade names, brand names, service marks, service names, trade dress, logos and corporate names including all translations, adaptations, combinations and derivations thereof, together with all common law rights and all goodwill associated with each of the foregoing; (d) technology, know-how, methods, processes, systems, trade secrets, inventions (whether or not patentable, copyrightable or susceptible to any other form of legal protection and whether or not reduced to practice), proprietary data, formulae, research and development data, and confidential information (including conceptions, ideas, innovations, manufacturing, development and production techniques, drawings, specifications, designs, proposals, financial and accounting data, business and marketing plans, customer and supplier lists and related information and documentation), in each case irrespective of whether in human or machine readable form; (e) computer software (including both source and object code) and all related program listings and data, systems, user and other documentation; (f) mask works; (g) all other forms of right by which one may effectively exclude another from using or otherwise enjoying any and each of the foregoing; and (h) all applications for any and each of the foregoing including applications for patent or registration, together with all registrations, renewals and extensions for any and each of the foregoing.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

3

"Inventories" means finished goods, raw materials and ingredients, work-in-process, consignment goods, wares and merchandise.

"Key Personnel" means the individuals set forth on Schedule 1.1(a).

"Knowledge" of Seller means actual knowledge of the Key Personnel.

"Kyphopak Natrix Kit" means a group of medical devices or other products manufactured by or on behalf of Medtronic or an Affiliate of Medtronic and packaged together as a kit, intended to be used by physicians who are performing the kyphoplasty procedure incorporating the Natrix System or Medtronic Natrix System, or otherwise utilizing the Natrix System Technology or the Medtronic Natrix System; provided, however, that either bone cement or a bone cement mixer packaged with a Natrix System or Medtronic Natrix System shall not be considered a Kyphopak Natrix Kit unless at least one additional medical device or other product manufactured by or on behalf of Medtronic or an Affiliate of Medtronic is included in such package.  For avoidance of doubt, products packaged separately and sold together, but not otherwise packaged together, do not qualify as a Kyphopak Natrix Kit.

"Liens" means liens, mortgages, charges, security interests, pledges, encumbrances, assessments, restrictions or other third party claims of any nature (other than liens for Taxes not yet due and payable).

"Material Adverse Effect" means any effect, change, event, circumstance or development (each a "Change," and collectively, "Changes") that, individually or in the aggregate with other related effects, is or could reasonably expected to be, materially adverse to the business, results of operation or financial condition of the Purchased Assets or the Business, considered as a whole; provided, however, that no Change (by itself or when aggregated or taken together with any and all other Changes) resulting from, arising out of, attributable to, or related to any of the following shall be deemed to be or constitute a "Material Adverse Effect," and no Change (by itself or when aggregated or taken together with any and all other such Changes) resulting from, arising out of, attributable to, or related to any of the following shall be taken into account when determining whether a "Material Adverse Effect" has occurred or may, would or could occur: (i) changes to the economic conditions (or changes in such conditions) in the United States or any other country or region in the world, or conditions in the global economy generally, or to the Business's industry in general which do not disproportionately affect the Business, results of operations or financial condition of the Purchased Assets or the Business; or (ii) acts of war (declared or undeclared), terrorism, disaster, strikes, civil disorder, earthquake, or similar occurrence or other force majeure events beyond Seller's control).

"Materiality Qualifier" means any qualification or reference to "material" or similar variations thereof, including "Material Adverse Effect."

"Medtronic Natrix System" means the Natrix System as may be modified, improved or otherwise changed by or on behalf of Medtronic or an Affiliate of Medtronic or their designees after the Closing or any system that otherwise utilizes some or all of the Natrix System Technology, including without limitation, the Kyphopak Natrix Kit. For the avoidance of doubt, to the extent any Kyphopak Natrix Kit or other bundled products include one or more Medtronic

EX. _A_ PG. _19_

Natrix Systems, each such Medtronic Natrix System shall be counted as a separate and distinct product for the purpose of calculating the Milestone Payments and the Additional Consideration.

"Milestone Payments" means the payments as defined in Sections 2.4.5.

"Natrix System" means the pump and delivery system used to hydraulically deliver bone cement that is in development by Seller and/or its Affiliates.

"Natrix System Technology" means the Intellectual Property owned or licensed by Seller or an Affiliate of Seller that, as of the Closing Date, is required, necessary, and/or actually used to make, have made, use, modify, sell or offer to sell the Natrix System including, but not limited to, the Business Intellectual Property listed on Schedule 3.1.2.

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"Prime Rate" means, for any calendar quarter, the prime commercial lending rate quoted by US Bank National Association as in effect on the first day of such quarter.

"Product Liability" means any liability, claim or expense, including but not limited to attorneys' fees and medical expenses, arising in whole or in part out of a breach of any express or implied product warranty, strict liability in tort, negligent manufacture of product, negligent provision of services, product recall, or any other allegation of liability arising from the design, testing, manufacture, packaging, labeling (including instructions for use), marketing, distribution or sale of the Natrix System (whether for clinical trial purposes, commercial use or otherwise).

