System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of two years following such date, $75 per Commercial Sale of the Medtronic Natrix System, and (b) commencing on the date that is two years following Medtronic's 500th Commercial Sale of the Medtronic Natrix System (which shall include any Medtronic Natrix System that may be sold as part of a kit or otherwise bundled with other products, including as part of the Kyphopak Natrix Kit) and continuing for a period of four years following such date, $50 per Commercial Sale of the Medtronic Natrix System.

2.4.7  Notwithstanding anything to the contrary herein, the total Purchase Price payable to Seller pursuant to this Section 2.4 shall not exceed Fifty Million Dollars and Medtronic shall have no further obligations under this Section 2.4 or Section 2.5 from and after the date that (A) (i) the total amount of Purchase Price that has become due and payable, and has actually been paid, to Seller pursuant to this Section 2.4 plus (ii) the amount of Resolved Indemnifiable Losses that have either been satisfied by claims on the Holdback Amount or set-off against Milestone Payments or Additional Consideration equals (B) Fifty Million Dollars ($50,000,000).

2.5  Milestone Payment/Additional Consideration and Reports.  No later than fifty (50) days following the last day of the first Fiscal Quarter in which there is a Commercial Sale of a Medtronic Natrix System, and within forty-five (45) days following the first day of each Fiscal Quarter thereafter, Medtronic shall deliver to Seller a written report that includes reasonable detail reflecting Medtronic's calculation of (i) the number of Commercial Sales of Medtronic Natrix Systems in the immediately preceding Fiscal Quarter; and (ii) the Commercial Sale Milestone Payment and/or Additional Consideration payable for such Fiscal Quarter (the "Payment Report").  The Payment Report shall be prepared in accordance with Medtronic's standard accounting practices and procedures, consistently and reasonably applied, and shall include all information reasonably necessary to allow Seller to confirm the number of Commercial Sales of Medtronic Natrix Systems.  Subject to Section 2.4.7, the Payment Report shall be accompanied by the payment to Seller of the Commercial Sale Milestone Payment and/or Additional Consideration reflected in the Payment Report.

2.6  Audit Rights.

2.6.1  Audit.  Upon written request by Seller delivered not later than sixty (60) days after Medtronic's delivery of a Payment Report, Medtronic and/or its Affiliates shall make available to Seller and its representatives during regular business hours and without disruption of the conduct of business by Medtronic, all records and relevant personnel related to the Business or necessary to verify the accuracy of the Payment Report.  Prior to its review of the records and with such personnel described above, Seller shall execute and deliver to Medtronic a binding commitment (i) prohibiting Seller's disclosure of information provided to it by Medtronic hereunder and (ii) prohibiting Seller's use of information provided to it hereunder, except as is deemed necessary to evaluate, in conjunction with outside advisors, whether any Milestone Payment described in Section 2.4 became due or any Additional Consideration is due pursuant to Section 2.4.6.  Such meetings with Medtronic as described above in this Section 2.6.1 shall be scheduled and held within fifteen (15) days of the date that a request for a meeting is delivered by Seller to Medtronic.  Medtronic shall keep and retain complete and accurate records in

10

sufficient detail to enable Seller to complete the review described above. The Payment Report shall be deemed final and binding on Seller in the event Seller: (a) fails to make a request to verify the accuracy of a Payment Report within sixty (60) days after Medtronic's delivery of the Payment Report; or (b) in the event Seller timely makes a request to verify the accuracy of a Payment Report, Seller fails to make a claim disputing the accuracy of the Payment Report within ninety (90) days after such a request is received by Medtronic.

2.6.2   Resolution of Disputes. The parties agree that disputes arising under this Section 2 with respect to the calculation of the amount of any Milestone Payment or Additional Consideration (each such disputed amount referred to as a "Disputed Payment") shall be resolved in the following manner:

2.6.2.1    Seller may deliver to Medtronic a written dispute notice setting forth a brief description of the issue in accordance with the time periods set forth in Section 2.6.1, for which such notice initiates the dispute resolution mechanism contemplated by this Section 2.6.2;

2.6.2.2    during the 60 day period following the delivery of the notice described above, Seller and a vice president management level representative of the business unit of Medtronic or Affiliate of Medtronic to which this Agreement relates (who initially shall be Robert White or his designee) will meet and seek to resolve the disputed issue through negotiation; or

2.6.2.3    if representatives of the parties are unable to resolve the disagreement relating to a Disputed Payment pursuant to Section 2.6.2.2. above, they shall promptly (within seven (7) days thereafter) jointly appoint an independent, nationally recognized accounting firm (the "Independent CPA") to resolve the objections and make any resulting adjustments to the Disputed Payment. If within such seven (7) day period the parties cannot agree on an Independent CPA, they shall each appoint an Independent CPA who will be charged with selecting the Independent CPA for the purposes of the audit contemplated by this Section 2.6.2.3. The Independent CPA shall not be the principal accounting firm of Medtronic and shall be required to sign a confidentiality agreement on terms reasonably acceptable to Medtronic. The scope of the work assignment for the Independent CPA shall be limited to the resolution of any objections so notified. The Independent CPA shall deliver its findings to the parties within sixty (60) days after its appointment. The parties shall provide their full cooperation with respect to any reasonable requests by the Independent CPA. The resolution of the objections by the Independent CPA and its adjustments to a new replacement Payment Report shall be final, binding and conclusive upon and without further recourse by Medtronic or Seller, except as provided in Section 2.6.3. below.

2.6.3   Costs. If the final amount for any Commercial Sales for any Disputed Payment is more than five percent (5%) greater than the original amount determined by Medtronic for such Milestone Payment or Additional Consideration, as the case may be, as listed on the applicable Payment Report, then all costs and expenses of the Independent CPA shall be borne by Medtronic; otherwise, the costs associated with the Independent CPA shall be borne by Seller.

2.7   Post-Closing Obligations. From and after the Closing Date, Medtronic shall have no obligation to achieve any of the events that would give rise to any the Milestone Payments in any period of time or any Additional Consideration, and any and all decisions regarding the level

11

EX. A   PG. 26

of efforts or the amount of resources which Medtronic or its Affiliates shall cause to be expended with respect to the design, development, production, marketing or sales of the Natrix System, Medtronic Natrix System or any other matters directly or indirectly affecting or relating to the Milestone Payments or Additional Consideration described in Section 2.4 shall be in the sole and absolute discretion of Medtronic and its Affiliates without any express or implied obligation or liability to any party, including Seller. Notwithstanding the forgoing, the parties acknowledge that as a result of solely the passage of time, the Milestone Payments contained in Sections 2.4.3 and 2.4.4 shall become due and payable, without regard to the achievement of any of the events that would give rise to the applicable Milestone Payment, at no later than the dates listed in each such section, respectively.

    2.8   Certification of Milestone Payments or Additional Consideration. The rights and interests of Seller in potential Milestone Payments and Additional Consideration shall not be represented by any certificate or instrument, and no portion of such rights or interests in the Milestone Payments and/or Additional Consideration may be sold, assigned, pledged, distributed or otherwise transferred, without the prior written consent of Medtronic, which consent shall not be unreasonably withheld.

