LINK:

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

| Present: The Honorable | BEVERLY REID O'CONNELL, United States District Judge | |
|---|---|---|
| Renee A. Fisher | Not Present | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (IN CHAMBERS)

### ORDER RE MOTION REGARDING THE INTERPRETATION OF CERTAIN PROVISIONS OF THE ASSET PURCHASE AGREEMENT

Pabban Development, Inc., Bio-Medical Devices, Inc., Bio-Medical Devices International, Inc., Harry N. Herbert, on the one hand, and Kyphon Sarl and Medtronic Inc. on the other hand (collectively "the Parties") asked the Court to use its authority under Federal Rule of Civil Procedure 16(c)(2)(P) to interpret specific contract provisions. (Dkt. No. 165.)  The Parties agree this will facilitate a just, speedy, and less expensive disposition of the action.

The Parties disagree over the meaning of the express representations and warranties in their 2008 Asset Purchase Agreement. The conflict centers on the meaning and scope of terms: "merchantable" and "in development."  Both Parties submitted briefs uring the Court to adopt their respective interpretations. For the following reasons, the largely Court adopts the interpretation proposed by Kyphon Sarl and Medtronic Inc.

## I.   BACKGROUND

### A. The Parties

Harry N. Herbert ("Herbert") is the founder, majority owner, and CEO of Bio-Medical Devices, Inc., Bio-Medical Devices International, Inc., and Pabban Development, Inc. The three companies are interrelated (collectively "Pabban"). (Dkt. No. 167-1 at 3.) Pabban Development, Inc. is the Plaintiff and Counter-Defendant in the

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | | Date | February 14, 2014 |
|---|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | | |

current litigation. (Dkt. No. 167-1 at 3.)  Herbert, Bio-Medical Devices, Inc. and Bio-Medical Devices International, Inc. are Counter-Defendants in the current litigation. (Dkt. No. 167-1 at 3.)

Kyphon Sarl and Medtronic Inc. are the Defendants and Counterclaimants. Medtronic Inc. is a global leader in restoring spine function through minimally invasive therapies. (Dkt. No. 167-1 at 2.) In August of 2008, Pabban entered into a $50 million Asset Purchase Agreement ("APA") with Kyphon Sarl, as Buyer, and Medtronic Inc. as Guarantor. (Dkt. No. 167-1 at 4.) Simultaneous with the APA, the Parties executed a manufacturing agreement with another company controlled by Herbert, which would manufacture the Natrix System. (Dkt. No. 167-1 at 4.) At the time the APA was drafted, Kyphon Sarl and Medtronic, Inc. were separate entities. (Dkt. No. 167-1 at 2.) They are now part of a single entity (collectively "Medtronic"). (Dkt. No. 167-1 at 2.)

## B. The Device

In 2003, Pabban began developing a new bone cement delivery system ("Natrix System") used to treat vertebral compression fractures ("VCFs"), designed to reduce the level of radiation exposure to the physician. (Dkt. No. 170-1 at 1.) Generally, doctors treat VCFs through a procedure that utilizes a small balloon to create a void within the cancellous bone. (Dkt. No. 170-1 at 1.)  After the void is created, bone cement is delivered into the void through a Cement Delivery System ("CDA"). (Dkt. No. 170-1 at 1-2.) Pabban spent nearly five years developing the Natrix System. (Dkt. No. 170-1 at 2.)

In December of 2007, Medtronic contacted Pabban's CEO and expressed an interest in purchasing the Natrix System. (Dkt. No. 170-1 at 3.) Beginning in May 2008, Medtronic performed extensive due diligence surrounding the potential acquisition of the Natrix System. (Dkt. No. 170-1 at 3.) The due diligence team twice inspected the Pabban facility, was provided extensive engineering drawings and related documentation, and was provided access to every single document related to the development of the Natrix System. (Dkt. No. 170-1 at 3.) Pabban also invited Medtronic's surgeon consultant to perform a procedure on a patient using the Natrix System. (Dkt. No. 170-1 at 3.)

LINK:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

## C. The Dispute

On August 7, 2008, Pabban entered into the APA with Medtronic. (Dkt. No. 170-1 at 4.) Among other things, Medtronic purchased the intellectual property rights to the Natrix System and the related manufacturing assets and equipment. (APA § 1.1 at 5-6.) The APA provided for upfront, milestone and royalty payments up to a total purchase price of $50 million. (Dkt. No. 167-1 at 4.) At the closing of the APA, Medtronic paid Pabban $18.75 million.[1] (Dkt. No. 170-1 at 4.) Medtronic agreed to pay Pabban an additional $31.25 million contingent, in part, on Pabban's representations and warranties. (Dkt. No. 167-1 at 4.)