"Product Liability Claim" means any claim made by a third party against a Seller Indemnified Party with respect to any Natrix System or Medtronic Natrix System sold by or under authority of Medtronic or its Affiliates after the Closing Date resulting from a defect in design, research, or any failure to warn, or any noncompliance with any applicable laws or regulations by Medtronic or an Affiliate of Medtronic. A Product Liability Claim will be deemed to be made on the first date a written notice asserting a Product Liability Claim is received by Seller or Medtronic, as the case may be. For the avoidance of doubt, in no event shall a Product Liability Claim include any above described claim to the extent it results from a material breach by Seller of a representation or warranty in the Supply Agreement.

"Purchase Price" has the meaning set forth in Section 2.4.1.

"Purchased Assets" means all the rights, title, interests and claims of Seller or an Affiliate of Seller, to the extent utilized by Seller or an Affiliate of Seller in connection with the Natrix System as of the Closing Date, in and to the following assets:

(i)     All books, records (computer or otherwise), files, and data (including supplier lists), customer service histories, warehouse and other inventories and the Clinical/Regulatory Product Information, but excluding all Tax Returns of Seller and all records related thereto;

(ii)    All manufacturing related assets and equipment specifically listed on Section 3.1.1 of the Schedules;

(iii)    All other assets necessary for the operation of the Business or the commercialization of sale of the Natrix System (other than the Retained Assets);

(iv)    The Natrix System Technology;

(v)    Regulatory Filings and Documentation in the possession of Seller or any of its Affiliates; and

(vi)    All intangible assets, including goodwill therein, used or proposed to be used by Seller or an Affiliate of Seller as of the date hereof for the Business.

"Regulated Products" has the meaning set forth in Section 3.7.

"Regulatory Filings and Documentation" means (a) all regulatory approvals, registrations, applications, permits, Authorizations, licenses and filings of Seller and its Affiliates for the Natrix System or the Natrix System Technology as of the Closing Date, including, but not limited to those listed on Schedule 1.1(b); (b) Clinical/Regulatory and Product Information for the Natrix System as of the Closing Date; and (c) all books, records (computer or otherwise), files, device master records, device history records, designs, data and information related to the Business and/or the commercialization of Natrix Systems (including, without limitation, all formulas, drawings, specifications, bills of materials, supplier lists, correspondence, files, ledgers, studies and reports) as of the Closing Date, whether or not these items are necessary for regulatory filings.

"Related Agreements" means the Supply Agreement and the Confidentiality Agreement.

"Retained Assets" has the meaning set forth in Section 2.2.

"Retained Liabilities" has the meaning set forth in Section 2.3.2.

"Supply Agreement" means the Supply Agreement in the form set forth in **Exhibit A**.

"Taxes" (and "Tax") means all taxes, additions to tax, penalties, interest, fines, duties, withholdings, assessments, and charges (all in the nature of taxes) assessed or imposed by any governmental authority, including but not limited to all federal, state, county, local and foreign income, profits, gross receipts, import, ad valorem, real and personal property, franchise, license, sales, use, value added, stamp, transfer, withholding, payroll, employment, excise, custom, duty, and any other taxes, obligations and assessments of any kind whatsoever; the foregoing shall include, but not be limited to, any liability arising as a result of being (or ceasing to be) a member of any affiliated, consolidated, combined, or unitary group as well as any liability under any Tax allocation, Tax sharing, Tax indemnity or similar agreement.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"Transfer and Sales Taxes" means all use taxes, stamp taxes, conveyance taxes, transfer taxes, filing fees, recording fees, prepayment fees or penalties, reporting fees and other similar

EX. A PG. 21

Final

duties, taxes and fees, if any, imposed upon, or resulting from, the transfer of the Purchased Assets or the Assumed Liabilities hereunder and the filing of any instruments relating to such transfer, including any sales tax.

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

1.2     Other Terms.  Other terms may be defined elsewhere in the text of this Agreement and shall have the meaning indicated throughout this Agreement.

1.3     Other Definitional Provisions.

1.3.1   The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provisions of this Agreement.

1.3.2   The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

1.3.3   Unless the context requires otherwise, references herein (i) to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement and (ii) to a statute, ordinance or regulation mean such statute, ordinance or regulation as amended from time to time and includes any successor thereto.

1.3.4   References to an "Exhibit" or to a "Schedule" are, unless otherwise specified, to one of the Exhibits or Schedules attached to or referenced in this Agreement, and references to an "Article" or a "Section" are, unless otherwise specified, to one of the Articles or Sections of this Agreement.

1.3.5   The term "person" includes any individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization or government or any department or agency thereof.