    2.9   Purchase Price Allocation. Prior to Closing, the parties shall agree on and attach hereto as Schedule 2.9(i) an allocation of the Purchase Price among the Purchased Assets. The allocation will be agreed to by Seller and Medtronic after arm's-length negotiations and in accordance with Section 1060 of the IRC and other applicable laws. Seller and Medtronic will, to the extent permitted by applicable law, adopt and utilize the amounts allocated to each asset or class of assets, as such allocations may be adjusted pursuant to this Section 2.9, for purposes of all federal, state, local and other Tax Returns, in any claim for refund, or otherwise with respect to such Tax Returns. Each party agrees to timely file an IRS Form 8594 reflecting the allocation of the Purchase Price among the Purchased Assets for the taxable year that includes the Closing Date, and to timely file any comparable or similar forms required by applicable state, local, and foreign tax laws. In the event of any adjustments to the Purchase Price, the parties shall prepare and timely file a supplemental asset acquisition statement on IRS Form 8594 in accordance with the rules under Section 1060 of the IRC and the Treasury regulations issued thereunder and shall prepare and timely file any comparable or similar form required by applicable state, local, and foreign tax laws. Except with respect to imputed interest, the parties also agree that no Form 1099 shall be issued in connection with the entering into or consummation of this Agreement or payments contemplated hereunder.

    2.10   Transfer and Sales Taxes. Seller shall promptly pay all Transfer and Sales Taxes, due as a result of the consummation of the transactions contemplated by this Agreement. The parties shall cooperate with each other and use commercially reasonable efforts to minimize Transfer and Sales Taxes.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF SELLER

    Except as set forth in the Schedules to this Agreement (the "Schedules"), which Schedules are arranged by schedule corresponding to the numbered and lettered sections of this Agreement (any disclosure contained in any Schedule hereto shall be deemed included in each

EX. A PG. 27

other applicable Schedule hereto, but only to the extent the applicability of the disclosure in such first Schedule is reasonably clear upon a reading of such disclosure), Seller represents and warrants to Medtronic as of the date of this Agreement (other than representations and warranties made specifically as of a particular date) as follows:

3.1     Listing of Certain Assets and Data.  Attached hereto as Schedule 3.1.1 through Schedule 3.1.4 are true and complete lists of the matters set forth in the following subsections of Section 3.1, including in each case all written or oral agreements or understandings and all amendments and modifications, if any, of each such Contract, document or other instrument referenced or described.

3.1.1   Manufacturing Assets: Equipment.  Schedule 3.1.1 sets forth a list of all material items of machinery, equipment, molding, benches, tools and dies, furniture, fixtures, spare parts, vehicles and other similar property and assets owned or leased by Seller or an Affiliate of Seller and used in the operation of the Business, setting forth with respect to all such listed property a summary description of all Liens relating thereto, specifically identifying the lien holders thereto.  Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies of all currently effective leases, conditional and other sales agreements and any other similar documents concerning the items listed in Schedule 3.1.1.

3.1.2   Business Intellectual Property.   Schedule 3.1.2 sets forth a list of all material Intellectual Property held or used by or for the benefit of Seller in the operation of the Business or which relates to the commercialization and sale of products related to the Business, and applications or registrations for, and invention disclosure forms that may result in, any of the foregoing, and any licenses pursuant to which any of the foregoing is held or used.  Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies of all issuances, registrations, applications, disclosures, and certificates regarding such Business Intellectual Property, true and complete copies of all Contracts with employees or others who has provided services to Seller in relation to the Business relating in whole or in part to disclosure, ownership, assignment or patenting of inventions or discoveries, confidential or proprietary information, product formulas, know-how, trade secrets or other Intellectual Property included in the Business Intellectual Property, and true and complete copies of all patent, trademark, trade name, copyright, know-how, trade secret or other Intellectual Property licenses granted at any time by or to Seller or for the operation of the Business.

3.1.3   Certain Agreements, Etc.  Schedule 3.1.3 sets forth a list of each of the following Contracts to which Seller is a party or by which it is bound and which, in each case, relates to the operation of the Business or the commercialization and sale of products related to the Business (other than Contracts listed on another Schedule and furnished pursuant to other subsections of this Section 3.1):

3.1.3.1    any research and development agreement, joint development agreement, OEM or other material supply agreement whereby products or components are developed or made by or for Seller;

3.1.3.2    any joint venture or franchise agreement, and related material agreements involving the acquisition or disposition of any products or process, or business by Seller;

13

Final

3.1.3.3    any Contract for the purchase of any services, raw materials, supplies or equipment or other goods, including outstanding purchase orders, involving remaining payments estimated at more than $20,000, excluding Contracts for the provision of accounting, financial, tax or legal services;

3.1.3.4    any Contract for the sale of assets, products or services that is in any way not yet performed and involving remaining payments estimated at more than $20,000;

3.1.3.5    any dealer, distributor, broker, agent, sales representative or similar Contract by Seller for the sale of any products; and

3.1.3.6    any Contract not made in the ordinary course of business of Seller, or any other Contract that has or could reasonably be expected to have a Material Adverse Effect.

Prior to the date of this Agreement, Seller has delivered or made available to Medtronic or its Affiliates true and complete copies of all Contracts identified in Schedule 3.1.3. Such copies contain all the terms of the agreements, understandings and arrangements between the parties thereto with respect to the subject matter thereof.

3.1.4    Permits, Licenses, Etc.    Schedule 3.1.4 sets forth a list of all material permits, Authorizations, licenses, notifications, registrations and approvals, including, but not limited to, those issued by the FDA or similar state or foreign agencies or governmental authorities, held by or for the benefit of Seller and required to operate the Business or which otherwise relates to the development, manufacture, commercialization and sale of products related to the Business. Prior to the date of this Agreement, Seller has delivered to Medtronic true and complete copies of all permits, Authorizations, licenses, notifications, registrations, approvals or other documents identified in Schedule 3.1.4.

3.2    Organization; Directors and Officers.    PDI is a corporation duly organized and in good standing under the laws of the State of California. PDI has all necessary power and authority to own its properties and assets and operate its business as it is presently being conducted. PDI is duly qualified and in good standing to do business in the jurisdictions listed on Schedule 3.2. The jurisdictions listed on Schedule 3.2 are the only jurisdictions where the character of the property owned, leased or operated by PDI or the nature of activities of PDI makes such qualification necessary, except where the failure to so qualify to do business would not have a Material Adverse Affect. Schedule 3.2 sets forth a true and complete list of the directors and officers (with all titles and positions indicated) of PDI.

3.3    Subsidiaries and Affiliates.    All of the Business is conducted solely through Seller. No Affiliate of Seller owns any interest in or to any of the Purchased Assets.