According to Medtronic, shortly after the APA closed, Medtronic received the first shipment of defective Natrix System devices. (Dkt. No. 167-1 at 5.) The saline bags and the product packaging were the main sources of alleged defects. (Dkt. No. 167-1 at 5.) The saline bags leaked hydraulic fluid, which was necessary to pump the bone cement. (Dkt. No. 167-1 at 5.) The Natrix System also failed product packaging tests. (Dkt. No. 170-1 at 4.) Pabban argues Medtronic was aware of the failed product packaging tests prior to the signing of the APA. (Dkt. No. 170-1 at 1.) When APA milestone payments of $4 million became due in April, and again in August of 2009, Medtronic refused to pay, claiming that the Natrix System was defective. (Dkt. No. 170-1 at 4.)

The Parties disagree as to whether payment is due according to the express language of the APA warranty provisions. Pabban argues that Medtronic is attempting to "rewrite the APA to reflect a finished biomedical device that was ready to be sold." (Dkt. No. 170-1 at 1.) Instead, Pabban argues that the Natrix System at the time of sale was a "functioning unfinished biomedical device." (Dkt. No. 170-1 at 1.) In support, Pabban points to provisions of the APA and pieces of parol evidence.

On the other hand, Medtronic argues that the APA is unambiguous as written. (Dkt. No. 167-1 at 1.) As such, Medtronic argues that Pabban is improperly urging the Court to utilize parol evidence. (Dkt. No. 167-1 at 1.) According to Medtronic, "Pabban

---

[1] Absent fraud, Pabban is entitled to keep the $18.75 million it received at closing. (Dkt. No. 167-1 at 4.)

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

represented and warranted in the [APA] that the product it sold was free from defects, merchantable and suitable for use as a medical device." (Dkt. No. 167-1 at 2.) Ultimately, however, Medtronic argues that the device "was defective and could not be safely used on patients." (Dkt. No. 167-1 at 2.)

The Parties move the Court to interpret "the warranty provisions contained in Sections 3.16 and 3.9 of the APA, the indemnification provisions contained in Sections 7.1, 7.3.1, and 7.4 of the APA, and any definitions or related provisions associated therewith." (Dkt. No. 165 ¶ 2.) The Parties' disagreement can be concentrated into three main issues: (1) the scope of the representations and warranties Pabban provided to Medtronic; (2) the proper party to assert that Pabban breached those representations and warranties; and (3) whether Medtronic provided Pabban with adequate notice of Pabban's breaches. (Dkt. No. 167-1 at 1.)

## II.  PROCEDURAL HISTORY

On November 25, 2013, the Parties stipulated and agreed to the filing of this Motion.  (Dkt. No. 165 at 2.) In keeping with the stipulation, each Party filed a Motion for Order of Interpretation of the Asset Purchase Agreement on December 9, 2013. (Dkt. Nos. 167, 170.) Additionally, each Party filed a Reply in support of the Motion for Order of Interpretation of the Asset Purchase Agreement. (Dkt. Nos. 178, 179.)

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 16(c)(2)(P), the Court is authorized to consider and take appropriate action on matters facilitating "the just, speedy, and inexpensive disposition of the action." Fed. R. Civ. P. 16(c)(2)(P).

## IV.  DISCUSSION

APA Section 8.7 expressly provides that the APA and its interpretation are governed by Delaware law.[2] (APA § 8.7 at 28.)

---

[2] The Court will refer to the APA by the page numbers in the original document, and the Global Supply Agreement by the page numbers assigned in Exhibit B of Medtronic's Docket Number 176.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **SA CV 10-00533 BRO (RNBx)** | Date | February 14, 2014 |
|----------|-------------------------------|------|-------------------|
| Title | **Pabban Development, Inc. v. Kyphon Sarl, et al.** | | |

## A. Contract Interpretation under Delaware Law

"The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal." *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991) (quoting *Klair v. Reese*, 531 A.2d 219, 222 (Del. 1987)). "[E]ven if there could be any doubt as to the meaning of the terms of the contract, it would still be the province and duty of the court to interpret and determine the meaning of them to the jury, and the jury would be bound by it." *Ott v. Specht*, 12 A. 721, 723 (Del. Super. Ct. 1887).

Under Delaware law, "[a] court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006). The "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (internal quotation marks omitted).

Delaware courts may look to "dictionaries for assistance in determining the plain meaning of terms that are not contractually defined." *Seaford Golf & Country Club v. E.I. duPont de Nemours & Co.*, 925 A.2d 1255, 1261 (Del. 2007) (holding that contract terms were ambiguous when dictionary definitions did not yield a uniform plain meaning). The existence of conflicting dictionary definitions does not necessarily render a term ambiguous. *Lorillard*, 903 A.2d at 740. "There may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case, but if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous." *Id.* (internal quotation marks omitted).

"The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract. The policy underlying that rule is cautionary: to avoid upsetting the sanctity of fully integrated written agreements." *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012). Delaware courts look to parol evidence only when the terms of the contract are ambiguous. *Lorillard*, 903 A.2d at 739 ("Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it.").