1.3.6   The term "Dollars" or "$" shall refer to the currency of the United States of America.

1.3.7   All references to time shall refer to Minneapolis, Minnesota time.

1.3.8   The word "including" or variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE 2.
## PURCHASE AND SALE OF ASSETS

7

EX. A  PG. 22

2.1     Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Seller hereby sells, transfers, assigns and conveys to Medtronic, and Medtronic hereby purchases, all of the Purchased Assets free and clear of all Liens.

2.2     Retained Assets.  Seller hereby retains all of its rights, title and interests in and to, and there shall be excluded from sale, assignment or transfer to Medtronic hereunder, any assets of Seller as of the Closing that are not included in the Purchased Assets (the "Retained Assets").

2.3     Assumed Liabilities; Retained Liabilities.

2.3.1     Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Seller hereby assigns, transfers, and conveys to Medtronic and Seller shall thereafter not remain liable for, and Medtronic hereby assumes and agrees to pay, perform and discharge when due (a) those obligations of Seller to be performed after the Closing under the Contracts set forth on Schedule 2.3.1, and (b) liabilities arising after the Closing out of the ownership and operation of the Purchased Assets by or on behalf of Medtronic or its Affiliates (the "Assumed Liabilities").

2.3.2     Retained Liabilities.  The parties agree that Medtronic is not, nor shall be considered, the successor to Seller, and that Medtronic does not hereby agree to assume or become liable to pay, perform or discharge any obligation or liability whatsoever of Seller or any Affiliate of Seller or any former or present employees of Seller or Affiliate of Seller, except as expressly provided for in Section 2.3.1.  Seller shall retain (the "Retained Liabilities") any liability or obligation of, or claim against, Seller or the Business, direct or indirect, known or unknown, absolute or contingent, not expressly included in the Assumed Liabilities, and, notwithstanding anything to the contrary in the Agreement, none of the following of Seller or the Business shall be Assumed Liabilities (and each shall be included in the definition of "Retained Liabilities"):

2.3.2.1     The obligations of Seller under this Agreement.

2.3.2.2     Any accounts payable of Seller and any obligation, liability or claim that arise under any Contract of any Seller or any Affiliate of Seller.

2.3.2.3     Any and all Products Liability relating to product designed, manufactured, sold or distributed by Seller, or services performed by Seller, in all cases prior to the Closing Date, whether or not related to the Business.

2.3.2.4     Any obligation, liability or claim that may arise from any lawsuits, actions or proceedings against any Seller to the extent arising from or related to any facts or circumstances occurring before the Closing Date.

2.3.2.5     Any obligation, commitment, liability or claim regarding relationships by and between Seller and a distributor, reseller, representative or agent, including those which may arise in connection with the termination of such relationships.

EX.  A  PG. 23

2.3.2.6    Any obligation, commitment, liability or claim related to any leased real property, including those which may arise in connection with the termination of the lease of such property by Seller.

2.3.2.7    Any obligation, commitment, liability or claim regarding relationships by and between Seller and Seller's employees, including those which may arise in connection with the termination of such relationships and any retention bonuses payable to any such employees.

2.3.2.8    Any obligation, liability or claim under any applicable Environmental Law and/or any regulatory requirements related to or arising out of events or conditions occurring or existing at or prior to the Closing Date.

2.3.2.9    Any other liability or obligation of, or claim against, Seller of any kind or nature whatsoever, whether known or unknown, fixed or contingent, determined or determinable, due or not yet due, or otherwise, that arose before the Closing Date or is based on facts or occurrences arising prior to the Closing Date and which is not expressly assumed by Medtronic under this Agreement.

2.4    <u>Purchase Price; Milestone Payments</u>.  Subject to the contingencies set forth in this Agreement, as applicable, the total consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall be up to an aggregate maximum of Fifty Million Dollars ($50,000,000), payable by Medtronic as follows:

2.4.1    At Closing, Eighteen Million Seven Hundred and Fifty Thousand Dollars ($18,750,000) (the "<u>Closing Payment</u>").

2.4.2    On the date that is eighteen (18) months after the Closing, One Million Two Hundred and Fifty Thousand ($1,250,000) subject to any reductions pursuant to Article 7 of this Agreement (the "<u>Holdback Amount</u>").

2.4.3    Upon the date that is eight (8) months after the Closing Date, Four Million Dollars ($4,000,000).

2.4.4    Upon the earlier to occur of (a) within ten (10) Business Days after the Commercial Launch of a Kyphopak Natrix Kit; and (b) the date that is twelve (12) months after the Closing Date, Four Million Dollars ($4,000,000).

2.4.5    Within the prescribed number of days as provided for in Section 2.5 after the date of the 15,000[th] aggregate Commercial Sale of a Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) Four Million Dollars ($4,000,000) (the "<u>Commercial Sale Milestone Payment</u>" and, together with the payments described in Sections 2.4.3 and 2.4.4, the "<u>Milestone Payments</u>").

2.4.6    Medtronic shall pay as additional contingent consideration (the "<u>Additional Consideration</u>") the following amount: (a) commencing with the 500th aggregate Commercial Sale of the Medtronic Natrix System (which shall include any Medtronic Natrix