3.4    Authority.    Seller has full power and authority to enter into this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by Seller of this Agreement and the Related Agreements, and the consummation by Seller of the transactions contemplated hereby and thereby, have been duly and validly authorized by Seller's Board of Directors and shareholders. No other action of Seller's Board of Directors or shareholders, or corporate proceedings on the part of Seller, is necessary to authorize this Agreement and the Related Agreements or to consummate the transactions

14

EX. __A__ PG. __29__

Final

contemplated hereby and thereby.  This Agreement and the Related Agreements have been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Medtronic and other parties thereto, constitute legal, valid and binding agreements of Seller enforceable against it in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.  Neither the execution and delivery of this Agreement or the Related Agreements nor compliance by Seller with their respective terms and provisions will violate (i) any provision of the certificate or articles of incorporation, bylaws or other governing instruments of Seller, (ii) to Seller's Knowledge, any permit or license of Seller relating to the Business, or (iii) to Seller's Knowledge, any law, statute, regulation, injunction, order or decree of any government agency or authority or court to which Seller or any of the Purchased Assets is subject.

     3.5    <u>Litigation</u>.  As of the date hereof, no actions, suits, proceedings, audits and investigations have been instituted against or by Seller, or to which the Business or the Purchased Assets are subject, nor, to the Knowledge of Seller, otherwise have affected or are affecting Seller, the Business or the Purchased Assets.  There are no actions, suits, or proceedings pending or, to the Knowledge of Seller, threatened against or by Seller, at law, in equity or otherwise, in, before, or by any court, arbitrator, or governmental agency or authority.  There are no unsatisfied judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against or to which Seller or the Business or any of the Purchased Assets are subject.

     3.6    <u>Compliance with Law</u>.  Seller has not violated in the past seven (7) years and is currently not in violation of any material applicable law, ordinance or regulation of any governmental entity in connection with its operation of the Business.  All governmental approvals, registrations, notifications, permits, licenses and other permissions or authorizations (collectively, "<u>Authorizations</u>") required in connection with the conduct of the Business have been obtained and are in full force and effect and are being materially complied with in all material respects; provided that nothing herein shall be interpreted as a guarantee by Seller that the FDA will not require a 510(k) clearance to market and sell the Medtronic Natrix System.  Seller has not received any written notification of any asserted past or present violation in connection with the conduct of the Business of any applicable law, ordinance or regulation, or any written complaint, inquiry or request for information from any governmental entity relating thereto.  Neither Seller nor the Business nor any of the Purchased Assets is the subject of any enforcement action instituted by any federal, state or local authority or, to the Knowledge of Seller, other material investigation.  Neither Seller nor any of its Affiliates has made any written regulatory filings with the FDA or other health care regulatory organization relating to the Natrix System.  To Seller's Knowledge, all design files related to the Natrix System that are included in the Purchased Assets materially comply with all applicable requirements of the FDA, if any. Seller has provided or made available to Medtronic or its Affiliates all relevant Regulatory Filings and Documentation that Seller or any of Seller's Affiliates has in its respective possession.

     3.7    <u>Taxes</u>.  To the extent that failure to do so could adversely affect Medtronic's use or ownership of the Purchased Assets, Seller has timely filed all Tax Returns required by any law or regulation of any jurisdiction to be filed by or on behalf of Seller, and all such Tax Returns

**EX.** <u>A</u> **PG.** <u>30</u>

were true, correct and complete in all material respects on the date of such Tax Returns. To the extent that failure to do so could adversely affect Medtronic's use or ownership of the Purchased Assets, Seller has duly paid, deposited or accrued on its books of account, all Taxes pursuant to such Tax Returns, or which Seller is obligated to withhold from amounts owing to any employee. No assessment of any additional Taxes that by law should have been reported or paid, nor any investigation or audit, is pending or, to the Knowledge of Seller, threatened or expected. No taxing or assessment authority has asserted in writing any unresolved deficiencies with respect to Tax liabilities of Seller for any period, and to the Knowledge of Seller there are no facts or circumstances that would give rise thereto. Seller has not waived any statute of limitations in respect of foreign, federal, state or local Taxes or agreed to any extension of time with respect to an assessment of deficiency with respect to such Taxes.

3.8   Consents.   Schedule 3.8 lists each consent, approval, waiver or authorization (collectively, the "Consents"), that is legally or contractually required on the part of Seller to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby.

3.9   Title to and Condition of the Purchased Assets.   Seller has full right, title and interest to the tangible Purchased Assets, free and clear of all Liens. The Purchased Assets (other than the Retained Assets or the Business Intellectual Property) include all assets, properties, rights, interests and claims necessary for the conduct of the Business and all assets, properties, rights, interests and claim owned or controlled by Seller or an Affiliate of Seller that relate to the development, manufacture, commercialization or sale of products related to the Business. The Purchased Assets (other than the Retained Assets or the Business Intellectual Property) are suitable for the uses for which they are presently used by Seller, in normal operating condition and free from any significant defects, ordinary wear and tear excepted. The Purchased Assets include at least those assets listed on Schedule 3.1.1 through 3.1.4 (other than the Retained Assets). Except as specifically set forth on Schedule 3.9, all of the Purchased Assets are located at the facilities of Seller.

3.10   Contracts.   Except as specifically set forth in Schedule 3.10, each Contract is valid and enforceable and is and, following the consummation of the transactions contemplated by this Agreement, will remain, in full force and effect in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Except as specifically set forth in Schedule 3.10, there have been no amendments, modifications, or supplements to any such Contracts. There is no default or claim of default by Seller under any Contract and no event has occurred, or will occur as a result of the consummation of the transactions contemplated by this Agreement, that, with the passage of time or the giving of notice or both, could reasonably be expected to constitute a default by Seller or, to the Knowledge of Seller, any other party thereto under any such Contract, or could reasonably be expected to permit modification, acceleration, or termination of any such Contract, except for such defaults or permits that would not, individually or in the aggregate, have a Material Adverse Effect. No event has occurred, or will occur as a result of the consummation of the transactions contemplated by this Agreement, that, with the passage of time or the giving of notice or both, would constitute a default by Seller under any Contract and could reasonably be expected to

EX. _A_ PG. _31_

permit the creation of any Lien on any of the Purchased Assets, except for such defaults or permits that would not, individually or in the aggregate, have a Material Adverse Effect.