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | | Date | February 14, 2014 |
|---|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | | |

**1. The Scope of the Representations and Warranties Pabban provided to Medtronic:**

> **i.   APA Section 3.16**

In order for the Court to interpret Section 3.16, the Court must discern the plain meaning of "merchantable" and whether "in development" alters said meaning. Under Section 3.16 of the APA, Pabban represented and warranted that:

> [t]o Seller's knowledge the Natrix System as presently designed and configured, and when manufactured in accordance with the Manufacturing Documentation, will materially conform to the specifications established therefor and to Seller's Knowledge will be (a) of merchantable quality; (b) free from defects in design, material and workmanship; and (c) suitable for their intended and labeled purpose.

(APA § 3.16 at p. 18.) Largely, the Parties do not disagree about the meanings of "free from defects" and "suitable for use on patients."  According to Delaware law, "[w]hen a term's definition is not altered or has no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning." *Lorillard*, 903 A.2d at 740 (internal quotation marks omitted). Neither Party argues that "merchantable" has an industry-specific definition; however, both sides urge a different interpretation of the term as used in Section 3.16. The main source of disagreement is use of the term "merchantable." The Parties disagree over whether the term means: (1) that the product was ready for sale (Dkt. No. 167-1 at 10); or (2) whether the term "in development" modifies it to mean the product was more akin to a prototype. (Dkt. No. 170-1 at 7.)

Medtronic asks the Court to apply dictionary definitions to discern its plain meaning. By contrast Pabban argues that "merchantable" should be read with respect to the entirety of the APA and ultimately urges the Court to rely on parol evidence.

> **1. Medtronic asks the Court to use extrinsic evidence to interpret "merchantable."**

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **SA CV 10-00533 BRO (RNBx)** | Date | February 14, 2014 |
|---|---|---|---|
| Title | **Pabban Development, Inc. v. Kyphon Sarl, et al.** | | |

Medtronic argues that the representations and warranties in the APA allocate to Pabban the risk that the Natrix System was not of "merchantable" quality. Medtronic argues that the plain meaning definition of "merchantable" is "ready to be sold." (Dkt. No. 167-1 at 10.) To support its argument, Medtronic offers extrinsic evidence in the form of (1) dictionary definitions of "merchantable"; and (2) a contract simultaneously entered into by the Parties. Determining the meaning of "merchantable" is essential for interpreting the express provisions of the APA in question.

### a) Dictionary Definitions

Medtronic provides dictionary definitions for "merchantable," a term which is not contractually defined. Merriam-Webster Dictionary defines merchantable as "of good enough quality to be sold," "of commercially acceptable quality," "saleable." (Dkt. No. 179-1, Ex. A.) Additionally, Law.com defines merchantable as "a product of high enough quality to make it fit for sale." (Dkt. No. 179-1, Ex. B.)

> Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract. Dictionary definitions change over time, provide the contemporary meaning of ordinary words, and note when a particular definition of a term has become obsolete.

*Lorillard*, 903 A.2d at 738. Pabban provides no conflicting dictionary definitions to show an alternative definition of "merchantable."

### b) Syntech Contract

#### i. Admissibility of the Global Supply Agreement

Additionally, Medtronic points to the Global Supply Agreement ("Supply Agreement") to shed light on the meaning of "merchantable." (Dkt. No. 179 at 5-6.) Medtronic argues that the Supply Agreement is "not only an exhibit to the APA, It is 'an

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|----------|---------------------------|------|-------------------|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

integral part of [the APA] to the same extent as if [it] had been set forth verbatim [therein]." (Dkt. No. 179 at 4) (quoting APA § 8.1.) The Court agrees.

First, the APA references the Supply Agreement in the recitals stating, "in connection with the transfer and assignment of such assets to Medtronic, the parties hereto desire to enter into the Supply Agreement." (APA at 1.) Additionally, the Supply Agreement explicitly references the APA in exhibit C, stating, "as described in Section 3.1.1 of the [APA]; capitalized terms not otherwise defined in this Exhibit C shall have the meanings ascribed to them in the [APA]." (Dkt. No. 176 at 86.) Delaware courts recognize the rule that writings which are part of the same transaction and reference one another should be interpreted together. *See Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1251 (Del. Ch. 2010) (holding that contemporaneous subscription agreement and sales share agreement were to be interpreted so as the forum selection clause in one applied to the other as well).