3.11   Intellectual Property.  Seller owns, free and clear of any Lien, or is licensed to use, the Intellectual Property included in the Purchased Assets (the "Business Intellectual Property").  The Business Intellectual Property includes all processes, methods, techniques, procedures, trade secrets and know how used or necessary to use to conduct the Business.  Seller has the exclusive right to use all Business Intellectual Property. No claim has been asserted, or, to the Knowledge of Seller, threatened, by any person with respect to Seller's use of the Business Intellectual Property or challenging or questioning the validity or effectiveness of any license or agreement with respect thereto, and, to Seller's Knowledge, no basis for any such claim exists. All Business Intellectual Property listed on Schedule 3.1.2 has the status indicated therein and is in good standing and has not been abandoned.  Seller has provided or made available to Medtronic or its Affiliates all material information Seller or any of Seller's Affiliates have in their respective possession, as the case may be, that relates to the Business.  To Seller's Knowledge after inquiry by Seller of its primary patent counsel (Peter Gluck of Greenberg Traurig), no facts or circumstances exist that could result in the invalidation or in a finding of unenforceability or unpatentability of any of the patents or trademarks listed in Schedule 3.1.2, or, to the Knowledge of Seller, any of the patents or trademarks issuing on any of the patent or trademark applications listed in Schedule 3.1.2.  To Seller's Knowledge, no person nor such person's business or products has infringed or misappropriated any Business Intellectual Property, or currently is infringing or misappropriating any Business Intellectual Property.  No Seller employee or consultant who performs services with respect to the Business is subject to or otherwise restricted by any employment, nondisclosure, assignment of inventions, nonsolicitation of employees, or noncompetition agreement between such employee or consultant and a third party that has been violated or will be violated as a result of the transactions contemplated by this Agreement.  All Seller employees and consultants who perform services with respect to the Business have signed a confidentiality and assignment of inventions agreement, a true and correct copy of the form of such confidentiality and assignment of inventions agreement has been delivered or made available to Medtronic or its Affiliates, and each such agreement shall remain, the legal, binding, and enforceable obligation of such employee or consultant, except as may be limited by laws affecting creditors' rights generally or by judicial limitations on the right to specific performance or other equitable remedies.  Seller has not granted any license rights or otherwise transferred any Business Intellectual Property to any third party.

3.12   No Finders.  Except as set forth on Schedule 3.12, which matters shall be the sole responsibility of Seller, no act of Seller or its Affiliates has given or will give rise to any claim against any of the parties hereto for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated herein.

3.13   Product Liability Claims.  To Seller's knowledge, all Natrix Systems that Seller has manufactured were manufactured in accordance with their specifications and were free from defects in design, manufacture, material or workmanship that have resulted in a claim for Product Liability.  Seller has never incurred any uninsured or insured Product Liability relating to the Natrix System, or received a claim based upon alleged Product Liability relating to the Natrix System, and to the Knowledge of Seller, no basis for any such claim exists.

EX. A PG. 32

3.14   <u>Relations with Suppliers.</u>   No material current supplier of the Business has canceled any contract or order for provision of, and, to the knowledge of Seller, there has been no threat by any such supplier not to provide, raw materials, products, supplies, or services.

3.15   <u>Environmental Matters.</u>   To Seller's knowledge, Seller has obtained, and is in compliance in all material respects with, all permits, licenses or other approvals necessary under the Environmental Laws with respect to the Business and the Purchased Assets, and is in material compliance with all Environmental Laws.   No capital or other expenditures are necessary so that the Business and the Purchased Assets comply in all material respects with any Environmental Law.

3.16   <u>Manufacturing Processes.</u>   Seller has delivered or made available to Medtronic or its Affiliates complete and accurate written documentation of the processes and procedures used or necessary to manufacture the Natrix System as it is currently conducted (the "<u>Manufacturing Documentation</u>").   To Seller's Knowledge, the Natrix System, as presently designed and configured, and, when manufactured in accordance with the Manufacturing Documentation, will materially conform to the specifications established therefor and to Seller's Knowledge will be (a) of merchantable quality; (b) free from defects in design, material and workmanship; and (c) suitable for their intended and labeled purpose.   The Business Intellectual Property includes all the Manufacturing Documentation and all processes, methods, techniques, procedures, trade secrets and know how included therein.

## ARTICLE 4.
## <u>REPRESENTATIONS AND WARRANTIES OF MEDTRONIC</u>

Medtronic represents and warrants to Seller as follows:

4.1   <u>Organization of Medtronic.</u>   Medtronic is a limited liability company duly organized, validly existing and in good standing under the laws of Switzerland. Medtronic has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as now being conducted and are duly qualified to do business and are in good standing in each jurisdiction in which the failure to be so qualified would have a material adverse effect on Medtronic. Medtronic has sufficient funds and financial resources necessary to permit Medtronic to satisfy its obligations under this Agreement, including payment of the Purchase Price and consummation of the transactions contemplated by this Agreement and the Related Agreements subject to the terms and conditions hereof.

4.2   <u>Authority.</u> Medtronic has full power and authority to enter into this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.   This Agreement and the Related Agreements have been duly authorized, executed, and delivered by Medtronic and, assuming the due authorization, execution and delivery by Seller and other parties thereto constitute legal, valid and binding agreements of Medtronic, enforceable against Medtronic in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. No further proceeding on the part of Medtronic is necessary to authorize this Agreement and the Related Agreements and the transactions contemplated hereby and thereby.   Neither the execution and delivery of this Agreement or the

EX. __A__   PG. __33__

Final

Related Agreements nor compliance by Medtronic with their respective terms and provisions will violate (i) any provision of the articles of incorporation or bylaws of Medtronic, (ii) any contract, permit or license of Medtronic, or (iii) any law, statute, regulation, injunction, order or decree of any government agency or authority or court to which Medtronic or any of Medtronic's assets is subject.

    4.3    <u>No Finders</u>.  No act of Medtronic has given or will give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated herein.

    4.4    <u>Consents</u>.  No consent, approval, waiver or authorization is legally or contractually required on the part of Medtronic to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby.

**ARTICLE 5.**
**CERTAIN COVENANTS AND AGREEMENTS**

    5.1    <u>Noncompetition Covenant</u>.

    5.1.1    For a period of five (5) years from and after the Closing, Seller agrees that it will not, individually or otherwise, do any of the following:

    5.1.1.1    directly or indirectly, own any interest in or control any person or entity, or subsidiary, subdivision, division, or joint venture of such entity (except Medtronic or its Affiliates) that designs, develops, manufactures, licenses, distributes, markets, or sells a Competing Product in the Field; provided, however, that Seller may purchase or otherwise acquire up to (but not more than) two percent (2%) of any class of publicly traded securities of any enterprise (but without participating in the activities of any enterprise engaged in the development or commercialization of Competing Products in the Field);

    5.1.1.2    render services (including but not limited to services in research or as an employee) to any person or entity in the Field (except Medtronic or its Affiliates) in connection with a Competing Product (it being understood that the foregoing shall not prohibit Seller from rendering services (including but not limited to services in research or as an employee) to any person or entity in connection with a product that is not a Competing Product even if any such person or entity has business interests in or relating to a Competing Product);

    5.1.1.3    directly or indirectly, solicit, attempt to solicit, interfere, or attempt to interfere with Medtronic's relationship, in connection with a Competing Product in the Field, with its customers, on behalf of any person or entity engaged in the design, development, manufacture, marketing, or sale of a Competing Product in the Field; or

    5.1.1.4    directly or indirectly design, develop, manufacture, license, distribute, market, or sell any Competing Product in the Field.

    5.1.2    The parties acknowledge and agree that the market for the Natrix System is worldwide and that the provisions of this Section 5.1 shall apply throughout the world.

19

EX. _A_ PG. _34_

Final

5.1.3   In addition to any other relief or remedies afforded by law or in equity, if Seller breaches its obligations under this Section 5.1, Medtronic shall be entitled, as a matter of right and without posting any bond or other security, to injunctive relief in any court of competent jurisdiction.  This shall not preclude the granting of any other appropriate relief including, without limitation, money damages against Seller for breach of this Section 5.1.