Third, the agreements were entered into simultaneously, involve the same parties, and pertain to the same matter. The Supply Agreement was contracted with Syntech International ("Syntech"), another company controlled by Herbert. (Dkt. No. 179 at 5.) The agreements were both dated August 7, 2008. (Dkt. No. 176, Exs. A-B.) Further, the agreements pertain to the same subject, the Natrix System. (Dkt. No. 176, Ex. A-B.) "[A]bsent anything to indicate a contrary intention, written instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument . . ." 11, S. Williston, *A Treatise on the Law of Contracts* § 30:26 (4th ed. 2012); *see also Simon v. Navellier Series Fund*, No. 17734, 2000 WL 1597890 at *7 (Del. Ch. Oct. 19, 2000) ("Because the Indemnification Agreement was entered into for all relevant purposes contemporaneously with the Declaration of Trust, the two instruments in this case must be viewed together and in their entirety when determining the scope and nature of the indemnification arrangements between Simon and the Fund."); *Crown Books Corp. v. Bookstop, Inc.*, 16 Del. J. Corp. L. 719, 722 (1990) ("[I]t is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters."). In the APA, the Parties contracted for the purchase of the intellectual property and any assets necessary for the business and commercialization of sale of the Natrix

LINK:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

System, amongst other things. (APA § 1.1 at 5-6.) The device delivery was scheduled for August 11, 2008, just days after the APA closed. (Dkt. No. 179 at 5.)

### ii.   Clarity for the APA

Interpreting the APA in conjunction with the Supply Agreement adds clarity and further supports Medtronic's argument that "merchantable" means "saleable" or "of good enough quality to be sold" and that the saline bags are covered by the representations and warranties of Section 3.16. In the Supply Agreement, the Parties contracted for Syntech to manufacture and deliver 300 Natrix System devices to Medtronic including, "190 guns without sterilization, 290 syringes without sterilization, 110 guns gamma sterilized, [and] 320 syringes eto sterilized." (Dkt. No. 176, Ex. B at 85.) Pabban does not address the inconsistency that is created by purchasing a product that is not "saleable" in the APA and simultaneously contracting to have production and delivery of the item. Additionally, the Supply Agreement incorporates the same matrix that is used in Schedule 3.1.1 to the APA, including the preamble that "[s]ellers are currently in the process of improving the engineering processes in connection with the following research and development matters." (Dkt. No. 176, Ex. B at 88.) Pabban does not point to a carve out for the saline bags in the Supply Agreement, nor is there an explicit exception that the Court can discern.

The Court finds that the plain meaning of "merchantable" is "of good enough quality to be sold" and that there is no carve out for the saline bags from the representations and warranties of Section 3.16. The Court will now address Pabban's arguments.

### 2.   Pabban asks the Court to use other provisions of the APA and Parol Evidence to interpret "merchantable."

Pabban argues that "when read in context and in conjunction with other provisions and definitions contained in the APA, the proper interpretation of the phrase 'merchantable quality' is 'functioning as designed, manufactured and used as of August 7, 2008.'" (Dkt. No. 178 at 1.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

### a) Other Provisions of the APA

First, Pabban argues that when "merchantable" is interpreted in conjunction with other portions of the APA, "of good enough quality to be sold" is not the interpretation upon which a third party reasonable observer would arrive. (Dkt. No. 170-1 at 7.) Such an interpretation does not reflect the definition of Natrix System in the APA, which is defined as "the pump and delivery system used to hydraulically deliver bone cement that is in development by Seller and/or its Affiliates." (APA § 1.1 at 5.) According to Pabban, the use of "in development" should be interpreted to mean a "functioning unfinished biomedical device." (Dkt. No. 170-1 at 1.) The Court does not agree. Should this be the proper interpretation, the Court would arrive at the conclusion that the Natrix System was a "merchantable" biomedical device that was not "saleable." The Court finds that this interpretation to be outside of what a reasonable third party would conclude.

The fact that the Natrix System is "in development" does not mean the device was not ready to be sold. First, Pabban warranted that the Natrix System would be free from defects and suitable for use on patients. (APA § 3.16 at 18.) The APA does not define the phrase "in development" to mean an "unfinished prototype" that was "not ready to be sold." (Dkt. No. 179 at 4.) In light of these other representations and warranties, the term "in development" only indicates that Pabban was engaged in efforts to improve the system.

### b) Parol Evidence

Pabban does not argue that the meaning of the term "merchantable" is ambiguous. Yet Pabban urges the Court to utilize parol evidence to demonstrate the subjective intent and knowledge of the Parties when they entered into the APA. (Dkt. No. 170-2, Ex. C.) Pabban argues that the Parties understood the real asset being purchased was the intellectual property. Pabban substantiates this argument by providing emails from those involved in the purchase. (Dkt. No. 170-2, Ex. C.) The Court finds that the use of parol evidence would be inappropriate.

Clear and unambiguous language ... should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it. When the language of a ...

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **SA CV 10-00533 BRO (RNBx)** | Date | February 14, 2014 |
|----------|-------------------------------|------|-------------------|
| Title | **Pabban Development, Inc. v. Kyphon Sarl, et al.** | | |

contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented....

*Lorillard*, 903 A.2d at 739. Simply because the Parties disagree about the interpretation does not mean the APA's terms are ambiguous. *See id*. Further, Pabban fails to point to contract terms or extrinsic evidence to show the terms of the APA are ambiguous. Reading the terms of Section 3.16 together, the Court finds that the meaning of "merchantable" unambiguous and that it would be inappropriate to utilize parol evidence to interpret it.