5.2   Confidentiality.  The parties hereby agree that any information provided or received pursuant to this Agreement, prior to and in connection with the negotiation and execution of this Agreement and pursuant to the consummation of the transactions contemplated hereby, shall be governed by the terms of a Mutual Confidentiality Agreement among Seller and Medtronic in the form set forth in **Exhibit B** (the "Confidentiality Agreement").

5.3   Prompt Payment of Retained Liabilities. Seller agrees that it shall pay, discharge and perform promptly, when due, any and all Retained Liabilities that may affect Medtronic from and after Closing.

5.4   Further Assurances; Seller Access to Records.  Subject to the other provisions of this Agreement, at such time and from time to time on and after the Closing Date upon request by Medtronic, Seller will, and will cause any of its Affiliates to, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances that may be reasonably required for the better conveying, transferring, assigning, delivering and confirming ownership to, or reducing to the possession of, Medtronic or its approved respective successors and assigns all of the Purchased Assets and to otherwise carry out the purposes of this Agreement.  Subject to the other provisions of this Agreement, Seller shall permit Medtronic and its authorized representatives to have reasonable access to, on a confidential basis, and to copy, at Medtronic's expense, during regular business hours and upon reasonable advance notice to Seller, such books, records and documents related to the conduct of the Business prior to the Closing as Medtronic may reasonably request.

## ARTICLE 6.
## CLOSING

6.1   Closing Date.  The consummation of the purchase and sale of the Purchased Assets provided for herein (the "Closing") shall take place at 10:00 a.m. (local time) on the date hereof, or on such other date and/or at such other time as the parties hereto may agree upon (the "Closing Date").  The Closing shall take place (i) at the offices of Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota, or (ii) on the mutual agreement of the parties, by delivery via facsimile transmission (with originals sent via overnight courier service) of the documents to be delivered at the Closing and wire transfer of the payment to be made in accordance with Section 2.4.1, or (iii) at such other place or in such other manner as the parties hereto may agree.

6.2   Proceedings.  All proceedings taken and all documents executed and delivered by the parties hereto at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

EX. A   PG. 30

## ARTICLE 7.
## INDEMNIFICATION

7.1     Indemnification of Medtronic.  Subject to Section 8.2 of this Agreement, Seller shall indemnify, defend and hold harmless Medtronic and each of its Affiliates, subsidiaries, officers, directors, employees, and shareholders (each being a "Medtronic Indemnified Party") from and against and in respect of any and all paid or incurred losses, damages, liabilities, assessments, interest and penalties, costs and expenses (including, without limitation, reasonable legal fees and disbursements incurred in connection therewith and in seeking indemnification therefor, and any amounts or expenses paid or incurred in connection with any action, suit, proceeding, claim, appeal, demand, assessment or judgment), whether or not involving a third party claim, (collectively "Indemnifiable Losses") directly or indirectly resulting from, arising out of, or imposed upon or incurred by any person to be indemnified hereunder by reason of, any one or more of the following:

7.1.1   any breach of any representation or warranty of Seller or an Affiliate of Seller contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Seller or an Affiliate of Seller in connection with any of the transactions contemplated by this Agreement or the Related Agreements;

7.1.2   any breach of any covenant or obligation of Seller or an Affiliate of Seller contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Seller or an Affiliate of Seller in connection with any of the transactions contemplated by this Agreement or the Related Agreements; and

7.1.3   any Retained Liability.

7.2     Indemnification of Seller.  Subject to Section 8.2 of this Agreement, Medtronic shall indemnify, defend and hold harmless Seller, and its officers, directors, employees and shareholders (each being a "Seller Indemnified Party") from and against and in respect of any and all Indemnifiable Losses paid or incurred by them directly or indirectly resulting from, arising out of, or imposed upon or incurred by any person to be indemnified hereunder by reason of, any one or more of the following:

7.2.1   any breach of any representation or warranty of Medtronic contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Medtronic in connection with the transactions contemplated by this Agreement or the Related Agreements;

7.2.2   any breach of any covenant or obligation of Medtronic contained in this Agreement or any Related Agreement, or in any certificate or document executed and delivered by Medtronic in connection with the transactions contemplated by this Agreement or the Related Agreements; and

7.2.3   any Assumed Liability; and

7.2.4   any Product Liability Claim.

21

EX. A  PG. 36

7.3     Right to Set-Off; Limitations.

7.3.1    Set-Off. Subject to the limitations set forth in this Agreement, Medtronic shall have the right to set-off any claims for Indemnifiable Losses of any Medtronic Indemnified Party as set forth in an Officer's Certificate delivered in accordance with Section 7.4 against any payments due and owing to Seller hereunder and not yet paid.  If (i) Medtronic has made claim(s) for indemnification pursuant to this Article 7 and (ii) the aggregate amount of any unpaid or unresolved Indemnifiable Losses as set forth in Officer's Certificates delivered in accordance with Section 7.4 exceeds the Holdback Amount or the Holdback Amount has already been paid to Seller, then Medtronic shall be entitled to retain that portion of the Milestone Payments and/or Additional Consideration, as applicable, otherwise due to Seller and not yet paid, which is equal to the amount by which the aggregate unpaid and Unresolved Indemnifiable Losses paid or incurred by Medtronic exceeds the Holdback Amount that is then available (the "Withheld Amount") and is necessary to satisfy unpaid claims for any such Unresolved Indemnifiable Losses.  Upon the final resolution of the underlying claim of any Indemnifiable Loss that was subject to Medtronic's retention of all or any portion of the Milestone Payments and/or Additional Consideration, as applicable, Medtronic shall release the Withheld Amount, or the appropriate portion thereof, within five (5) Business Days after such resolution, that is determined to be no longer necessary to satisfy any remaining unpaid claims for Unresolved Indemnifiable Losses.

7.3.2    Limitations.

7.3.2.1    Subject to 7.3.2.4. below, Seller shall not have liability for any indemnification with respect to any Indemnifiable Losses under Section 7.1.1 unless and until the aggregate amount of all Indemnifiable Losses under Section 7.1.1, taken together, exceeds One Hundred Thousand United States Dollars ($100,000) (the "Basket Amount"), in which case the Medtronic Indemnified Party shall be entitled to indemnification for the amount of Indemnifiable Losses that exceeds the Basket Amount.

7.3.2.2    No claim for Indemnifiable Losses under Section 7.1 may be brought hereunder unless such claim is first asserted prior to the relevant survival of such a claim as determined in accordance with Section 8.2.