Though the parties may disagree about the plain meaning of "merchantable" in the phrase "merchantable quality," the Court finds that the plain meaning unambiguous. The plain meaning of "merchantable" is "of good enough quality to be sold." As such, Pabban warranted to Medtronic that Harry N. Herbert, Bill Starks, and Lawrence Green did not know that the Natrix System was not: (a) of "merchantable quality" or "of good enough quality to be sold;" (b) "free from defects in design, material and workmanship;" and (c) "suitable for their intended and labelled purpose." (*See* APA Schedule 1.1(a) at 37, § 3.16 at 18.)

### 3. Pabban argues that the representations and warranties of 3.16 are limited by the Schedule in 3.1.1.

Aside from the meaning of "merchantable" and "in development," Pabban makes a broad argument that the representations and warranties of Section 3.16 are diluted by the disclosures in the APA's attached Schedules. (Dkt. No. 178 at 4.) According to Pabban all of the representations and warranties included in Article 3 are subject to the Schedules attached to the APA. (Dkt. No. 178 at 4.)

Specifically, Pabban argues that Schedule 3.1.1 made it explicitly clear that the saline bags were still in development and not included in any representations and warranties of 3.16. (Dkt. No. 178 at 5.) The saline bags are a large source of the Natrix System's alleged defects. (Dkt. No. 170-1 at 5.) Schedule 3.1.1 identifies numerous items that the Seller was "in the process of improving" at the time the APA was executed.

LINK:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

(APA Schedule § 3.1.1 at 3.) The relevant part of Schedule 3.1.1 contains the following disclosure about the saline bags:

> • Sellers are currently in the process of improving the engineering processes in connection with the following research and development matters- all of which are on hold after the Closing unless otherwise instructed by Kyphon Sarl

| Part # & Description | Description | Status | Comments |
|---|---|---|---|
| Saline Bag | Source alternative material to reduce saline loss (lower WMTR) | In process | Waiting for new samples requested on 06/24/2008. Evaluate new material |

(APA Schedule § 3.1.1 at 3.) First, Schedule 3.1.1 does not indicate that the saline bags were non-functioning. The disclosure of Schedule 3.1.1 does not state that the saline bags leaked or could not withhold the pressure of the Natrix System.  All that is stated is that the Seller is in the process of *improving* the engineering process in connection with the saline bag to "source alternative material to reduce saline loss (lower WMTR)." (APA Schedule § 3.1.1 at 3.) The fact that something is being improved does not mean it does not function. Contrary to Pabban's arguments, it is not express that the bags were non-functioning.

Further, Schedule 3.1.1 does not establish that the saline bags were excluded from the representations and warranties of Section 3.16. (Dkt. No. 179 at 9.)  Pabban argues that "a contract must be construed as a whole, giving effect to all of its provisions and avoiding a construction which would render any of those provisions illusory or meaningless." *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986). Pabban fails to cite the entirety of the preamble, however, excluding the portion that requires the interpreter to apply the Schedules only where "it is reasonably clear from a reading of such disclosure." The entire preamble to the Schedules sets forth that:

> No reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule, as some matters stated herein are given for informational purposes.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

This Disclosure Schedule is organized by sections as they appear in the Asset Purchase Agreement. The headings contained in this Disclosure Schedule are included for convenience only, and are not intended to limit the effect of the disclosures contained in this Disclosure Schedule or to expand the scope of the information required to be disclosed in this Disclosure Schedule.

The information and disclosures contained in each section of this Disclosure Schedule shall be deemed to be disclosed against the corresponding section of the Asset Purchase Agreement (any disclosure contained in any section of this Disclosure Schedule shall be deemed included in each other applicable section of this Disclosure Schedule, but only to the extent the applicability of the disclosure in such first section of this Disclosure Schedule is reasonably clear upon a reading of such disclosure.)

(APA Schedule at 1.) According to the preamble, the Schedules are to be read in conjunction with the corresponding numbered headings. (APA Schedule at 1.) There are Schedules that correspond to Sections 1.1(a), 1.1(b), 2.9(i), 2.3.1, 3.1.1, 3.1.2, 3.1.3, 3.1.4, 3.2, 3.6, 3.8, 3.9, 3.10, 3.11, and 3.12. (Dkt. No. 167-1 at 13.) The Schedules are not to be limited to the corresponding numbered heading, if it is reasonably clear that the Schedule should apply to an additional Section. (APA Schedule at 1.) There is no Schedule that corresponds to Section 3.16 and it is not reasonably clear from a reading of Schedule 3.1.1 that it should apply to Section 3.16. In keeping with the express terms of the preamble, it is not "reasonably clear upon a reading of [3.1.1]" that this Schedule should be read into the representations and warranties of 3.16.

The Court finds that the representations and warranties of Section 3.16 apply to the pump and saline bags, and are not limited by the Schedule in 3.1.1.