7.3.2.3    The parties agree that the Holdback Amount and rights of Medtronic to set-off Indemnifiable Losses against the Milestone Payments and Additional Consideration as set forth in Section 7.3.1 shall be the sole and exclusive remedy and recourse of Medtronic and the Medtronic Indemnified Parties with respect to any and all Indemnifiable Losses actually suffered or incurred by any such person, except Indemnifiable Losses resulting from or arising out of: (i)  any fraud on the part of Seller; (ii) any Retained Liability; (iii) any breach by Seller of the representations and warranties set forth in Section 3.4 (Authority) or the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets); or (iv) the breach of any covenant of Seller to be performed after the Closing, including, but not limited to, Seller's obligations under Section 5.1 (Noncompetition Covenant).  Seller's maximum liability under this Agreement, other than liability relating to claims by Medtronic of fraud or breach of the covenants set forth in Section 5.1 (Noncompetition Covenant), Section 5.2 (Confidentiality) or Section 5.3 (Retained Liabilities), shall be limited to the amount of

EX.  A  PG. 3 7

the Purchase Price already paid to Seller plus the amount of any Purchase Price that becomes due and payable to Seller hereunder.

7.3.2.4    The Basket Amount requirement of Section 7.3.2.1. shall not apply to Indemnifiable Losses resulting from or arising out of (i) any fraud on the part of Seller or any Affiliate of Seller; (ii) any Retained Liability; (iii) failure with respect to the title or delivery of any of the Purchased Assets by Seller; (iv) a breach by Seller of Section 5.1 (Noncompetition Covenant); or (v) a breach by Seller of a representation or warranty set forth in Section 3.4 (Authority), the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets), Section 3.11 (Intellectual Property), Section 3.12 (No Finders), Section 3.13 (Product Liability Claims) or Section 3.15 (Environmental Matters).

7.4    Indemnification Claims. Subject to Section 7.4.1. hereof, to the extent Medtronic asserts a claim for Indemnifiable Losses, at any time on or before the Survival Date, Medtronic shall deliver to Seller a certificate signed by any officer of Medtronic (an "Officer's Certificate"): (i) stating that a Medtronic Indemnified Party has paid or reasonably anticipates that it will have to pay Indemnifiable Losses and the amount thereof, and (ii) specifying in reasonable detail the individual items of Losses included in the amount so stated, the date each such item was paid, or the basis for such reasonably anticipated liability to be paid, and the nature of the misrepresentation, breach of warranty or covenant or otherwise to which such item is related.

7.4.1    Objections to Claims. For a period of thirty (30) days after the delivery of any Officer's Certificate, Seller may object in a written statement to the claim made in the Officer's Certificate, and such statement shall have been delivered to Medtronic prior to the expiration of such thirty (30) day period.

7.4.2    Resolution of Conflicts. In case Seller objects in writing to any claim or claims made in any Officer's Certificate as provided in Section 7.4.1 hereof, Seller and Medtronic shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claim. If Seller and Medtronic should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties. Subject to Section 7.4.1. hereof, Medtronic shall be entitled to rely on any such memorandum form satisfaction of its Indemnifiable Losses with respect to such claims in accordance with the terms thereof.

7.4.2.1    In connection with any Indemnifiable Losses, except resulting from or arising out of a breach by Seller of Section 3.11 (Intellectual Property) or any claim by a third party, if no agreement can be reached after good faith negotiation, either Medtronic or Seller may demand arbitration of the matter. The parties shall negotiate in good faith regarding the identification of a single arbitrator with respect to the arbitration and regarding whether the results of the arbitrations shall be binding or non-binding on the parties. In the event that the parties cannot agree on whether the arbitration shall be binding or non-binding, the results of the arbitration shall be non-binding on the parties. In the event that the parties cannot agree on the identity of a single arbitrator, the matter shall be settled by arbitration conducted by three arbitrators with Medtronic and Seller each selecting one arbitrator, and the two arbitrators so selected selecting a third arbitrator. The arbitrator(s) shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the

EX. A  PG. 38

arbitrators, to discover relevant information from the opposing parties about the subject matter of the dispute.   If the parties agree that the arbitration is binding, the decision of the arbitrator (or, if applicable, a majority of the three arbitrators) as to the validity and amount of any claim in such Officer's Certificate shall be binding and conclusive upon the parties to this Agreement, and notwithstanding anything in Section 7.4.1. hereof, Medtronic shall be entitled to act in accordance with such decision for the satisfaction of any Indemnifiable Losses with respect to any claim in such Officer's Certificate in accordance therewith.   Any decision of the arbitrator(s) shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).

       7.4.2.2     Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction.   Any such arbitration shall be held in Orange County, California under the rules then in effect of the American Arbitration Association.

       7.4.2.3     If Seller and Medtronic otherwise fail to reach agreement on an any claim or claims made in any Officer's Certificate after good faith negotiations or through binding arbitration pursuant to Sections 7.4.2.1 and 7.4.2.2, a party may pursue rights they have under law.

       7.4.2.4     Following resolution of any disputes relating to Indemnifiable Losses pursuant to this Section 7.4, such final and resolved Indemnifiable Losses shall be referred to herein as "Resolved Indemnifiable Losses."

    7.5    <u>Third party Claims</u>.

       7.5.1     If a claim by a third party is made against any indemnified party, and if the indemnified party intends to seek indemnity with respect thereto under this Article 7, such indemnified party shall promptly notify the indemnifying party of such claim and deliver pursuant to Section 7.4 to the indemnifying party a written notice describing in reasonable detail the nature of such third party claim and referencing the section(s) of this Agreement which serve as the basis for the indemnified party's request for indemnification under this Agreement, together with a copy of all complaints, subpoenas and other documents with respect to such claim, if any; provided, however, that failure to give timely notice shall not affect the rights of the indemnified party so long as the failure to give timely notice does not materially adversely affect the indemnifying party's ability to defend such claim against a third party.

       7.5.2     Except as otherwise provided in this Section 7.5, where any Medtronic Indemnified Party is the indemnified party, Medtronic shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any third party claim, action or suit against such Medtronic Indemnified Party as to which indemnification will be sought by any Medtronic Indemnified Party hereunder; provided, however, that Medtronic shall be required to use reasonable efforts to diligently defend, prosecute and settle such third party claim, action or suit.   In any such case, Seller shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Medtronic Indemnified Party in connection therewith; provided, that Seller may participate, through counsel chosen by it and at its own expense, in the defense of any such claim, action or suit as to which the Medtronic Indemnified Party has so elected to conduct and control the

defense thereof.  No Medtronic Indemnified Party shall, without the written consent of Seller (which written consent shall not be unreasonably withheld), pay, compromise or consent to the entry of a judgment or enter into any settlement agreement with regard to any third party claim, action or suit.

7.5.3   Notwithstanding Section 7.5.2., (i) if any third party claim, action or suit against any Medtronic Indemnified Party: (A) is solely for money damages of an amount equal to or less than the remaining portion of the Holdback Amount; and (B) will have no continuing effect in any material respect on any Medtronic Indemnified Party or its business, assets or operations; or (ii) where a Seller Indemnified Party is the indemnified party, then Seller shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any such third party claim, action or suit against such indemnified party as to which indemnification will be sought by any indemnified party from any indemnifying party hereunder; provided, however, that Seller shall be required to use all commercially reasonable efforts to diligently defend, prosecute and settle such third party claim, action or suit.  In any such case the indemnified party shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the indemnifying party in connection therewith; provided, that the indemnified party may participate, through counsel chosen by it and its own expense, in the defense of any such claim, action or suit as to which the indemnifying party has so elected to conduct and control the defense thereof.  Notwithstanding the foregoing, the indemnified party shall have the right to pay, compromise or consent to the entry of a judgment or enter into any settlement agreement with regard to such third party claim, action or suit provided, however, that the indemnified party shall have waived in writing any right to indemnity hereunder for Indemnifiable Losses by Seller Indemnified Parties resulting from any such third party action or suit and such resolution involves only the payment of money or does not otherwise adversely effect the other party.