### 4. Pabban argues that Medtronic Conducted Due Diligence.

Pabban also argues that the Medtronic conducted significant due diligence, involving a 23-person team, and inspections of the relevant facilities. This is irrelevant to the interpretation of the APA. "It is well settled under Delaware law that the extent or quality of the buyer's due diligence is not relevant to the determination of whether the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

seller breached its representations and warranties in the agreement." *Hudson's Bay Co. Lux., S.A.R.L. v. JZ LLC*, No. 10C-12-107-JRJ, 2011 WL 3082339, at *2 (Del. Super. July 26, 2011); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005) *aff'd*, 886 A.2d 1278 (Del. 2005) ("[T]he extent or quality of plaintiffs' due diligence is not relevant to the determination of whether Spherion breached its representations and warranties in the Agreement."). Further, Section 8.2 of the APA bars Pabban's due diligence defense. It states:

> No independent investigation made by a party hereto, or by its counsel or any of its agents or employees, shall in any way limit or restrict the scope of the representations, warranties, covenants or agreements made by another party in this Agreement.

(APA § 8.2 at 26.) Accordingly, the Court will not take Medtronic's due diligence efforts into consideration when interpreting the APA. Medtronic "was entitled to rely on [the defendant's] explicit representations and warranties regardless of anything that occurred during the due diligence phase." *Hudson's Bay*, 2011 WL 3082339 at *2. As a matter of law, Medtronic is entitled to rely on the warranties in the APA.

### ii.   APA Section 3.9

The Parties also request that the Court interpret Section 3.9 to determine if the scope of its representations and warranties. Under Section 3.9 of the APA, Pabban represented and warranted that:

> **The Purchased Assets** (other than the Retained Assets or the Business Intellectual Property) **are suitable for the uses** for which they are presently used by Seller, in normal operating condition and **free from any significant defects**, ordinary wear and tear excepted.

(APA § 3.9 at 16.) Pabban argues that the warranty in Section 3.9 for the "purchased assets" narrowly applies to the equipment listed in Section 3.1.1 that is necessary to manufacture the Natrix System. (Dkt. No. 170-1 at 9-10.) Therefore, Pabban maintains that Section 3.9 is not applicable to the instant APA provisions because there are no current disputes over the condition of manufacturing equipment. (Dkt. No. 170-1 at 9-

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|----------|---------------------------|------|-------------------|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

10.) In contrast, Medtronic alleges that Section 3.9 is a broad warranty which includes the packaging for the Natrix System and the saline bags. The Court finds that Section 3.9 has a broader application than suggested by Pabban but not as broad as suggested by Medtronic. Accordingly, Section 3.9 applies to the packaging but does not apply to the saline bags.

### 1. If the Packaging is not Warranted by Section 3.16, Medtronic Argues that the Packaging is Warranted by Section 3.9.

The Court finds that the packaging is not explicitly defined as a part of the Natrix System and therefore is not included in the representations and warranties of Section 3.16. The Court finds, however, that the packaging qualifies as a "purchased asset," and therefore is included in the representations and warranties of Section 3.9.

Pabban argues that the representations and warranties of 3.16 do not encompass the packaging, which was an alleged source of defects. Pabban points to the APA definition of the Natrix System, which "means the pump and delivery system used to hydraulically deliver bone cement that is in development by Seller and/or Affiliates." (APA § 1.1 at 5.) Pabban states that a plain reading of this definition makes clear that the Natrix System, as defined and warrantied, includes the operable device, and not the packaging. (Dkt. No. 170-1 at 8.) The Court agrees, but finds the packaging is included in the representations and warranties of Section 3.9.

Section 3.9 explicitly cites to the "purchased assets," a defined term in the APA. According to the APA, the "purchased assets" include all "assets necessary for the operation of the Business or commercialization of sale of the Natrix System."[3] (APA §1.1

---

[3] The full definition of "purchased assets" sets forth that:

"Purchased Assets" means all the rights, title, interest and claims of Seller or an Affiliate of Seller, to the extent utilized by Seller or an Affiliate of Seller in connection with the Natrix System as of the Closing Date, in and to the following assets:

(i)    All books, records (computer or otherwise), files, and data (including supplier lists), customer service histories, warehouse and other inventories and the Clinical/Regulatory Product Information, but excluding all Tax Returns of Seller and all records related thereto;

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

at 5-6.) The APA also defines "Business" to include the "business of researching, developing, commercializing and selling the Natrix System." (APA § 1.1 at 4.) The Court finds that a reasonable third party observer would read the commercialization of sale of the Natrix System to require and include sterile packaging. The device was intended for use in surgical procedures. (Dkt. No. 167-1 at 5.) Without sterile packaging, the Natrix System could not be "suitable for the uses for which they are properly used by Seller" and could not be sold for such use.[4] The Court finds that sterile packaging is an integral part of "commercialization" of the Natrix System.