7.6   Cooperation as to Indemnified Liability.  Each party hereto shall cooperate fully with the other parties with respect to access to books, records, or other documentation within such party's control, if deemed reasonably necessary or appropriate by any party in the defense of any claim that may give rise to indemnification hereunder.  Regardless of which party is controlling the settlement or defense of any claim, both the indemnified party and indemnifying party shall act in good faith and the indemnifying party shall not thereby permit to exist any Lien upon any asset of any indemnified party or its Affiliates.

7.7   Determination of Indemnifiable Losses.  For purposes of determining the amount of any Indemnifiable Losses, and not with regard to determining the occurrence of any breach of or inaccuracy in any representation or warranty, Indemnifiable Losses shall be determined without regard to any Materiality Qualifier set forth in such representation or warranty.

# ARTICLE 8.
## MISCELLANEOUS

8.1   Complete Agreement.  The Schedules and Exhibits to this Agreement shall be construed as an integral part of this Agreement to the same extent as if they had been set forth verbatim herein.  This Agreement and the Confidentiality Agreement constitute the entire

EX. __A__ PG. __40__

agreement between the parties hereto with respect to the subject matter hereof and supersede all prior proposals, discussions, or agreements, whether written or oral, relating hereto.

8.2   Survival.   The representations, warranties and indemnification for breaches thereof, and the covenants, agreements and indemnification for breaches thereof that are to have been fully performed prior to the Closing, shall survive the Closing and remain in full force and effect for eighteen months hereafter (the "Survival Date"); provided that any claims made prior to such date shall survive until final resolution thereof; provided further that claims with respect to (i) title to the Purchased Assets; (ii) the representations and warranties set forth in Section 3.4 (Authority), the first two sentences of Section 3.9 (Title and Condition of the Purchased Assets), Section 3.12 (No Finders), Section 3.13 (Product Liability Claims) or Section 3.15 (Environmental Matters) shall survive the Closing and remain in full force and effect for forty-eight months hereafter; (iii) the representations and warranties set forth in Section 3.11 (Intellectual Property) shall survive the Closing and remain in full force and effect for sixty months hereafter; and (iv) claims with respect to fraud shall survive indefinitely.   No independent investigation made by a party hereto, or by its counsel or any of its agents or employees, shall in any way limit or restrict the scope of the representations, warranties, covenants or agreements made by another party in this Agreement.   All covenants and obligations of the parties contained in this Agreement and any other documents, certificate, schedule or instrument delivered in connection herewith that are required to be performed or complied with after the Closing shall survive until fully performed or fulfilled.

8.3   Waiver, Discharge, Amendment, Etc.   The failure of any party hereto to enforce at any time any of the provisions of this Agreement, including the election of such party to proceed with the Closing despite a failure of any condition to such party's closing obligations to occur, shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part thereof or the right of the party thereafter to enforce each and every such provision.   No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.   Any amendment to this Agreement shall be in writing and signed by the parties hereto.

8.4   Notices.   All notices or other communications to a party required or permitted hereunder shall be in writing and shall be given by hand delivery, overnight courier service (with acknowledgment of receipt), facsimile transmission (with confirmation of transmission), or by certified mail, postage prepaid with return receipt requested.   Such notices or other communications shall be deemed to have been delivered (i) if given by hand delivery, when it is delivered, (ii) if delivered by overnight courier service, on the next Business Day following the date when deposited with such overnight courier serviced and marked for next Business Day delivery, (iii) if delivered by telecopier, telex or facsimile transmission, upon transmission to the party's fax number set forth below, with the party's name and address set forth below clearly shown on the page first transmitted together with confirmation of successful transmission and (iv) if delivered by certified mail, postage prepaid, return receipt requested and addressed to the party to receive it as set forth below, three (3) Business Days after being deposit in the U.S. mails.   All notice or other communications to party shall be addressed to such party at the following addresses:

EX. __A__ PG. __41__

**Final**

if to Medtronic, to:

> Medtronic, Inc.
> World Headquarters
> 710 Medtronic Parkway NE
> Minneapolis, MN 55432-5604
> Attention:   General Counsel
> Telecopier No.:  (763) 572-5459

> with a separate copy thereof addressed to:

> Medtronic, Inc.
> World Headquarters
> 710 Medtronic Parkway NE
> Minneapolis, MN 55432-5604
> Attention:   Vice President, Corporate Development

and if to Seller:

> Pabban Development, Inc.
> 955 S. Virginia Street
> Suite 116
> Reno, Nevada 89502
> Attention: Harry N. Herbert

> with a separate copy thereof addressed to:

> C. Tucker Cheadle, A Law Corporation
> 4041 MacArthur Boulevard, Suite 375
> Newport Beach, California, 92660
> Attention: Tucker Cheadle
> Telecopy No.: 949-553-2477

> and

> Wilson Sonsini Goodrich & Rosati
> Professional Corporation
> 650 Page Mill Road
> Palo Alto, California 94304-1050
> Attention:  J. Casey McGlynn, Esq.
> Telecopy No.:  (650) 493-6811

Any party may change the above-specified recipient and/or mailing address by notice to all other parties given in the manner herein prescribed.

27

EX. _A_ PG. _42_

8.5    Public Announcement.  Seller agrees that no press release or similar public announcement or communication will be made or caused to be made concerning the execution or performance of this Agreement unless specifically approved in advance by Medtronic.

8.6    Expenses.  Except as otherwise expressly provided herein, each party hereto shall pay its own expenses (including, but not limited to, all compensation and expenses of its own counsel, financial advisors, consultants, actuaries and independent accountants) incident to this Agreement and the preparation for, and consummation of, the transactions provided for herein.

8.7    Governing Law.  The legality, validity, enforceability and interpretation of this Agreement shall be governed by the laws of the State of Delaware, without giving effect to the principles of conflict of laws.

8.8    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the successors or assigns of the parties hereto; provided that the rights of Seller herein may not be assigned except as otherwise provided for herein, and all or any portion of the rights of Medtronic may be assigned only to a subsidiary of Medtronic, Inc. or to such business organization that shall succeed to the business of Medtronic or of such subsidiary to which this Agreement relates, provided that Medtronic remains liable for the fulfillment by such assignee(s), in accordance with and subject to the terms and conditions hereof, of Medtronic's obligations hereunder.

8.9    Titles and Headings; Construction.  The titles and headings to Sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  This Agreement shall be construed without regard to any presumption or other rule requiring construction hereof against the party causing this Agreement to be drafted.