### 2. Pabban urges the Court to Rely on Parol Evidence Showing Medtronic Knew about Potential Packaging Defects.

Pabban then argues that Medtronic also knew about the Natrix System had failed a packing test and was aware that the product had yet to be sold as of the closing date of the APA. (Dkt. No. 178 at 3.) As evidence, Pabban points to parol evidence in the form of an email disclosing that the Natrix System failed a packaging validation test days before the APA closed. (Dkt. No. 179 at 10 n.4; No. 178 at 5.) Medtronic has not argued

---

(ii)     All manufacturing related assets and equipment specifically listed on Section 3.1.1 of the Schedules;

(iii)    All other assets necessary for the operation of the Business or the commercialization of sale of the Natrix System (other than the Retained Assets);

(iv)    The Natrix System Technology;

(v)     Regulatory Filings and Documentation in the possession of Seller or any of its Affiliates; and

(vi)    All intangible assets, including goodwill therein, used or proposed to be used by Seller or an Affiliate of Seller as of the date hereof for the Business.

(APA § 1.1 at 5-6.)

[4] The Supply Agreement provides additional clarity on this issue. In the related agreement, Syntech agreed to deliver to Medtronic "110 sterilized Natrix Devices on or before August 11, 2008." (Dkt. No. 179 at 10.) The Natrix System Devices could not be delivered in compliance with the Supply Agreement without packaging.

---

LINK:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

that the terms of the APA are ambiguous, which is necessary in order for the Court to apply parol evidence. (Dkt. No. 178 at 4.) Instead, Pabban argues that reading the terms of the APA in harmony favors its proposed interpretation. (Dkt. No. 178 at 4.) The Court finds it would be inappropriate to apply parol evidence to this unambiguous term of the APA. *See Kirkwood Motors, Inc. v. Conomon*, No. 00A-05-001-PLA, 2001 WL 112054, at *4 (Del. Super. February 5, 2001) ("By admitting parol evidence to contradict the plain meaning of this contract, the Court of Common Pleas erred as a matter of law."). "The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract." *Galantino*, 46 A.3d at 1081. Therefore the Court declines to consider the email exhibits submitted with the moving papers.

As an integral part of the commercialization of sale for the Natrix System, the Court finds that the packaging is included as a "purchased asset" in the representations and warranties of Section 3.9. The Court finds it important to note that the Section 3.9's corresponding Schedule does not add anything that would limit the representations and warranties for the packaging.[5]

### 3. If the Packaging was not Warranted by Section 3.16, Medtronic Argues that the Saline Bags Were Warranted by Section 3.9.

---

[5] The Schedule for 3.9 pertains to the locations of some of the "purchased assets." The Schedule sets forth that:

> Those assets listed under "Mold List" under Schedule 3.1.1 above are located at the facilities of an Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 13948 Mountain Avenue, Chino, California, 91710. All other tangible assets listed under Schedule 3.1.1 are located at the facilities of an Affiliate of Seller (as previously disclosed and identified to Medtronic) located at 17171 Daimler Avenue, Irvine, California 92614.

(APA Schedule § 3.9 at 13.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

Because the saline bags have been included in the more specific representations and warranties of Section 3.16, the Court finds that they are not included in the representations and warranties of Section 3.9. In *DCV Holdings, Inc. v. ConAgra, Inc.*, the Delaware Supreme Court held that the more specific of two similar warranties governed in a contract. 889 A.2d 954, 960 (2005). "Well-settled rules of contract construction require that a contract be construed as a whole, giving effect to the parties' intentions. Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *Id.* at 961; *see contra Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, No. 3158-VCL, 2009 WL 1111179, at *9-10 (Del. Ch. Apr. 27, 2009) (distinguishing the set of facts from *DVC Holdings* because there was no conflict between two Sections as one containing a "knowledge qualifier" dealt with the purchasing plans of defendant's customers and the other dealt with the operation of defendant's business).

The provisions in question for *DCV Holdings* are similar to the provisions in question here. Section 3.16 is more specific because it contains a knowledge qualifier. (APA § 3.16 at 18.) Section 3.16 limits liability to the defects explicitly known by the Seller at the time of sale. (APA § 3.16 at 18) ("To Seller's Knowledge, the Natrix System, as presently designed . . ."). As such, the Court finds the pump and saline bag are represented and warranted by Section 3.16 not Section 3.9.

## 2. The Proper Party to assert that Pabban Breached those Representations and Warranties.

Pabban does not dispute that according to Section 7.3.1 of the APA, Kyphon Sarl of Medtronic had the "right to set-off any claims for Indemnifiable Losses of any Medtronic Indemnified Party . . . against any payments due and owing to [Pabban]." (APA § 7.3.1 at 22.) During the hearing, Pabban stated,

The phrase --- the word 'Medtronic' inside of the Purchase and Sale Agreement is defined to be Kyphon Sarl, a Swiss limited liability company. So they use Medtronic but they mean Kyphon Sarl. But I agree, [sic] it does go on to say that it's not only Kyphon Sarl that's indemnified. It goes on to say that each of its affiliates are indemnified. So we know that the scope of

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **SA CV 10-00533 BRO (RNBx)** | Date | February 14, 2014 |
|----------|------------------------------|------|-------------------|
| Title | **Pabban Development, Inc. v. Kyphon Sarl, et al.** | | |

what's indemnified or the scope of the indemnified losses includes Kyphon Sarl and its affiliates. We know that.