8.10   Severability.  If any provision of this Agreement is held invalid, unenforceable or void by a court of competent jurisdiction, the remaining provisions shall nonetheless be enforceable according to their terms.  In such case, the parties agree to use their best efforts to achieve the purpose of the invalid provision.  Further, if any provision is held to be overbroad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.

8.11   Benefit.  Nothing in this Agreement or the agreements referred to herein, expressed or implied, shall confer on any person other than the parties hereto or thereto, or their respective permitted successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, the agreements referred to herein, or the transactions contemplated herein or therein.

8.12   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

8.13   Performance by Medtronic.  Medtronic, Inc. hereby agrees to cause Medtronic to comply with and to satisfy its obligations under this Agreement or the Related Agreements,

Final

subject to the terms and conditions hereof and whenever this Agreement or the Related Agreements require Medtronic to take any action, such requirement hereby includes an undertaking of Medtronic, Inc. to cause Medtronic to take such action and Medtronic, Inc. hereby guarantees the payment and performance of all Medtronic's obligations under this Agreement or the Related Agreements.

*(Signature page follows)*

EX. A PG. 44

ACCORDINGLY, each of the parties has caused this Asset Purchase Agreement to be executed, in the manner appropriate for each, as of the date first above written.

KYPHON SARL

By:_____

Its:_____


PABBAN DEVELOPMENT, INC.

By:_____

Its:_____


For the limited purposes set forth in Section 8.13:


MEDTRONIC, INC.

By:_____

Its:_____


4398653_3.DOC

EX.___A___ PG. 45

ACCORDINGLY, each of the parties has caused this Asset Purchase Agreement to be executed in the manner appropriate for each, as of the date first above written.

KYPHON SARL

By: _____

Its: _____


FABBAN DEVELOPMENT, INC.

By: _____

Its: PRESIDENT


For the limited purposes set forth in Section 8.13:

MEDTRONIC, INC.

By: _____

Its: _____


4358653-3.DOC

EX. A  PG. 46

ACCORDINGLY, each of the parties has caused this Asset Purchase Agreement to be executed, in the manner appropriate for each, as of the date first above written.

KYPHON SÀRL

By: _____

Its: _____

PARADAN DEVELOPMENT, INC.

By: _____

Its: _____

For the limited purposes set forth in Section 8.13:

MEDTRONIC, INC.

By: _____

Its: Vice President, Corporate Treasury Operations

EX. __ PG. 47

*FINAL*

## PABBAN DEVELOPMENT, INC.

### DISCLOSURE SCHEDULE

This Disclosure Schedule (the "**Disclosure Schedule**") has been prepared and is being delivered pursuant to the Asset Purchase Agreement, dated as of August 7, 2008 (the "**Asset Purchase Agreement**"), by and among Pabban Development, Inc., a California corporation ("**Pabban**") and Medtronic, Inc., a Minnesota corporation ("**Medtronic**").  All capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Asset Purchase Agreement.

No reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule, as some matters stated herein are given for informational purposes only.

This Disclosure Schedule is organized by sections as they appear in the Asset Purchase Agreement.  The headings contained in this Disclosure Schedule are included for convenience only, and are not intended to limit the effect of the disclosures contained in this Disclosure Schedule or to expand the scope of the information required to be disclosed in this Disclosure Schedule.

The information and disclosures contained in each section of this Disclosure Schedule shall be deemed to be disclosed against the corresponding section of the Asset Purchase Agreement (any disclosure contained in any section of this Disclosure Schedule shall be deemed included in each other applicable section of this Disclosure Schedule, but only to the extent the applicability of the disclosure in such first section of this Disclosure Schedule is reasonably clear upon a reading of such disclosure.)

EX. _A_ PG. _48_

## Section 3.1

### Listing of Certain Assets and Data

### Section 3.1.1 Manufacturing Assets; Equipment

*Assets*

- Natrix Gun Molds

*Mold List*

| Part Name | Part No. | Mold Class | Mold Type | Mold No. |
|---|---|---|---|---|
| Housing Left | 02821027 | 104 | SDM Inserts | 10212 |
| Housing Right | 02821026 | 104 | SDM Inserts | 10212 |
| Trigger Quick Release | 02821001 | 103 | SDM Inserts | 10214 |
| Handle, Liquid Reservoir | 02821025 | 104 | SDM Inserts | 10215 |
| Handle, Pumping | 02821029 | 104 | SDM Inserts | 10229 |
| 10CC Syringe | 02821034 | 103 | Complete | 10235 |
| Valve Input | 02821018 | | MUD Unit | 10240 |
| Body | 02821024 | 103 | Complete | 10242 |
| Syringe Connector | 02821019 | 104 | SDM Inserts | 10243 |
| CAP, 10CC Syringe | 02821017 | 103 | | 10244 |
| General CAP Assembly, 10CC | 02831132 | 103 | | 10244 |
| Plunger, 10CC Syringe | 02821022 | 104 | SDM Inserts | 10252 |
| Funnel Syringe | 02821059 | 103 | SDM Inserts | 10263 |
| Adapter Input Valve | 02821062 | 103 | SDM Inserts | 10291 |
| Ring | 02821030 | 103 | SDM Inserts | 10292 |
| Plunger, Gun | 02821020 | 103 | MUD Unit | 10352 |
| Valve, Pressure | 02821021 | 104 | Family | 10353 |
| Piston Pressure Relief | 02821023 | 104 | Family | 10354 |
| Valve Input | 02821018 | 104 | SDM Inserts | 10357 |
| Cover Liquid Reservoir | 02821028 | 104 | SDM Inserts | 10374 |
| CAP, 10CC Syringe Kyphon | 02821134 | 104 | SDM Inserts | 10414 |
| Kyphon Cap Assembly 10CC | 02831138 | 104 | SDM Inserts | 10414 |
| Manual Bleed Connector | 02821125 | 104 | SDM Inserts | 10417 |
| Kyphon Cap Assembly | 02821133 | 104 | SDM Inserts | 10418 |
| CAP 10CC Syringe Kyphon | 02821126 | 104 | | 10420 |
| Kyphon CAP Assembly | 02831133 | 104 | | 10420 |
| Auto Bleed Connector 10CC | 02821124 | 104 | SDM Inserts | 10423 |

***Existing Assembly Fixtures and Tooling** currently being used by the Seller in the Natrix System*

Gun Assembly, P/N 02831033
- Fixture 364: Fixture used to press and bond input valve into body (used with Arbor Press)
- Fixture 339: Multiple Body Holding Fixture, used to hold bodies while set screw is being tightened
- Fixture 342: Custom wrench with stop used for tightening set screw
- Fixture 343: Torque wrench used to torque tubing brass fitting into body
- Fixture 340: Multiple Holding Fixture, used to hold several liquid reservoir handles
- Fixture 351: Fixture used to press ring with saline bag into liquid reservoir (used with arbor press)
- Fixture 348: Pressurization fixture

Tubing Assembly P/N 02831035
- Fixture 297-1: Bottom Crimping Tool, used to crimp ferrule & sleeve (used with arbor

EX. _A_ PG. _49_