(Transcript of Oral Argument at 19:4-12.) Accordingly, Kyphon Sarl had the right to withhold further payment to Pabban based on losses suffered not only by itself, but also by any of Medtronic's affiliates and subsidiaries. (Dkt. No. 167 at 17.)

The core of Pabban's problem with the Officer Certificates pertains to how Medtronic invoked the indemnification. There is a question as to whether Medtronic drafted the Officer's Certificates in conformity with the express terms set forth in 7.4. (Transcript of Oral Argument at 19:13-14.) Accordingly, the Court will now analyze that Section of the APA.

**3.   Whether Defendants provided Pabban with Adequate Notice of Plaintiff's Breaches**

**i. <u>APA Sections 7.4</u>**

If Medtronic determined it had suffered "Indemnifiable Losses," the APA required the Parties to engage in an alternative dispute resolution process ("ADR") that included a negotiation and non-binding arbitration. (Dkt. No. 167-1 at 18.) To initiate this ADR process, Section 7.4 of the APA required Medtronic to deliver an Officer's Certificate stating that "a Medtronic Indemnified Party has paid or reasonably anticipates that it will have to pay Indemnifiable Losses" and "specifying in reasonable detail the individual items of Losses… or the basis for such reasonably anticipated liability to be paid." (APA § 7.4 at 23.)  If Pabban objected, the ADR process would be triggered. In 2009, Pabban the Officer's Certificates were delivered and Pabban objected. (Dkt. No. 167-1 at 18.) Thus, the ADR process was triggered.

According to Medtronic, whether the Officer's Certificates were "reasonably detailed" is a factual dispute at best and not an issue of contract interpretation.[6] (Dkt. No.

---

[6] Medtronic also argues that even assuming the Officer's Certificates were not "reasonably detailed" as required, that was at worst a non-material breach. *See Shore Investments, Inc. v. Bhole, Inc.*, No. 90-9013, 2011 WL 5967253 at *5 (Del. Super. November 28, 2011) (citing 23, S. Williston on Contracts §

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|----------|---------------------------|------|-------------------|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

167-1 at 18.) Though Pabban argues that there was not sufficient detail in the Officer's Certificate issued on behalf of Kyphon Sarl, it concedes that this issue should be reserved for a jury determination. (Transcript of Oral Argument 20:6-11) (arguing that the Officer's Certificates did not mention that any other affiliate suffered a loss, or who those affiliates were). During oral argument, Pabban conceded that the Officer's Certificates would largely be an issue during the motions in limine. (Transcript of Oral Argument at 20:12-13) ("Now, this will come up more in the motions in limine than necessarily today, but it's an important legal point."). Additionally, in its papers, Pabban concedes that "Sections 7.4(i) and 7.4(ii) will be issues for the jury." (Dkt. No. 178 at 8.) Pabban cites to case law stating that "[r]easonableness is a question of fact to be determined by the finder of fact." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1206 (Del. 1993).

The Court agrees. A breach of these provisions involves a factual dispute. A jury should determine whether the Officer's Certificates were "reasonably detailed" to determine if Medtronic complied with Section 7.4.

## V.   CONCLUSION

After reviewing the express terms of the APA, the Court finds that the terms of the APA are not ambiguous. As such the Court finds that the utilization of parol evidence would be inappropriate.  The relevant terms of the APA should be interpreted as follows:

1. The term of "merchantable quality" in Section 3.16 should be interpreted according to Merriam-Webster Dictionary, which defines merchantable as "of good enough quality to be sold."

2. Section 3.16 of the APA should accordingly be interpreted to read: Pabban

---

63:3 (4th ed.)) (noting a breach is non-material if it is not "so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract"). The Court does not need to reach this argument because of Pabban's concession that this is an issue that should be reserved for jury determination.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV 10-00533 BRO (RNBx) | Date | February 14, 2014 |
|---|---|---|---|
| Title | Pabban Development, Inc. v. Kyphon Sarl, et al. | | |

warranted that the devices delivered to Medtronic would be "of good enough quality to be sold," "free from defects in design, material and workmanship," and "suitable for its intended and labeled purpose."

3.  Schedule 3.1.1 does not limit the representations and warranties of Section 3.16. As such, the saline bags were not excluded from the representations and warranties of Section 3.16.

4.  Section 3.9 is not limited to the assets necessary to manufacture the Natrix System. As such, the packaging was not excluded from the representations and warranties of Section 3.9.

5.  Whether the Officer's Certificates were "reasonably detailed" in accordance with Section 7.4 is a question for jury interpretation.

**IT IS SO ORDERED.**

Initials of Preparer                    :

Rf